## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re U.S. Foodservice, Inc. Pricing Litigation | Civil Action No. 07-1894 (CFD) MDL No. 1894 (CFD) |
| This Document Relates To: | |
| Waterbury Hospital, *et al.*,               Plaintiffs, v. U.S. Foodservice, Inc.,             Defendant. | Civil Action No. 06-1657 (CFD) |
| Catholic Healthcare West,             Plaintiff, v. Koninklijke Ahold N.V., *et al.*, Defendants. | Civil Action No. 08-0004 (CFD) |
| Thomas & King, Inc.,             Plaintiff, v. Koninklijke Ahold N.V., *et al.*, Defendants. | Civil Action No. 08-0005 (CFD) JURY TRIAL DEMANDED |

## CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

This Consolidated and Amended Class Action Complaint is being filed in this MDL proceeding pursuant to this Court's Order entered on May 30, 2008 and involves three previously transferred cases: *Catholic Healthcare West v. Koninklijke Ahold N.V., et al.*, Civ. A. No. 08-0004, *Thomas & King, Inc. v. Koninklijke Ahold N.V., et al.*, Civ. A. No. 08-0005, and *Waterbury Hospital,*

*et al. v. U.S. Foodservice, Inc.*, Civ. A. No. 06-1657. *See also In re U.S. Foodservice, Inc., Pricing Litig.*, No. MDL 1894, 2007 WL 4615789 (J.P.M.L. 2007).

Plaintiffs Waterbury Hospital, Cason, Inc., Frankie's Franchise Systems Inc., Catholic Healthcare West, and Thomas & King, Inc. (collectively "Plaintiffs"), by their attorneys, bring this individual and class action pursuant to Rule 23 of the Federal Rules of Civil Procedure against U.S. Foodservice, Inc. ("USF"), Koninklijke Ahold N.V. ("Royal Ahold") and Gordon Redgate ("Redgate") (collectively "Defendants") for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, ("RICO"), breach of contract, violation of California Business and Professions Code §§ 17200 *et seq.*, unjust enrichment and constructive trust, and allege the following upon information and belief based on the investigation of their counsel and/or documents and information obtained in discovery in this action, except as to those paragraphs pertaining to Plaintiffs' own actions, which are alleged upon personal knowledge:

## NATURE OF ACTION

1.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") and two subclasses, defined below, of similarly situated entities and individuals that purchased products from USF or any of its subsidiaries pursuant to contractual arrangements that defined the price in terms of a cost component (*i.e.*, Landed Cost, Invoice Cost, Market Replacement Cost or other similarly defined cost component) plus a mark-up (*e.g.*, cost-plus or margin-on-sell contracts). These arrangements are hereinafter referred to as "cost-plus arrangements."

2.    USF, the second largest food distributor in the United States, provides food products and services to approximately 250,000 customers, and approximately half of USF's sales are made to

customers who purchase products pursuant to cost-plus arrangements.  Plaintiffs and USF's other customers purchased food and other products from USF with the expectation that USF would act honestly and in a commercially reasonable manner.

3.      The case involves a scheme to defraud whereby USF falsely inflated the prices it charged to its cost-plus customers since at least 1998 through the use of shell companies, sham transactions and phony invoices.  Defendants implemented their scheme on a nationwide scale, effectively stealing hundreds of millions of dollars from innocent customers across the country including thousands of hospitals and restaurants.

4.      Specifically, USF was able to falsely inflate the cost component of the prices charged to its customers by operating and controlling companies called "Value Added Service Providers" or VASPs, and conspiring with their owners, Defendant Redgate and Brady Schofield.  The companies were so-called to hide and conceal from USF's cost-plus customers their true purpose:  to pretend to buy and then re-sell food to USF at a higher "invoice cost" and to provide USF with fraudulent invoices (as described more fully herein, "the VASP System").  USF used the VASP System to falsely inflate the cost component of the price charged to USF's cost-plus customers, such as Plaintiffs and other members of the Class (hereinafter "cost-plus customers").  As part of the operation of the VASP System, after receiving payment from USF, the VASPs would secretly kick back this falsely inflated amount.  USF's cost-plus arrangements, however, did not permit USF to falsely inflate the cost component by a fictional or fraudulent amount.

5.      Defendant Royal Ahold, USF's parent company, had full knowledge of, and helped facilitate and conceal, the existence and purpose of the VASP System as a scheme to defraud USF's

cost-plus customers from the time it acquired USF. Instead of putting a stop to the use of the VASP System following its acquisition of USF, Royal Ahold approved of it, allowed it to continue and expand, and reaped the benefits of it.

6.     Over a period of several years, Defendants USF, Royal Ahold, Redgate and others used the VASP System to "purchase" almost $8.5 billion in products and overcharge USF's cost-plus customers.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964 and 28 U.S.C. §§1331 and 1367. This Court also has jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of Plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. *See* 28 U.S.C. §§ 1332(d)(2) and (6). This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d), the state long-arm statutes of Connecticut, California, and Illinois, and also has personal jurisdiction over Defendant Royal Ahold pursuant to Fed. R. Civ. P. 4(k).

8.     This Court is the proper venue pursuant to *In re U.S. Foodservice, Inc., Pricing Litig.*, No. MDL 1894, 2007 WL 4615789 (J.P.M.L. 2007).

## PARTIES

9.     Plaintiff Waterbury Hospital is a public hospital located in Waterbury, Connecticut. As part of its operations, Waterbury Hospital offers meals and other foodservices to its patients,

- 4 -

employees and visitors.  Waterbury Hospital is a party to a cost-plus arrangement originally entered into with Alliant Exchange, which was acquired by USF in 2001.  Following the acquisition of Alliant Exchange, Waterbury Hospital continued to purchase products from USF pursuant to its cost-plus arrangement.  On information and belief, Defendants wrongfully overcharged Waterbury Hospital through the operation and control of the VASP System.  As result, Waterbury Hospital has been injured in its business and property.

10.     Plaintiff Cason, Inc. is an Illinois corporation located in Rockford, Illinois.  Cason has operated a family-owned restaurant under the name Maria's Italian Cafe since the early 1960s.  USF has invoiced Cason on a weekly basis for products Cason purchased on a "cost-plus" basis since at least 2000.  On information and belief, Defendants wrongfully overcharged Cason through the operation and control of the VASP System.  As result, Cason has been injured in its business and property.

11.     Plaintiff Frankie's Franchise Systems Inc. ("Frankie's") is a Connecticut corporation located in Waterbury, Connecticut.  Frankie's operates a chain of franchised restaurants in the State of Connecticut, including Frankies of Naugatuck, Frankies of Bristol, Frankies of West Haven, Frankies of Reidville, Frankies Dairyette, Inc., Frankies Lakewood Road, Ballpark Frankies, Frankies By The Sea, and Big Franks.  Frankie's is a party to a cost-plus arrangement with USF, pursuant to which Frankie's and its franchisees have purchased products from USF. On information and belief, Defendants wrongfully overcharged Frankie's through the operation and control of the VASP System.  As result, Frankie's has been injured in its business and property.

12.     Plaintiff Catholic Healthcare West, ("CHW") is a non-profit corporation organized

under the laws of the State of California, with its principal place of business at 185 Berry Street, Suite 300, San Francisco, CA 94107. CHW is a system of dozens of hospitals and medical centers in California, Arizona and Nevada. Founded in 1986, CHW is one of the largest hospital systems in the nation and the largest not-for-profit hospital provider in California. In 1999, CHW and its hospitals and medical centers became members of Premier, Inc., a Group Purchasing Organization engaged in contracting services for its members to help them manage and reduce supply costs. CHW has purchased products from USF pursuant to a cost-plus arrangement between Premier and USF's predecessor, Alliant Foodservice, which was acquired by USF in late 2001. This contract was in effect until June 29, 2005. From 2000 to 2004, this contract was modified three times with "Alliant Foodservice, Inc. d/b/a U.S. Foodservice" executing the amendments as the foodservice distributor. In 2005, this contract was modified again with "U.S. Foodservice" executing the amendment as the foodservice distributor. On information and belief, Defendants wrongfully overcharged CHW through the operation and control of the VASP System. As result, CHW has been injured in its business and property.

13.     Plaintiff Thomas & King, Inc. ("T&K") is a corporation organized under the laws of the State of South Carolina, with its principal place of business at 249 East Main Street, Lexington, KY 40507. Founded in 1988, T&K owns and operates eighty-eight Applebee's Neighborhood Grill & Bar restaurants and seven Carino's Italian Grill restaurants in Arizona, Indiana, Kentucky, Ohio and Pennsylvania. T&K has purchased products from USF pursuant to a cost-plus arrangement it entered into with Alliant effective July 1, 2001. This contract was in effect until either party elected to terminate it. On information and belief, Defendants wrongfully overcharged T&K through the operation and control of the VASP System. As result, T&K has been injured in its business and

property.

14.     Defendant U.S. Foodservice, Inc. is based in Maryland with its principal offices located at 9755 Patuxent Woods Drive, Columbia, Maryland 21046. USF describes itself as one of the leading broad line foodservice distributors in the United States, with yearly revenues exceeding $18 billion. From April 10, 2000 through July 3, 2007, USF was a wholly-owned subsidiary of defendant Royal Ahold.

15.     Following its acquisition by Royal Ahold, USF substantially expanded its operations through a series of acquisitions of other foodservice distribution companies, including: GFG Foodservice, Inc., acquired in July 2000; PYA/Monarch, Inc., acquired in December 2000; Parkway Food Service, acquired in February 2001; Mutual Wholesale Co., acquired in May 2001; Alliant Exchange, acquired in November 2001; Lady Baltimore Foods, acquired in December 2002; and Allen Foods, acquired in December 2002.

16.     Defendant Royal Ahold is a public holding company in The Netherlands with its principal place of business at Piet Heinkade 167 – 173, 1019 GM, Amsterdam, The Netherlands. As a part of its operations, Royal Ahold owns and operates grocery stores and food service companies in the United States and Europe through subsidiaries and affiliates. Royal Ahold's companies generated more than 44 billion euros in their fiscal year 2006. On July 3, 2007, Royal Ahold completed the sale of USF to a consortium of Clayton, Dubilier & Rice Fund VII, L.P. ("CD&R") and Kohlberg Kravis Roberts & Co L.P. ("KKR") for a purchase price of $7.1 billion.

17.     Pursuant to the terms of the Stock Purchase Agreement dated May 2, 2007, by and between Royal Ahold, Ahold U.S.A., Inc. and Restore Acquisition Corp., an entity controlled by

investment funds associated with CD&R and KKR, and other agreements related to the transaction, Royal Ahold agreed to indemnify USF from and against damages and litigation expenses (including attorneys' fees and expenses) related to the claims in this case, suffered, incurred or paid after the closing of the sale of USF ███████████████

18.    Defendant Gordon Redgate is an individual who, upon information and belief, resides in Chatham, New Jersey.  During the relevant period, Redgate was president and, upon information and belief, the principal owner of the following corporations:  (1) Commodity Management Systems, Inc. and (2) Private Label Distribution, Inc.

## OTHER ENTITIES

19.    Brady Schofield is an individual who, upon information and belief, resides in Naples, Florida.  During the relevant period, Schofield was president and, upon information and belief, the principal owner of the following corporations:  (1) Frozen Farms, Inc., (2) Produce Solutions, Inc., (3) Seafood Marketing Specialties, Inc., and (4) Specialty Supply & Marketing, Inc.

20.    Frozen Farms, Inc. ("Frozen Farms") was a corporation organized under the laws of the state of Rhode Island that was incorporated on June 5, 1998, with its principal place of business in Middletown, Rhode Island.  Frozen Farms purportedly transacted in frozen and processed foods.

21.    Produce Solutions, Inc. formerly known as Cross-Valley Produce ("Produce Solutions"), upon information and belief, was a corporation organized under the laws of the state of California that was incorporated on January 18, 2000, with its principal place of business in Newport, Rhode Island.  Produce Solutions purportedly transacted in produce.

22.    Seafood Marketing Specialists, Inc. ("Seafood Marketing Specialists") is a

corporation organized under the laws of the State of Rhode Island that was incorporated on December 24, 1997, with its principal place of business in Middletown, Rhode Island. Seafood Marketing Specialists purportedly transacted in seafood products.

23.     Specialty Supply & Marketing, Inc. ("Specialty Supply & Marketing") was a corporation organized under the laws of the Commonwealth of Massachusetts that was incorporated on July 3, 2000, with its principal place of business in New Bedford, Massachusetts. Specialty Supply & Marketing purportedly provided sales support.

24.     Commodity Management Systems, Inc. ("Commodity Management") is a corporation organized under the laws of the State of New Jersey that was incorporated on September 18, 1990, with its principal place of business in Chatham, New Jersey. Commodity Management purportedly transacted in frozen fruits and vegetables.

25.     Private Label Distribution, Inc. ("Private Brands") was a corporation organized under the laws of the State of New Jersey that was incorporated on September 8, 1994, with its principal place of business in Summit, New Jersey. Private Brands purportedly transacted in canned food products.

## SUBSTANTIVE ALLEGATIONS

### USF's Business and Cost-Plus Arrangements

26.     USF supplies food and related products to customers including small independently owned restaurants, chain restaurants (including national and regional chains), healthcare providers, governmental entities, educational institutions and other foodservice establishments. USF's operations cover over 95% of the geographic area of the United States.

- 9 -

27.     USF markets a wide variety of foodservice products to its customers, including meat, seafood, produce, dairy, frozen foods and other private label and brand name items.  USF purchases these products from suppliers and then re-sells the products to USF's customers.  Between 2000 and 2005, USF generated annual revenues of between $7 billion and $18 billion.

28.     A substantial amount of USF's sales are made pursuant to cost-plus arrangements. Indeed, a Royal Ahold spokesman stated in a Wall Street Journal article that approximately half of USF's sales are made to customers who purchase products pursuant to cost-plus arrangements.

29.     Typically, USF's cost-plus arrangements provide that USF will sell to its cost-plus customers certain types of products in amounts and at times specified by the customers.  The arrangements further provide that the prices to be charged USF's cost-plus customers will equal a cost component,  which is based on the prices charged to USF by its suppliers, plus an agreed upon mark–up of either a fixed percentage or a set dollar amount.

30.     In order to allow USF to retain the benefits achieved as a result of its relationships with its suppliers and the volume of products it purchased, USF's cost-plus arrangements provide that certain contingent payments and other incentives USF receives from its suppliers will not be used to reduce the cost component used to calculate the price charged to USF's cost-plus customers, even though such amounts have the affect of reducing the prices charged to USF by its suppliers. These payments are generally referred to as "promotional allowances."

31.     Promotional allowances are rebates, discounts, credits or similar consideration that suppliers provide to customers to promote the sale of their goods.

32.     Promotional allowances can take various forms including signing bonuses, volume-

based programs, seasonal programs, growth programs, corporate marketing allowances, and local marketing funds and food shows.

33.     Specifically, the pricing terms of a typical USF cost-plus arrangement provide as follows:

> The price of product to Customer shall equal USF's invoice cost (as hereinafter defined) plus the agreed upon fee per case on cost as outlined below.  USF's invoice cost is defined as the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to USF's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice discounts or off-invoice allowances to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice).  Invoice cost shall not be adjusted for, and Customer shall not be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by USF.

34.     A cost-plus arrangement between USF and Novation LLC, dated April 2004, pursuant to which Waterbury Hospital has purchased products as a participating member, contains the following virtually identical language:

> The price to Participating Members for all Products sold under this Agreement (the "Price) will be calculated on the basis of Landed Cost.  For the purposes of this agreement, "Landed Cost" is defined as follows:
>
> * * * * *
>
> (in the case of Non-contract product) the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to Approved Distributor's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice [discounts] to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically related on the invoice).
>
> * * * * *
>
> Participating Members shall in no event be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by [USF].

35.     Waterbury Hospital, CHW and T&K have also purchased products from USF

pursuant to arrangements originally entered into with USF's predecessor, Alliant Foodservice, which was acquired by USF in late 2001. Substantially similar to the typical USF cost-plus arrangement described above, the Alliant arrangements provided that cost-plus products would be priced based on the cost component as reflected on an invoice plus applicable freight, without, among other things, reduction for promotional allowances.

36.     Similarly, in other cost-plus arrangements, including a February 2, 2006 arrangement between USF and plaintiff Frankie's, USF represented that it would charge its cost-plus customers an amount equal to the "local market replacement cost or current market average cost of procured products" plus in-bound freight and an agreed upon mark-up percentage. As with the other typical USF cost-plus arrangements, this arrangement provided that USF would be entitled to retain "supplier incentives." Prior to the date of this arrangement, Frankie's has purchased products from USF on a cost-plus basis under arrangements containing the same or substantially the same terms.

37.     Moreover, invoices issued by USF to its cost-plus customers, including Plaintiffs, consistently contained the following language which is substantially similar to that set forth in USF's other cost-plus arrangements:

> Promotional allowances, cash discounts, prompt pay discounts, growth programs and all other incentives are retained by U.S. Foodservice and do not reduce product cost. Product cost is defined as the supplier, packer or any other vendor delivered cost or f.o.b. unit price plus standard freight less off-invoice discounts or off-invoice allowances (i.e., manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice).

38.     In sum, regardless of the precise language used, the material pricing terms of USF's cost-plus arrangements provided that the amount charged to USF's cost-plus customers would be

predicated on a cost component and an agreed-upon mark-up. Although USF was permitted to retain promotional allowances received from suppliers, none of these arrangements allowed USF to enter into secret arrangements and/or operate and control the VASP System. Such a scheme to defraud is prohibited by USF's cost-plus arrangements, as it renders the cost-plus pricing system wholly illusory and gives USF *carte blanche* to charge whatever it wanted, while at the same time depriving its cost-plus customers of any ability to uncover and detect that the invoices used by USF to derive the prices it charged were bogus. Nevertheless, as alleged in detail below, in violation of federal and state law as well as its contractual obligations, this is precisely what USF did.

**Defendants' Operation And Control of the VASP System**

39.     A substantial amount of USF's sales were made pursuant to the VASP System. Over a period of several years, VASP related transactions with USF accounted for almost one-fifth of all of USF's purchases. In fact, Royal Ahold stated in its fiscal year 2002 Form 20-F, filed on October 16, 2003, that the VASPs' "sales" to USF during the period from 2000 to 2003 totaled approximately eight billion euros and that these sales included primarily private label and signature brand products.

40.     In its 2004 Form 20-F, filed on April 14, 2005, Royal Ahold further disclosed an additional four hundred and eighty nine million euros in VASP "sales" to USF, and stated that USF ended its relationship with five of the VASPs through a phased transition of services.

41.     Although nominally independent, USF effectively controlled the VASPs and directed their business on a daily basis. As operated and controlled by USF, the VASPs had no legitimate or commercially reasonable business purpose and provided no legitimate or commercially reasonable service to USF. The VASPs did not manufacture or process any products themselves, but rather

would merely purchase products from other suppliers at USF's direction at prices and in amounts dictated by USF for the purpose of reselling them to USF at a falsely inflated price. Indeed, although the orders were placed through the VASPs, USF would communicate directly with the actual suppliers to determine price, specifications of products and other information related to the orders. Similarly, the amount by which the cost component charged to USF's cost-plus customers was falsely inflated as a result of funneling purchases through the VASPs was also dictated by USF. Thus the VASPs served only as vehicles to falsely inflate the cost component of the price charged to USF's cost-plus customers and to generate a bogus paper trail that would conceal USF's illegal conduct from its cost-plus customers.

42.     All or most of the VASPs were set up for the purpose of selling products to USF and all or most of their sales were made to USF. In addition, all or most of the VASPs purchases were funded by interest free advances from and financial guarantees by USF, and 100% of the VASPs' shares were assigned and irrevocably transferred to USF as collateral for these advances. Indeed, the VASPs were not provided with any owner-supplied funding whatsoever and the "transaction fees" paid to the VASPs, which were approximately $27.50 per invoice regardless of the amount of products involved, were intentionally structured to cover the VASPs' operating costs and enable the VASPs to "break even." Moreover, USF would retain the risk of loss on the products, even though the purchases were routed through the VASP System.

43.     Further, the written agreements between USF and the VASPs prohibited the VASPs from disclosing the existence and operation of the VASP System. ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

44.     Pursuant to USF's arrangements with the VASPs, USF would direct the VASPs to purchase particular products in particular amounts and at particular prices. At USF's direction, the VASPs would then falsely inflate the cost of the products and resell them to USF. USF, in turn, would then sell these products to its customers using the falsely inflated cost component invoiced by the VASP. A fixed percentage or set dollar amount then would be added on to the falsely inflated cost component to arrive at the prices charged by USF to its cost-plus customers.

45.     After USF paid the VASPs for the products, the difference between the VASPs' actual costs and the prices charged to USF (the "bucket") minus a nominal transaction fee retained by the VASPs,would be kicked back to USF and recorded as income on USF's books. These "buckets" of money sent from the VASPs to USF were structured to hide the "cost" falsely added by the VASP System and were concealed from USF's cost-plus customers.

46.     USF deceived its cost-plus customers into believing that USF's cost component was calculated based on using transactions with only legitimate suppliers. The VASP System was designed to, and did, induce USF's customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF. Moreover, such reliance was reasonable under the circumstances because Defendants intentionally used the

VASP System to hide the scheme from USF's customers and concealed from, and at no time fully disclosed to, USF's cost-plus customers the existence and true purpose of the VASP System.

47. The "buckets" kicked back to USF did not constitute legitimate "promotional allowances" or any other sort of *bona fide* incentive that USF sometimes received from its suppliers. Unlike legitimate promotional allowances, the kickbacks were self-generated and not dependent on USF achieving any distribution contingency or USF providing any benefit to the VASPs. Rather, the kickbacks were tied directly and solely to inflated pricing dictated by USF and were sent to USF upon its demand.

48. Not only were the kickbacks impermissible, self-generated amounts, but they provided a mechanism whereby USF was able conceal its ability to overcharge its customers through the operation of the VASP System and falsely inflate the cost component of the price charged to USF's cost-plus customers.

49. The sham nature of the relationship between USF and the VASPs was succinctly acknowledged by one of USF's inside counsel, ██████████████████████ ████████████████████████████████████████ ████████████████████████ This, however, is exactly what USF did.

50. The following example illustrates how the VASP System generally worked: At USF's direction, a VASP would purchase an item from a supplier at the price of $1.00 per unit. The purchase was made by the VASP for the purpose of "reselling" the product to USF, and was funded by and/or guaranteed by USF. At USF's direction, the VASP would then falsely inflate the price of the product and sell it to USF for $1.10 per unit. USF would, in turn, sell the product to one of its

customers.  After USF paid the VASP for the product, however, the VASP would pay the supplier only $1.00 per unit and kick back the "bucket" (*i.e.*, the $0.10 per unit difference) to USF (minus a nominal transaction fee).  Nevertheless, USF would use the falsely inflated invoice amount of $1.10 per unit to calculate the cost component charged to its cost-plus customers.  USF would then add on an additional mark-up, for example 6.5%, thereby charging its customer $1.17 per unit.  As a result, in this example, the transaction would indicate on paper that USF received a 6.5% margin on its cost of $1.10 per unit, or $0.07 per unit, when, in fact, it actually received a 17% margin on the $1.00 per unit uninflated price, or $0.17 per unit.

51.     Royal Ahold and Redgate had knowledge of, and willingly participated in, the VASP System.  Schofield and Redgate knew each other and were in frequent contact.  In fact, Schofield, Redgate and a USF executive who supervised the VASPs on a day-to-day basis, were sometimes referred to around USF's offices as "the Three Musketeers."  Furthermore, Redgate had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs.

52.     The VASP System was a self-contained scheme that operated independently from any single USF cost-plus arrangement.  In fact, the VASP System was not designed to defraud only Plaintiffs, but rather represented a systematic way of doing business that was independent of any particular cost-plus arrangement or specific customer.

53.     On information and belief, between 1998 and 2004, USF engaged in thousands of separate fraudulent transactions in furtherance of its scheme to falsely inflate the cost component and the mark-up charged to its cost-plus customers.  Details regarding the dates, times, products

purchased, and the amount by which the cost component was falsely inflated, which occurred on a daily basis for a period of several years from at least 1998 until 2004, remain to be determined through the discovery process.

54.     The amount of the kickbacks resulting from USF's operation of the VASP System was substantial.  On April 10, 2000, USF was acquired by Royal Ahold.  At that time, USF had annual sales of approximately $7 billion.  Following its acquisition, Royal Ahold and USF continued the operation of the VASP System and substantially expanded USF's operations through the aggressive acquisition of other food distribution companies.  As a result, by the following year, USF's sales had grown to approximately $12 billion, and by 2002, sales reached approximately $17.5 billion.  USF's dramatic growth placed increasing pressure on USF to takes steps to improve its operating margins and the amount of the kickbacks resulting from the operation of the VASP System grew substantially.

55.     Indeed, in 2000 through 2003, between 16% and 20% of USF's total sales (i.e. between $1.2 billion and $3.6 billion a year) were of products that were passed through the VASP System for the purpose of falsely inflating USF's cost component.  During this same time period alone, the VASP System kicked back hundreds of millions of dollars to USF.

**Royal Ahold's Knowledge of and Support of the VASP System**

56.     Pursuant to an Agreement and Plan of Merger dated March 13, 2000, Royal Ahold acquired all of the stock of USF.  Under the merger agreement, and amendments to USF's by-laws following the merger, Royal Ahold exercised its authority to name all of the members of the USF board of directors.  As a result of due diligence performed in connection with its acquisition of USF,

Royal Ahold became aware of the existence and purpose of the VASP System.  Jim Miller, USF's CEO, was appointed to Royal Ahold's Executive Board on September 1, 2001.

57.     The VASP System was well known to senior management at both USF and its parent Royal Ahold, and was considered standard operating procedure to increase USF's margins above what it was entitled to under its cost-plus arrangements.  For example, a report dated February 20, 2000, prepared by Royal Ahold's internal audit staff prior to Ahold's acquisition of USF and sent to Ahold executives Cees van der Hoeven, Michiel Meurs, Jan Andreae, Allan Noddle, Robert Tobin, Ton Tielraden, Andre Buitenhuis, and Bert Verhelst regarding due diligence performed with respect to USF, notes the existence of the VASPs and acknowledges that their purpose is to "shelter and earn . . . 'rebates' on its private label brands and to hide [promotional allowances] from clients' auditors."  The report concludes that USF's use of the VASPs "needs to be researched to assess the tax and legal implications and associated business risks."

58.     In addition, an April 12, 2001 memorandum from the then-Chief Financial Officer of USF, Ernie Smith, to Michial Meurs, Royal Ahold's Chief Financial Officer at the time and a member of its executive board, states:

> In the normal course of business, USF has engaged in setting up friendly third parties, *which allow them to establish pads to income*.  In substance a new legal entity is set up, the entity will take title to goods; mark them up and sale [sic] the product to USF.  In turn by contract, the third party will collect a fee for the service and return to USF allowances.  It has been common practice for USF to have these entities forward buy and USF to give them a deposit for inventory. [Emphasis added]

59.     Mr. Smith sent this memorandum to Mr. Meurs in order to bring to the attention of Royal Ahold's executive board the serious concerns that Mr. Smith had regarding certain accounting

issues at USF involving the manipulation of reported earnings from promotional allowances received from various suppliers and the VASPs.  Due to his concerns over USF's financial records and the lack of integrity of USF's management, Mr. Smith stated that he "felt [he] had no alternative other than to exit the business and disclose the issues."

60.    Despite Royal Ahold's extensive knowledge about the operation and purpose of the VASP System, it refused to take steps to rein in the VASP System.  According to the minutes of a Royal Ahold Audit Committee meeting held on December 11, 2001, Royal Ahold refused to implement a promotional allowance monitoring system as recommended by its auditors because of the "sensitive nature" of how the system operated.

61.    Royal Ahold continued to keep the VASP System secret.  Then, on February 24, 2003, Royal Ahold disclosed that its financial results for 2000 through 2002 would be substantially less than previously reported due to "significant accounting irregularities" involving USF.  Specifically, Royal Ahold disclosed that USF had intentionally overstated the amount of promotional allowances received from its suppliers for the purpose of allowing USF to report that it had achieved or exceeded its earnings targets.  USF accomplished this by recording completely fictitious promotional allowances in amounts that would cover any shortfall from projected earnings targets.  These disclosures, however, failed to reveal that Defendants operated the VASP System alleged herein to overcharge its cost-plus customers.

62.    The disclosures of the accounting fraud led to extensive civil and criminal investigations of Royal Ahold and USF, as well as significant review of USF's accounting practices by outside accountants retained by Royal Ahold, including PricewaterhouseCoopers ("PwC"), who

was retained to conduct a forensic accounting investigation and prepare a report. In connection with this process, PwC discussed the Defendants' operation of the VASP System to overcharge its cost-plus customers. PwC included information about the VASP System in a report submitted to Royal Ahold's Audit Committee on June 25, 2003 (the "PwC Report").

63.     The PwC Report describes the VASPs in the following manner:

> Value Added Service Providers or "VASPs" (6) – special purpose entities *designed to enable mark-up on items for which normal vendor Pas [promotional allowances] do not exist*. VASPs create "pass-back" or "bucket" earnings, which is essentially the markup between manufacturer cost and what the VASP charges the USF branch, less a transaction fee. (Emphasis added).

64.     Moreover, the PwC Report pointed out to Royal Ahold the significant concerns over whether these arrangements are permissible under USF's cost-plus arrangements with its customers, stating as follows:

> In light of the control aspect, significant questions are raised relative to customer contracts where the Company provides product on a "cost-plus" basis. While customer contracts, especially those with commercial customers, appear to address this point by indicating that the customer is not entitled to any rebates or allowances that are not "off invoice" (i.e. the customer is only entitled to discounts that reduce the original invoice to USF), *it is unclear whether such contract language would protect the Company if the fact of USF control of the VASPs were disclosed or otherwise known.* . . .

> The VASP entities are closely-held businesses whose principals are well-known by Tim Lee and Mark Kaiser. Except for one, these entities are funded entirely by USF advances, and make all of their sales to USF. Generally, USF directs the VASPs' purchase decisions, including quantities and prices, and for five of the six, has audit rights to their books and records. Furthermore, the VASPs shares are irrevocably assigned to USF as collateral for the advances. (Emphasis added).

65.     PwC noted that USF's outside counsel, White & Case, had issued a heavily qualified opinion letter dated ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████ only to retract the letter ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████

66.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████

(i)    ███████████████████████████████████████

(ii)   █████████████████████████████████████████

(iii)  ████████████████████████████████████████

(iv)   ███████████████████████████████████████████

(v)    ████████████████████████████████████████████

(vi)   ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████

67.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

68.     The existence of the VASPs was first disclosed to Royal Ahold shareholders in October 2003 as part of Royal Ahold's announcements that it would be restating its earnings for fiscal years 2000 and 2001 by more than $800 million after discovering accounting fraud at USF. Royal Ahold's 2003 announcements led the SEC, DOJ and Netherlands authorities to launch parallel investigations into whether USF booked inflated and not yet earned "promotional allowances" from suppliers.

69.     As a result of those investigations, in October 2004, the SEC charged Royal Ahold and its top three executives—Cees van der Hoeven, CEO, A. Michiel Meurs, CFO, and Jan Andreae, EVP—with securities fraud. The company and two former executives settled the charges on October 18, 2004. Specifically, van der Hoeven and Meurs consented to orders barring them from serving as officers or directors of a public company. Subsequently, in November 2005, Royal Ahold settled a U.S. shareholder class action for $1.1 billion, and in May 2006, Royal Ahold's former CEO and CFO were convicted of fraud in the Netherlands. Additionally, four former USF executives— Michael Resnick, CFO, Mark Kaiser, Chief Marketing Officer, Timothy Lee, EVP of Purchasing, and William Carter, VP of Purchasing, Supply Chain—have been convicted of, or pled guilty to, criminal charges arising from the accounting fraud. In July 2004, Lee and Carter pled guilty to criminal securities fraud and agreed to cooperate with investigators. Resnick later pled guilty to conspiracy to submit false books, records and accounts and received three years probation. On May 17, 2007, Kaiser was sentenced to seven years in prison. In addition to Royal Ahold, USF and their executives, approximately a dozen co-conspirators from USF's supplier companies have pled guilty to fraud, conspiracy and/or insider trading, including the owners of the VASPs – Schofield and individual Defendant Redgate.

70.     Further, Royal Ahold has stated in filings with the United States Securities and Exchange Commission (the "SEC") that the DOJ has instituted a civil investigation which Royal Ahold "believes relates to certain billing practices of USF with regard to contracts with federal agency customers." Royal Ahold has further stated that "[t]he U.S. Attorney has requested that the company provide certain documents generally related to (i) U.S. Foodservice's cost of products purchased from certain vendors, including the VASPs, and the prices charged for such products when sold to federal agency customers." In its filings with the SEC, Royal Ahold has stated that it "believes it is probable that claims will be asserted in the [DOJ's] civil investigation." On information and belief, Plaintiffs believe that the civil investigation being conducted by the DOJ involves the same type of fraudulent contracting and billing practices at issue in this case.

**USF Employees' Admissions Concerning the VASP System**

71.     More recently, the VASP System was the subject of testimony given in the criminal trial brought by the United States against Mark Kaiser, USF's former Chief Marketing Officer, for conspiracy and securities fraud. Although the charges against Mr. Kaiser pertained to USF's improper accounting practices, testimony provided at the trial also demonstrates the fraudulent nature of USF's billing practices. Specifically, while testifying at the trial in October, 2006, Timothy Lee, a former USF executive, described the VASPs in the following manner: "[T]hey were companies that were set up on the behalf of U.S. Foodservice to procure product and capture the difference in the spread on the cost of goods and send it back to U.S. Foodservice."

72.     When asked to describe the function of one of the VASPs, named Private Brands, the following testimony was elicited from Mr. Lee:

- 24 -

A. Gordon Redgate owns Private Brands.  Private Brands is the third-party billing company that U.S. Foodservice uses.

Q.  What does that mean again?

A.  It means that they – they take product, they – U.S. Foodservice buys product and bills it through Gordon's company and then collects the Pas from Gordon's company.

Q.  Now, just the -- when you say "Pas," do you mean the spread?

A.  Yes, the difference of spread.

Q.  Or the markup between what Private Brands has paid for the product and what USF pays from the product when it buys it from Private Brands?

A.  Yes.


73.     Mr. Lee further described how the kickbacks received from the VASPs were referred to internally at USF, testifying as follows:

A.  They're called shelters, self-generated promotional allowances.

Q.  Self-generated because Mr. Redgate's company is going out and buying the product, right, at a certain price, and then is selling it back to USF at a higher price, correct?

A.  Mr. Redgate's company is taking title of the product at a lower price, billing U.S. Foodservice at a higher price at U.S. Foodservice's direction.  Mr. Redgate's company, this company here, Private Brands, did business solely with U.S. Foodservice.

Q.  And then that difference between what Private Brands bought it for and then sold it to USF, who gets that difference?

A.  That's the difference that comes back to U.S. Foodservices as income.

Q.  And Mr. Redgate also gets a percentage of that or –

A.  He was paid a transaction fee by invoice.


74.     Demonstrating the substantial amount of kickbacks USF received from the VASPs, Mr. Lee testified that the "buckets" transferred back to USF from the single VASP, Private Brands, amounted to more than $58 million in 2002 alone.


75.     Mr. Lee then provided the following example to illustrate how the process worked:

US Foodservice would – would buy a case of product let's say for $10.  We would then tell Mr. Redgate at private brands to bill US Foodservice at $11 for that same case.  The difference between the 10-dollar price that Mr. Redgate actually paid for it and the 11-dollar price that was invoiced to US Foodservice, that difference of 1 dollar is what went into those buckets.  Those buckets then were sent to US Foodservice as income, sheltered income.

76.    Mr. Lee also explained how this would impact the fixed percentage mark up charged to USF's cost-plus customers as follows:

Q.  And then, Mr. Lee, when US Foodservice went to sell the product to street or chain customers, would there be a markup on top of the $11?

A.  Yes.  That was the – the cost of goods just coming into US and then there was the markup that US Foodservice put on it to the customers.

Q.  Cost-plus.

A.  Cost-plus.

77.    Upon hearing Mr. Lee's explanation, the Court expressed doubt as to what legitimate purpose the arrangements with the VASPs could have, resulting in the following colloquy with the witness:

THE COURT:  I don't understand the sense of that.  In other words, if the vendor received $10, right –

THE WITNESS:  Yes, sir.

THE COURT: -- and who pays the extra dollar, anybody?

THE WITNESS:  The extra dollar is then passed on in the cost of goods to US Foodservice's customers.  US Foodservice works from a higher base cost of $11, and that's where all the markup starts from.

THE COURT:  And is it or is it not considered a promotional allowance?

THE WITNESS:  It is part of the promotional allowance.  It is a form of promotional allowance called a shelter.

BY MR. SABOT:

Q.  But it's different from –

THE COURT:  But the normal promotional allowance is paid for by the vendor.

- 26 -

THE WITNESS:  That is correct.

THE COURT:  The vendor isn't paying anything, as far as what we're talking about now, right?

THE WITNESS:  That is correct.

78.     In sum, Mr. Lee testified that the VASP System was put in place solely for the purpose of allowing USF "to have a higher billing cost" and a higher mark-up on that cost.  Such an arrangement both violates the terms of USF's cost-plus arrangements with its customers and constitutes a scheme to defraud.

79.     The purpose and effect of the VASP System also is succinctly described in papers filed by several former USF employees in connection with a lawsuit over a non-compete agreement brought by USF in the United States District Court for the District of Massachusetts entitled, *U.S. Foodservice, Inc. v. Arthur Tsebetzis, et al.*  Specifically, a brief filed in that action on February 3, 2004, claims, as supported by an affidavit submitted by Arthur Tsebetzis, a former senior vice president and divisions president of USF, that:

> USF has inflated its costs to customers via fictitious or USF-controlled middlemen and transport companies.  Since USF bills its customers on a "cost-plus" basis – charging its customers for the cost of goods plus a certain percentage – USF has artificially and fraudulently inflated the prices its customers pay.

### USF And Royal Ahold's Post-VASP System Wrongdoing

80.     Beginning in late 2003 and early 2004, USF began to phase out its operation of the VASP System.  Nevertheless, USF continued to unlawfully overcharge it cost-plus customers by entering into direct agreements with suppliers and other third parties pursuant to which they would inflate the cost of products sold by an amount dictated by USF.  USF would add a specified percentage on top of the inflated price, as provided for in its cost-plus arrangements, in order to

arrive at the amount billed to its cost-plus customers.

81.     As was the case with the VASP System, after receiving payment from USF, the suppliers and other third parties would kick back to USF the agreed upon amount by which the cost of the products was secretly inflated.  The suppliers and other third parties agreed to "bill" these additional amounts to USF in their invoices (which were in addition to legitimate incentives already included in the prices) and then collect such amounts from USF only to return these amounts back to USF at USF's insistence, and all based on USF's representations that such an arrangement did not constitute a violation of any state or federal law.  In many instances, the additional amounts added to the invoices were calculated so that USF would be able to continue charging its cost-plus customers the same prices as were being charged under the prior operation of the VASP System.

82.     By engaging in the foregoing conduct, USF was able to falsely inflate the cost component that it used to calculate the prices charged to its customers, allowing USF to reap significantly greater profits than it otherwise could have under the terms of its cost-plus arrangements.

**USF's and Royal Ahold's Concealment Of Their Unlawful Conduct**

83.     Defendants' actively concealed their conduct to unlawfully overcharge USF's cost-plus customers in numerous ways.  As a result, Plaintiffs and Class members could not have uncovered the existence of the unlawful conduct any earlier with the exercise of reasonable diligence.

84.     Indeed, as reflected in PwC's interview notes with a USF employee, █████████

██████████████████████████████████████████████████████

█████████████████████████████ Thus, although cost-plus customers may have had limited rights to examine documentation supporting USF's pricing, the false invoices supplied by the VASPs and other suppliers prevented the cost-plus customers from discovering Defendants' unlawful conduct. ████████████████████████████████████████████

████████████████████████████████████

85.     In addition, Royal Ahold and USF continued to conceal the true purpose of the VASP System to overcharge USF's cost-plus customers even after USF's scheme to inflate its reported earnings by recording completely fictitious promotional allowances was publicly disclosed. Beginning in October 2003, for the first time, Royal Ahold included selective information regarding USF's relationship with the VASPs in public filings with the United States Securities and Exchange Commission. Specifically, Royal Ahold told investors in the United States that USF had relationships with *independently owned companies* known as VASPs that "*provide varying degrees of support to USF*" in the purchase of certain products from suppliers (emphasis added). In making that statement, Royal Ahold falsely stated that the VASPs were a legitimate part of the distribution chain, when in fact the most important "support" provided by the VASPs was to serve as a vehicle to falsely inflate USF's invoices sent to cost-plus customers.

86.     Thus, instead of disclosing that the VASP System was set up for the purpose of allowing USF to falsely inflate its costs so that it could overcharge its cost-plus customers or that the VASPs did not provide any legitimate services, Royal Ahold's disclosures were designed to give the appearance of "full disclosure," while in reality continuing to shroud in a false and misleading light the true nature of the VASP System. Moreover, Royal Ahold's false and misleading statements were made at a time during which the VASP System was actively being operated and the statements were

made in furtherance of the scheme and had the effect of allowing it to continue. As a result, even after Royal Ahold's limited disclosures regarding the VASPs, Plaintiffs and other members of the Class were not aware that they had been defrauded and were, at best, further misled and prevented from learning the true nature of the VASP System.

87. Moreover, as set forth above, in order to avoid any substantial reduction in its margins after the VASP System was phased out, USF replaced the VASP System with direct agreements with suppliers. In this manner, USF was able to charge cost-plus customers the same falsely inflated prices for goods following the elimination of the VASP System. In the absence of these agreements, prices charged cost-plus customers would have declined noticeably and revealed the fraud committed by Defendants' operation and control of the VASP System. As was the case with respect to the VASP System, neither USF nor Royal Ahold disclosed that USF had entered into these direct arrangements with other suppliers.

88. Upon information and belief, in 2006, USF also sent correspondence to customers denying any wrongdoing with regard to the VASP System. All such disclosures and correspondence were designed to protect and retain the benefits Defendants and their shareholders wrongfully obtained through the operation and execution of the VASP System and subsequent unlawful conduct.

89. Plaintiffs' discovery of the wrongful conduct alleged herein was delayed by the fraudulent concealment, deceptive acts, practices and omissions and continuing conspiracy of Defendants and others. Plaintiffs could not have discovered the illegal conduct at an earlier date by the exercise of reasonable diligence because of Defendants' deceptive practices and techniques of secrecy and misinformation. As a result of the fraudulent concealment by Defendants' all applicable

statutes of limitations have been tolled.

**Royal Ahold's Business Activities in the United States in Support of its Subsidiaries**

90.    Although separately incorporated, Royal Ahold provided direct support to many of its U.S. subsidiaries, including to USF, and in doing so conducted business directly with numerous banks, financial institutions, and landowners in the United States.

91.    For example, Royal Ahold routinely provided financial guaranties for debt issued by its subsidiary, Ahold Finance USA, Inc. that was used to finance the activities of its U.S. subsidiaries, including USF. According to Royal Ahold's 2002 Form 20-F filed with the United States Securities and Exchange Commission, as of December 31, 2002 Royal Ahold had guaranteed more than EUR 2 billion, and an additional $1.7 billion in bonds and loans issued by Ahold Finance USA.

92.    On information and belief, all or a substantial portion of the U.S. dollar denominated bonds issued by Ahold Finance USA were sold to investors in the United States and Royal Ahold held itself out to those investors as the ultimate guarantor of those bonds when they were being marketed. For example, according to Ahold's 2000 Form 20-F, in July 2000, Ahold Finance USA made a public offering in the United States of $700 million in bonds to refinance and pay down USF's debt. Royal Ahold fully and unconditionally guaranteed those bonds to U.S. investors who purchased them.

93.    In addition, Royal Ahold's Form 2002 20-F stated that "the Company", which the 20-F defines to include Royal Ahold, "has guaranteed some of the obligations of the VASPs relating to purchases made on behalf of USF." Accordingly, although USF now denies that Royal Ahold

guaranteed obligations of the VASPs, Royal Ahold publicly has held itself out to be included as a guarantor of obligations of the VASPs, regardless of who issued the guarantees. ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

94.      Likewise, Royal Ahold routinely entered into capital investment commitments for fixed assets (mainly land and buildings) used by its U.S. subsidiaries, including on information and belief, by USF, in the regular operation of their businesses. Again, according to its 2002 Form 20-F, as of the end of 2002, Royal Ahold had $214 million in such investment commitments for fixed assets in various locations in the United States.

95.      In addition to its credit guaranties and capital investment commitments on behalf of its U.S. subsidiaries, Royal Ahold  regularly provided other corporate guaranties, in the form of "letters of assurance, comfort letters, real estate guarantees, and buy-back guarantees" given directly to suppliers and banks doing business with its U.S. subsidiaries, including USF.  For example, when USF entered into an operating lease agreement to finance the acquisition and construction of two distribution centers and an office building, Royal Ahold guaranteed the debt.  In 2003 Royal Ahold was required to purchase the trust that owned those leased properties for $42 million.

96.      As Royal Ahold explained in Note 30 to its financial statements contained in its 2002

Form 20-F, Royal Ahold provided these guarantees to "acknowledge the Company's awareness and support of the transactions and relationships entered into by its subsidiaries and franchisees." The Note went on to further explain that the "buy-back guarantees have been granted by Ahold to facilitate external financing for franchisees or subsidiaries. The liability under these guarantees is secured by the value of the related assets that the Company could obtain and liquidate in the event Ahold has to perform under the guarantees."

## RICO ALLEGATIONS

### The VASP System Enterprise

97.     USF, Royal Ahold and Redgate are all "persons" within the meaning of 18 U.S.C. §1961(3).

98.     Defendant USF, together with Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands form an association-in-fact for the common and continuing purpose described herein including Paragraphs 1 to 96 above, and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "VASP System Enterprise").

99.     The VASP System Enterprise was an ongoing organization which engaged in, and whose activities affected, interstate commerce.

100.    While USF has participated in and is a member and part of the VASP System Enterprise, it also has an existence separate and distinct from the enterprise.

101.    As set forth above, the VASP System Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

- 33 -

**The Individual VASP Enterprises**

102.     Alternatively, Private Brands, Commodity Management, Frozen Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Individual VASP Enterprises"). Each Individual VASP Enterprise has been engaged in, and their activities have substantially affected, interstate commerce.

**Operation and Control**

103.     Defendants have controlled and operated the VASP System Enterprise and/or Individual VASP Enterprise by, among other things:

(a)     Entering into agreements with the VASPs pursuant to which the amounts invoiced USF are falsely inflated;

(b)     Dictating the products to be purchased by the VASPs and the amounts by which the invoices received from the VASPs were to be inflated;

(c)     Dictating the amount of kickbacks to be paid by the VASPs to USF; and

(d)     Concealing the true nature of the relationship between USF and the VASPs.

**Predicate Acts**

**A.     Mail and Wire Fraud**

104.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire

fraud).  As set forth below, Defendants engaged in conduct violating each of these laws to effectuate their scheme.

105.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises Defendants in violation of 18 U.S.C. §1341, caused matter and things to be delivered by the Postal Service or by private or commercial interstate carrier, and/or received matter and things from the Postal Service or private or commercial interstate carriers.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

106.    Defendants carried out their scheme in different states and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

107.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted, caused to be transmitted and/or received by means if wire communication in interstate and foreign commerce, various writings, signs, and signals.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

108.    The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, *inter alia*:

a.    contracts and invoices that intentionally mislead USF's cost plus customers about the manner in which USF would compute prices charged to them;

b.    invoices that falsely and fraudulently misrepresented the amounts that USF's cost-plus customers owed USF under the terms of its cost-plus arrangements;

c.    materials that falsely and fraudulently supported the basis of the cost component used by USF to calculate the prices charged to its customers pursuant to its cost-plus contracts; and

d.    materials that falsely and fraudulently described USF's relationship with the VASPs.

109.    Other matter and things sent through or received from the Postal Service, private or commercial carrier or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

110.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class and obtaining their property for Defendants' gain.

111.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the Class relied on the misrepresentations and omissions as set forth above.

112.    As a result, Defendants have obtained money and property belonging to Plaintiffs and Class members, and Plaintiffs and the Class have been injured in their business or property by the

- 36 -

Defendants' overt acts of mail and wire fraud.

### B.     Money Laundering

113.     Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956 in that, knowing that funds they received from Plaintiffs and other Class members constituted the proceeds of unlawful activity including mail and wire fraud, Defendants conducted and attempted to conduct certain financial transactions affecting interstate commerce involving these proceeds.

114.     These proceeds were the portions of payments received by USF from Plaintiffs and other Class members as a result of the scheme alleged herein, *i.e.*, payments for the falsely inflated cost components used by USF to calculate the price charged to its customers, and payments for USF's increased mark-ups resulting from USF's use of falsely inflated costs to calculate such mark-ups.

115.     These financial transactions conducted by Defendants were intended to promote the carrying on of the mail and wire fraud by making the VASPs appear to have a legitimate business purpose, and to hide from Plaintiffs and other Class members the false "cost" added to USF's invoices.

116.     Defendants further had knowledge that these financial transactions were designed to, and did, conceal and disguise the nature, location, source, ownership or control of the proceeds of the mail and wire fraud, by making it appear that the full invoice amount belonged to the VASPs, when in fact the VASPs kicked back a portion of the invoice price, representing the proceeds of the mail and wire fraud, to USF, and thus hiding the falsely inflated cost component from its clients' auditors.

117.     Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1957 in

that they knowingly engaged in and attempted to engage in monetary transactions affecting interstate commerce and involving funds received from Plaintiffs and other Class members, which Defendants knew to be the proceeds of mail and wire fraud and criminally derived property from unlawful activity as described above, of a value greater than $10,000.

118.    Defendants, upon information and belief, deposited these funds in financial institutions, and withdrew, transferred and exchanged such funds from those financial institutions.

### Pattern of Racketeering Activity

119.    Defendants USF, Royal Ahold and Redgate, each of whom are persons associated with, or employed by, the VASP System Enterprise and/or the Individual VASP Enterprises, did knowingly, willfully, and unlawfully conduct or participate in the affairs or the VASP System Enterprise and/or the Individual VASP Enterprises through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961 (1), 1961(5) and 1962(c).  The racketeering activity was made possible by each Defendant's regular and repeated use of the facilities and services of the VASP Enterprise and/or the Individual VASP Enterprises.  Defendants Royal Ahold, USF and Redgate had the specific intent to engage in the substantive RICO violation alleged herein.

120.    Defendants Royal Ahold, USF and Redgate each committed or aided and abetted in the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957 as described above, within the past ten years.  In fact, Defendants collectively have committed thousands of acts of racketeering activity.  The acts of racketeering were not isolated, but rather had the same or similar purpose, participants, method of commission, and victims, including Plaintiffs and Class members.

- 38 -

121.    The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were continuous.  There was repeated conduct in a closed, but substantial period of time at least during the period from 1998 to 2004.  This conduct therefore constituted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this action against Defendants on their own behalf and, pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, as a class action on behalf of a class of all persons or entities that purchased products from USF or one of its subsidiaries pursuant to arrangements in which the price paid was defined in terms of a cost component plus a mark-up (*i.e.*, cost-plus arrangements).  Excluded from the Class are Defendants, any entity in which any defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a defendant and any of Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

123.    Plaintiffs also bring this action on behalf of the following subclasses:

(a) Any person in the United States who purchased products from USF pursuant to arrangements in which the price paid was defined in terms of a cost component plus a mark-up, and for which USF used a VASP transaction to calculate the cost component (the "RICO Subclass").  Excluded from the RICO Subclass are Defendants, any entity in which any defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a defendant and any of Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

(b) Any person in California who purchased products from USF pursuant to arrangements in which the price paid was defined in terms of a cost component plus a mark-up, and for which USF used a VASP transaction to calculate the cost component (the "California Subclass"). Excluded from the California Subclass are Defendants, any entity in which any defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a

defendant and any of Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

124.    There are thousands of members of the Class as well as the RICO and California Subclasses (collectively the "Classes"). Accordingly, the Classes are so numerous that joinder of all members is impracticable. Although the exact number of Class members is not yet known, on information and belief, USF has tens of thousands of customers who bought products pursuant to cost-pus arrangements. These customers are geographically dispersed throughout the United States. The Classes are ascertainable, as the names and addresses of all Class members can be identified in business records maintained by Defendants.

125.    Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other Class members. Plaintiffs are represented by counsel experienced and competent in the prosecution of complex class action litigation and other complex litigation including federal RICO claims.

126.    There are questions of law and fact common to the Classes which predominate over any questions affecting only individual members of the Classes. Such common questions include, *inter alia*:

    a.    Whether Defendants have engaged in the schemes or artifices described herein to improperly and unlawfully inflate the prices charged to USF's customers;

    b.    Whether Defendants have engaged in mail and wire fraud;

    c.    Whether Defendants have engaged in money laundering;

    d.    Whether Defendants have engaged in a pattern of racketeering activity;

e.      Whether the VASP System Enterprise and Individual VASP Enterprises are enterprises within the meaning of 18 U.S.C. 1961(4);

f.      Whether Defendants conducted or participated in the affairs of the VASP System Enterprise and/or the Individual VASP Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c);

g.      Whether Defendants conspired to violate 18 U.S.C. §§ 1962(c) as prohibited by 18 U.S.C. § 1962(d);

h.      Whether Defendants' violations of 18 U.S.C. §§ 1962(c) and/or 1962(d) proximately caused injury to Plaintiffs' and RICO Subclass members' business or property;

i.      Whether Defendants' fraudulently concealed their scheme;

j.      Whether USF has breached its contractual obligations to its customers under its cost-plus arrangements;

k.      Whether USF has breached its implied duty of good faith and fair dealing;

l.      Whether Defendants' unlawful conduct unjustly enriched Royal Ahold; and

m.      Whether a constructive trust should be imposed on all the property Royal Ahold acquired as a result of Defendants' unlawful conduct.

127.    Plaintiffs' claims are typical of the claims of the members of the Classes because they originate from the same illegal, fraudulent, and confiscatory practices of Defendants, and Defendants act in the same way toward Plaintiffs and the Classes.

128.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class litigation and have no interests antagonistic to or in conflict with those of

the Classes.  As such, Plaintiffs are adequate representatives of the Classes.

129.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the Classes.

130.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Classes is impracticable and because of the many questions of law and fact that are common to Plaintiffs' claims and those of the Classes.  Further, the expense and burden of individual litigation make it impossible for all the members of the Classes individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

131.    Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessarily duplicating evidence, effort, and expense that numerous individual actions would engender.

## COUNT I

### (Violation of 18 U.S.C. § 1962(c) Against All Defendants)

132.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

133.    This claim for relief arises under 18 U.S.C. § 1962(c) and is brought on behalf of the RICO Subclass.

134.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or

participating directly or indirectly in the conduct of the affairs of the VASP System Enterprise and /or the Individual VASP Enterprises through a pattern of racketeering.

135.    As a direct and proximate result, Plaintiffs and the members of the RICO Subclass have been injured in their business or property by the predicate acts which make up the Defendants' pattern of racketeering activity through the VASP System Enterprise and/or the Individual VASP Enterprises.

136.    Specifically, Plaintiffs and members of the RICO Subclass have been injured in their business or property by having paid too much for foodservice products purchased from USF pursuant to cost-plus arrangements entered into with USF.

## COUNT II

### (Violation of 18 U.S.C. § 1962(d) Against All Defendants)

137.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

138.    This claim for relief arises under 18 U.S.C. § 1962(d) and is brought on behalf of the RICO Subclass.

139.    In violation of 18 U.S.C. § 1962(d), Defendants Royal Ahold, USF and Redagte have, as set forth above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced at least as early as 1998 and continued at least until 2004.  Royal Ahold joined the conspiracy in 2000.  The object of the conspiracy was to use dummy corporations to falsely inflate invoices to obtain money or property rightfully belonging to members of the RICO Subclass.

140.    As set forth above, each of the Defendants knowingly, willfully, and unlawfully

- 43 -

agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the VASP System Enterprise and/or the Individual VASP Enterprises through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341, 1343, 1956 and 1957 in violation of 18 U.S.C. § 1962(c).  Royal Ahold, USF and Redgate objectively manifested their agreement to the commission of the substantive RICO violations by at least one member of the conspiracy by words or acts.

141.    Each Defendant committed at least one overt act of racketeering activity or other wrongful activity in furtherance of such conspiracy.

142.    Even if some of the Defendants did not agree to harm specifically the Plaintiffs or other RICO Subclass members, the purpose of the acts that caused them injury was to advance the overall object of the conspiracy, and the harm to Plaintiffs and other RICO Subclass members was a reasonably foreseeable consequence of Defendants' scheme.

143.    As a direct and proximate result, Plaintiffs and the members of the RICO Subclass have been injured in their business or property by the predicate acts which make up the Defendants' pattern of racketeering activity through the VASP System Enterprise and/or the Individual VASP Enterprises.

144.    Specifically, Plaintiffs and members of the RICO Subclass have been injured in their business or property by having paid too much for foodservice products purchased from USF pursuant to cost-plus arrangements entered into with USF.

## COUNT III

### (Breach of Contract Against USF)

145.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

146.    Plaintiffs and the other members of the Class entered into or are third party beneficiaries of cost-plus arrangements with USF or one of its acquired subsidiaries or predecessors pursuant to which Plaintiffs and the members of the Class have purchased food and other products from USF on a cost-plus basis.  Plaintiffs and other Class members complied with all of their obligations under the arrangements.

147.    The terms of these contracts provided that the price charged by USF to Plaintiffs and other Class members was to be based on a cost component plus a mark-up.  The mark-up was expressed as a percentage of the cost component or as a fixed dollar amount for certain products. For certain products, these cost-plus arrangements calculate the cost component of the price charged to USF's customers by using the invoice issued by USF's suppliers or other similar types of entities.

148.    USF repeatedly used invoice costs from the VASPs to calculate the cost component of the price billed to its customers.

149.    The VASPs, or other entities operated in a substantially similar manner, are not the type of entity from which USF's cost-plus arrangements permit USF to use an invoice to calculate the cost component of the price billed to its customers.

150.    USF did not have the discretion to use the invoice costs from the VASPs, or other

entities operated in a substantially similar manner, to calculate the cost component of the price billed to its customers.

151.   USF breached its cost-plus arrangements with, and the reasonable expectations of, Plaintiffs and other Class members by using invoice costs from the VASPs, or other entities operated in a substantially similar manner, to calculate the cost component of the price billed to its customers.

152.   USF further breached the terms of its cost-plus arrangements with Plaintiffs and other Class members by acting dishonestly and in a commercially unreasonable manner to manipulate the invoice costs (as described in more detail above) used to calculate the cost component of the price charged to its customers.

153.   USF has also breached its implied duty of good faith and fair dealing imposed on all of its cost-plus arrangements.  In this regard, by intentionally getting suppliers to falsely inflate the amounts they invoice USF and/or by purchasing products through the VASPs for the purpose of increasing its cost component, USF has prevented Plaintiffs and members of the Class from receiving the benefit of their cost-plus arrangements.

154.   As a result of the foregoing, Plaintiffs and Class members have been injured by having paid higher prices for food and other products purchased from USF pursuant to cost-plus arrangements entered into with USF or one of its acquired subsidiaries than they otherwise would have paid had USF not breached its cost-plus arrangements.

## COUNT IV

**(Violation of California Business and Professions Code §§ 17200 *et seq.* Against Defendants for Unlawful, Unfair and Fraudulent Business Practices)**

155.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

156.     This claim is brought on behalf of the California Subclass.

157.     Defendants have engaged in unlawful, unfair and fraudulent business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.* in connection with their illegal overcharge schemes, as described above.  Defendants used these illegal overcharge schemes with the intent, directly or indirectly, to dispose of plaintiff CHW and other California Subclass members' property through the use of falsely inflated invoices.

158.     To do so, Defendants engaged in unlawful business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.* by, as described above, conducting the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); conspiring to conduct the affairs of an enterprise in violation of 18 U.S.C. § 1962(d); violating the federal mail fraud statute, 18 U.S.C. § 1341; violating the federal wire fraud statute, 18 U.S.C. § 1343; and violating the federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957.

159.     Further, Defendants engaged in unfair and fraudulent business acts or practices in violation of California Business & Professions Code §§ 17200 *et seq.* by, among other things, setting up shell companies, inventing sham transactions, and creating phony invoices used to bill CHW and other California Subclass members.

160.    These business acts or practices constituted a pattern of behavior that victimized CHW and other California Subclass members by deceiving them into believing that USF's cost component was calculated based on transactions with only legitimate suppliers.

161.    As a direct and foreseeable result of Defendants' violations, CHW and other California Subclass members suffered substantial monetary losses by having paid higher prices for the food and other products they purchased from USF.

## COUNT V

### (Unjust Enrichment Against Defendant Royal Ahold)

162.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

163.    As set forth above, Royal Ahold knew about the existence, use, and execution of the VASP System.  Royal Ahold further provided guarantees for the purchase of products funneled through the VASPs.  Royal Ahold also made false statements designed to conceal and further perpetuate the operation of the VASP system.

164.    As a result of the acts alleged, Plaintiffs and Class members paid inflated product prices for purchases from USF, adding hundreds of millions of dollars in income to USF's books thus artificially inflating USF's value.  That inflated value was obtained by Royal Ahold through the $7.1 billion purchase price that Royal Ahold received when it sold USF in 2007.  Moreover, by retaining liability for damages arising out the claims in this case (through the indemnification provisions contained in the 2007 sale transaction), Royal Ahold recognized that USF's unlawful conduct inured to its benefit and that such benefit was included in the purchase price of USF, which

it has to date retained.  The overcharges paid by USF's cost-plus customers thus represents an unjust benefit the Plaintiffs and Class members conferred upon Royal Ahold, and had Royal Ahold not agreed to the indemnifications provisions, the purchase price of USF would have been substantially reduced.

165.    Royal Ahold accepted and retained the proceeds of these illegal acts and thus, was unjustly enriched by these illegal overcharges.  Equity requires disgorgement to prevent Royal Ahold from benefiting from the retention of the Plaintiffs' and Class members' property.

166.    Plaintiffs and Class members seek an order directing Royal Ahold to return the benefit Royal Ahold unjustly procured, received, and retained from the unlawful conduct alleged herein.

## COUNT VI

**(Imposition of Constructive Trust Against Defendant Royal Ahold)**

167.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

168.    The Court should impose a constructive trust on all monies, currency, profits, negotiable instruments, promissory notes and interests in property, both real and personal, which Royal Ahold acquired as a result of the unlawful conduct described herein, including but not limited to any proceeds Royal Ahold receives from its sale of USF.  Royal Ahold holds Plaintiffs and Class members' funds as a constructive trustee for the benefit of Plaintiffs and Class members.

169.    Plaintiffs and Class members are unaware of the total amount of funds attributable to

the VASP System and other unlawful conduct Royal Ahold currently holds.  However, these amounts are traceable to the transactions in which Plaintiffs and Class members were overcharged for purchases from USF.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and in favor of the Classes against Defendants, jointly and severally, as follows:

A.      Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b);

B.      Declaring that Defendants have violated Sections 1962(c) and 1962(d) of RICO and that USF breached its contractual obligations;

C.      As to Counts I and II, preliminarily and permanently enjoining Defendants and all persons acting under, in concert with, or for them, from continuing conduct in violation of the RICO statute;

D.      As to all Counts, ordering Defendants to pay damages in an amount to be determined at trial;

E.      As to Counts I and II, ordering Defendants to pay treble the amount of damages suffered by Plaintiffs and the RICO Subclass as a result of Defendants' violations of Sections 1962(c) and 1962(d) of RICO;

F.      As to Counts I and II, ordering disgorgement;

G.      As to Count IV, for restitution and disgorgement of monies pursuant to the California Business and Professions Code;

H.      As to Count V, for restitution and disgorgement;

I.      As to Count VI, for imposition of a Constructive Trust;

J.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and the reimbursement of expenses in amounts to be determined by the Court;

K.      Awarding prejudgment interest; and

L.      Granting such other and further relief as this Court deems to be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury.

Dated:  June 30, 2008

Respectfully submitted,

THE PLAINTIFFS

By:  ____/s/_____
        James E. Hartley, Jr.
        Federal Bar No. ct 08275

**DRUBNER & HARTLEY, L.L.C.**
500 Chase Parkway
Waterbury, CT 06708
(203) 753-9291

and

Charles Hellman
One Penn Plaza, Suite 4507
New York, NY  10119
(212) 736-2121

**WHATLEY DRAKE & KALLAS, LLC**
Edith M. Kallas
Joe R. Whatley, Jr.
Deborah Clark-Weintraub
1540 Broadway, 37th Floor
New York, NY 10036
(212) 447-7070

**AKIN GUMP STRAUSS HAUER & FELD
  LLP**
R. Laurence Macon
Karen Kroesche Gulde
300 Convent Street, Suite 1600
San Antonio, Texas 78205
(210) 281-7000

and

Richard L. Wyatt, Jr.
Todd M. Stenerson
Robert S. Strauss Building
1333 New Hampshire Ave., N.W.
Washington, D.C.  20036-1564
(202) 887-4000

*Co-Lead Counsel for Plaintiffs*

**FOOTE, MEYERS, MIELKE &
FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL  60134
(630) 232-6333

**GRAY & WHITE**
Mark Gray
1200 PNC Plaza
Louisville, KY  40202
(502) 585-2060

**STROM LAW FIRM, PLLC**
J. Preston Strom, Jr.
1501 Main Street, Suite 700
Columbia, SC  29201
(803) 252-4800

**BALL & SCOTT**
Gordon Ball
550 West Main Street, Suite 601
Knoxville, Tennessee  37902
(865) 525-7028

**MCNAIR LAW FIRM, P.A.**
Celeste T. Jones
1301 Gervais Street
P.O. Box 11390
Columbia, SC 29211
(803)799-9800

**Edwards Angell Palmer & Dodge LLP**
Dennis O. Brown
Joseph R. Geoghegan
90 State House Square, 9th Floor
Hartford, CT 06103
(860) 541-7749

**ROME MCGUIGAN**
Anne C. Dranginis
Joseph Bree Burns
One State St., 13th Floor
Hartford, CT 06103-3101
(860) 493-3538

*Additional Plaintiffs' Counsel*