# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ——————————————— | : | |
| IN RE: US FOODSERVICE INC. | : | |
| PRICING LITIGATION | : | Case No. 3: 07 MD 1894 (CFD) |
| ——————————————— | : | |
| | : | |
| WATERBURY HOSPITAL, ET AL. | : | |
|     Plaintiffs, | : | |
| v. | : | Case No. 3: 06 CV 1657 (CFD) |
| U.S. FOODSERVICE, INC. | : | |
|     Defendant. | : | |
| ——————————————— | : | |
| | : | |
| CATHOLIC HEALTHCARE WEST | : | |
|     Plaintiff, | : | |
| v. | : | Case No. 3: 08 CV 4 (CFD) |
| KONINKLIJKE AHOLD N.V., ET AL. | : | |
|     Defendants. | : | |
| ——————————————— | : | |
| | : | |
| THOMAS & KING, INC. | : | |
|     Plaintiff, | : | |
| v. | : | Case No. 3: 08 CV 5 (CFD) |
| KONINKLIJKE AHOLD N.V., ET AL | : | |
|     Defendants. | : | |
| ——————————————— | : | |

## RULING ON MOTIONS TO DISMISS

The plaintiffs, Waterbury Hospital, Cason, Inc., Frankie's Franchise Systems Inc., Catholic Healthcare West, and Thomas & King, Inc., bring this class action against U.S. Foodservice, Inc. ("USF"), Koninklijke Ahold N.V. ("Ahold"), and Gordon Redgate. Against USF, the plaintiffs assert violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), breach of contract, and violations of California Business and

Professions Code §§ 17200 et seq. ("the California statute").  Against Ahold, the plaintiffs allege

RICO violations, violations of the California statute, unjust enrichment, and constructive trust.

Against Redgate, the plaintiffs allege RICO violations and violations of the California statute.

Ahold moves to dismiss arguing that the Court does not have personal jurisdiction over it, and

that the complaint fails to state a claim upon which relief can be granted.  USF separately moves

to dismiss for failure to state a claim, and alternatively, it moves to strike several allegations of

the complaint.  For the reasons that follow, Ahold's motion to dismiss is granted, USF's motion

to dismiss is granted in part and denied in part, and USF's motion to strike is granted.

## I.      Procedural Background

The plaintiffs filed a Consolidated and Amended Class Action Complaint ("Complaint")

in this multidistrict litigation ("MDL") proceeding.  The MDL involves three previously filed

cases: Catholic Healthcare West v. Koninklijke Ahold N.V., et al., filed in the Northern District

of California; Thomas & King, Inc. v. Koninklijke Ahold N.V., et al., filed in the Southern

District of Illinois; and Waterbury Hospital et al. v. U.S. Foodservice, Inc., filed in the District of

Connecticut.  The United States Judicial Panel on Multidistrict Litigation previously found that

the "three actions involve common questions of fact, and that centralization under [28 U.S.C. §

1407] in the District of Connecticut will serve the convenience of the parties and witnesses and

promote the just and efficient conduct of this litigation."  In re: U.S. Foodservice, Inc., Pricing

Litigation, 528 F. Supp. 2d 1370, 1371 (J.P.M.L. 2007).

In multidistrict litigation, the transferee court applies the law of the transferee forum

when interpreting federal law, and applies the laws of the transferor forums when interpreting

state law.  Desiano v. Warner-Lambert & Co., 467 F.3d 85, 89-92 (2d Cir. 2006); Menowitz v.

Brown, 991 F.2d 36, 40 (2d Cir. 1993).

## II.   Factual Allegations of the Consolidated and Amended Class Action Complaint[1]

### A.   Cost-Plus Arrangements Generally

USF is the second largest food distributor in the United States, providing food products and services to approximately 250,000 customers. Ahold owns directly or indirectly subsidiaries and affiliates that operate food retail stores in the United States and Europe. Boerboom Decl. ¶ 4. On April 10, 2000, Ahold's indirectly wholly-owned subsidiary, Giant Food Inc., acquired one-hundred percent of the outstanding common shares of USF. Id. at ¶ 6. Ahold never directly owned USF. Id.

About half of USF's sales were made to customers who purchased products pursuant to "cost-plus arrangements," whereby USF sold to its cost-plus customers products in amounts and at times specified by the customers. The price USF charged its cost-plus customers equaled: (1) a cost component based on the prices charged to USF by USF's suppliers, (2) plus an agreed upon mark-up of either a fixed percentage or a set dollar amount.[2] The cost-plus arrangements

---

[1]Unless cited otherwise, the following is drawn from the allegations of that Complaint.

[2]The Complaint provides two examples of the pricing terms of "invoice cost" or "landed cost" of a "typical" USF cost-plus arrangement. The first provides:

> The price of product to Customer shall equal USF's invoice cost (as hereinafter defined) plus the agreed upon fee per case on cost as outlined below. USF's invoice cost is defined as the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to USF's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice discounts or off-invoice allowances to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice). Invoice cost shall not be adjusted for, and Customer shall not be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier

provided that certain contingent payments and other incentives USF received from its suppliers

_____

       incentives received by USF.

Compl. ¶ 33.  The second provides:

> The price to Participating Members for all Products sold under this Agreement
> (the "Price") will be calculated on the basis of Landed Cost.  For the purposes of
> this agreement, "Landed Cost" is defined as follows:
>
>       * * * * *
>
> (In the case of Non-contract product) the manufacturer's (supplier, packer or any
> other vendor) delivered cost or f.o.b. unit price plus standard freight (as
> hereinafter defined) to Approved Distributor's distribution center, less off-invoice
> discounts or off-invoice allowances (such off-invoice [discounts] to mean
> manufacturer generated discounts or allowances on particular items for set periods
> of time and which are specifically related on the invoice).
>
>       * * * * *
>
> Participating members shall in no event be entitled to, promotional allowances,
> cash discounts, prompt pay discounts, growth programs or any other supplier
> incentives received by [USF].

Id. at ¶ 34 (omissions and alterations in the Complaint).  In a February 2, 2006 arrangement
between USF and Frankie's, USF represented that "it would charge its cost-plus customers an
amount equal to the 'local market replacement cost or current market average cost of procured
products' plus in-bound freight and an agreed upon mark-up percentage.  As with the other
typical USF cost-plus arrangements, this arrangement provided that USF would be entitled to
retain 'supplier incentives.' " Id. at ¶ 36.  Finally, the plaintiffs point to language USF used in
invoices sent to the plaintiffs, as follows:

> Promotional allowances, cash discounts, prompt pay discounts, growth programs
> and all other incentives are retained by U.S. Foodservice and do not reduce
> product cost.  Product cost is defined as the supplier, packer or any other vendor
> delivered cost or f.o.b. unit price plus standard freight less off-invoice discounts
> or off-invoice allowances (i.e., manufacturer generated discounts or allowances on
> particular items for set periods of time and which are specifically reflected on the
> invoice).

Id. at ¶ 37.

would not reduce the cost component used to calculate the price charged to USF's cost-plus customers, even though such amounts had the effect of reducing the prices charged to USF by its suppliers.  These excepted amounts are generally referred to as "promotional allowances." Promotional allowances are rebates, discounts, credits, or similar consideration that suppliers provide to customers to promote the sale of their goods.

**B.**     **Parties**

Plaintiff Waterbury Hospital is a public hospital located in Waterbury, Connecticut.  As part of its operations, Waterbury Hospital offers meals and other food services to its patients, employees, and visitors.  The hospital is party to a cost-plus arrangement originally entered into with Alliant Exchange ("Alliant"), which USF acquired in 2001.  Following USF's acquisition of Alliant, Waterbury Hospital continued to purchase products from USF pursuant to its cost-plus arrangement.

Plaintiff Cason, Inc. ("Cason") is an Illinois corporation located in Rockford, Illinois. Cason has operated a family-owned restaurant under the name "Maria's Italian Cafe" since the early 1960s.  Since at least 2000, USF has invoiced Cason on a weekly basis for products Cason purchased on a cost-plus basis.

Plaintiff Frankie's Franchise Systems, Inc. ("Frankie's") is a Connecticut corporation located in Waterbury, Connecticut.  Frankie's operates a chain of franchised restaurants in Connecticut.  Frankie's is party to a cost-plus arrangement with USF, pursuant to which Frankie's and its franchisees have purchased products from USF.

Plaintiff Catholic Healthcare West ("CHW") is a non-profit corporation with its principal place of business in California.  CHW is a system of dozens of hospitals and medical centers in

-5-

California, Arizona, and Nevada.  In 1999, CHW and its hospitals and medical centers became members of Premier, Inc., a "Group Purchasing Organization" engaged in contracting services for its members to help them manage and reduce supply costs.  CHW has purchased products from USF pursuant to a cost-plus arrangement between Premier and USF's predecessor, Alliant.

Plaintiff Thomas & King, Inc. ("T&K") is a corporation with its principal place of business in Kentucky.  T&K owns and operates eighty-eight "Applebee's Neighborhood Grill & Bar" restaurants and seven "Carino's Italian Grill" restaurants in several states.  T&K purchased products from USF pursuant to a cost-plus arrangement it entered into with Alliant effective July 1, 2001.

The defendant USF is based in Maryland.  From April 10, 2000 through July 3, 2007, USF was an indirect, wholly-owned subsidiary of defendant Ahold.  Following its acquisition by Ahold, USF expanded its operations through a series of acquisitions, including acquiring Alliant in November 2001.

The defendant Ahold is a public holding company in The Netherlands with its principal place of business in Amsterdam.  As part of its operations, Ahold owns and operates grocery stores and food service companies in the United States and Europe through subsidiaries and affiliates.  On July 3, 2007, Ahold sold USF to a consortium of Clayton, Dubilier & Rice Fund VII, L.P. ("CD&R") and Kohlberg Kravis Roberts & Co L.P. ("KKR") for a purchase price of $7.1 billion.

The defendant Gordon Redgate is an individual who was the president and principal owner of Commodity Management Systems, Inc. and Private Label Distribution, Inc.  Both companies are organized under the laws of New Jersey and have their principal places of

business in New Jersey.

Non-party Brady Schofield was the principal owner of Frozen Farms, Inc., Produce Solutions, Inc., Seafood Marketing Specialities, Inc., and Specialty Supply & Marketing, Inc. Those four companies have their principal places of business in Rhode Island or Massachusetts.

### C.    VASP System

Plaintiffs allege that USF defrauded cost-plus customers through the use of sham transactions, phony invoices, and shell companies known as "Value Added Service Providers" ("VASPs").  The six VASPs were the following companies owned by defendant Redgate and non-party Brady Schofield: Commodity Management Systems, Inc., Private Label Distribution, Inc., Frozen Farms, Inc., Produce Solutions, Inc., Seafood Marketing Specialities, Inc., and Specialty Supply & Marketing, Inc.  The plaintiffs allege that USF conspired with Redgate and Schofield for the VASPs to purchase products that plaintiffs required, sell them at a higher price to USF, and for USF to then pass the extra cost along to plaintiffs pursuant to the cost-plus arrangements.  Plaintiffs further allege that after receiving payment from USF, the VASPs would secretly kick back the falsely inflated amount of cost to USF.  Specifically, after USF paid the VASPs for the products, the difference between the VASPs' actual costs and the prices the VASPs charged to USF, referred to as the "bucket," minus the nominal transaction fee retained by the VASPs, would be kicked back to USF and recorded as income by USF.  The plaintiffs allege that this money sent from the VASPs to USF was structured to hide the "cost" falsely added by the VASPs and was concealed from USF's cost-plus customers.  Moreover, the plaintiffs claim that the money kicked back to USF cannot be categorized as legitimate "promotional allowances" or any other bona fide incentive that USF sometimes received from its

suppliers because the kickbacks were self-generated and not dependent on USF achieving any distribution contingency or USF providing any benefit to the VASPs.

Although the VASPs were "nominally independent," the Complaint alleges that USF controlled the day-to-day operations of the VASPs and the VASPs had no commercial purpose except to serve as a pass-through vehicle for USF to increase its profits.  The Complaint alleges that the VASPs did not manufacture or process any products, but would simply purchase products from other suppliers at USF's direction.  The Complaint also alleges that although the orders were technically placed through the VASPs, USF would communicate directly with the actual suppliers to determine price, specifications of products and other information related to the orders; the amount the VASPs charged USF for the products–which later became the price component of plaintiffs' cost-plus arrangements–was dictated by USF rather than by the VASPs.

Additionally, the plaintiffs allege that all or most of the VASPs' purchases were funded by interest free advances from and financial guarantees by USF, and that one-hundred percent of the VASPs' shares were assigned and irrevocably transferred to USF as collateral for these advances.  The plaintiffs allege that the VASPs were not provided with any owner-supplied funding and the "transaction fees" paid to the VASPs, which were approximately $27.50 per invoice regardless of the amount of product involved, were intentionally structured to cover the VASPs' operating costs and enable the VASPs to "break even."  USF retained the risk of loss on the products that were routed through the VASPs.  The written agreements between USF and the VASPs allegedly prohibited the VASPs from disclosing the existence and operation of the "VASP System."

The plaintiffs argue that USF deceived its cost-plus customers into believing that USF's

cost component was calculated based on transactions with "legitimate suppliers." The VASP System, they contend, induced USF's customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF, and that such reliance was reasonable given that the defendants intentionally concealed the VASP System from its cost-plus customers.

Schofield, Redgate, and a USF executive who supervised the VASPs on a day-to-day basis were sometimes referred to around USF's offices as "the Three Musketeers." Redgate allegedly had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs. The VASP System operated independently from any single USF cost-plus arrangement and represented a systematic way of doing business.

### D.    Ahold's Knowledge of and Involvement in the VASP System

The plaintiffs allege that Ahold had full knowledge of, and in fact helped facilitate and conceal, the existence and purpose of the VASP System as a scheme to defraud USF's cost-plus customers. Ahold learned about the VASP System while conducting due diligence prior to its acquisition of USF. Specifically, a due diligence report dated February 20, 2000 and prepared by Ahold's internal audit staff prior to Ahold's acquisition of USF, which was sent to several Ahold executives, noted the existence of the VASPs and acknowledged that their purpose was to "shelter and earn . . . 'rebates' on its private label brands and to hide [promotional allowances] from clients' and auditors." Compl. ¶ 57 (alternation in Complaint). The report continued that USF's use of the VASPs "needs to be researched to assess the tax and legal implications and associated business risks." Id.

Pursuant to an Agreement and Plan of Merger dated March 13, 2000, Ahold (through a subsidiary) acquired all of the stock of USF.  Under the merger agreement and amendments to USF's bylaws following the merger, Ahold exercised its authority to name all of the members of the USF board of directors.  Jim Miller, USF's Chief Executive Officer, was appointed to Ahold's Executive Board on September 1, 2001.

An April 12, 2001 memorandum from the then-Chief Financial Officer of USF, Ernie Smith, to Michiel Meurs, Ahold's Chief Financial Officer and a member of its Executive Board, stated:

> In the normal course of business, USF has engaged in setting up friendly third parties, which allow them to establish pads to income.  In substance a new legal entity is set up, the entity will take title to goods; mark them up and sale [sic] the product to USF.  In turn by contract, the third party will collect a fee for the service and return the USF allowances.  It has been common practice for USF to have these entities forward buy and USF to give them a deposit for inventory.

Id. at ¶ 58.  The plaintiffs allege that Smith sent this memorandum to Meurs in order to bring to the attention of Ahold's Executive Board the serious concerns that Smith had regarding certain accounting issues at USF, and that Smith stated that he "felt [he] had no alternative other than to exit the business and disclose the issues."  Id. at ¶ 59.  Additionally, the Complaint alleges that according to the minutes of an Ahold Audit Committee meeting held on December 11, 2001, Ahold refused to implement a promotional allowance monitoring system as recommended by its auditors because of the "sensitive nature" of how the system operated.  Id. at ¶ 60.  The plaintiffs allege that Ahold continued to keep the VASP System secret.

Ahold hired PricewaterhouseCoopers ("PwC") to review USF's accounting practices.  A report submitted to Ahold's Audit Committee on June 25, 2003 (the "PwC Report") described

-10-

the VASPs in the following manner: " 'VASPs' (6) – special purpose entities designed to enable

mark-up on items for which normal vendor Pas [promotional allowances] do not exist.  VASPs

create 'pass-back' or 'bucket' earnings, which is essentially the markup between manufacturer

cost and what the VASP charges the USF branch, less a transaction fee."  Id. at ¶ 62-63.  The

PwC Report further stated:

> In light of the control aspect, significant questions are raised relative to customer
> contracts where the Company provides product on a "cost-plus" basis.  While
> customer contracts, especially those with commercial customers, appear to
> address this point by indicating that the customer is not entitled to any rebates or
> allowances that are not "off-invoice" (i.e. the customer is only entitled to
> discounts that reduce the original invoice to USF), it is unclear whether such
> contract language would protect the Company if the fact of USF control of the
> VASPs were disclosed or otherwise known. . . .

> The VASP entities are closely-held businesses whose principals are well-known
> by Tim Lee and Mark Kaiser.  Except for one, these entities are funded entirely by
> USF advances, and make all of their sales to USF.  Generally, USF directs the
> VASPs' purchase decisions, including quantities and prices, and for five of the
> six, has audit rights to their books and records.  Furthermore, the VASPs shares
> are irrevocably assigned to USF as collateral for the advances.

Id. at ¶ 64.

PwC also noted that USF's outside counsel, White & Case, had issued an opinion letter

dated February 11, 2003, which concluded that USF did not face substantial exposure to damages

from potential claims by USF's cost-plus customers, but that White & Case retracted the letter

less than a month later allegedly because the letter had relied upon the misrepresentations of

management involved in USF's accounting.  Id. at ¶ 65.  The original White & Case opinion

letter allegedly cited the following assumptions, which were later claimed to be faulty, as

supporting its conclusion that USF did not face exposure to damages from use of the VASP

System: (i) there was no affiliation between USF and any of the VASPs; (ii) title to products

procured for USF by a VASP passes through the VASP; (iii) in some circumstances, the VASPs compete with USF for sales; (iv) there was no improper motive behind USF's arrangements with the VASPs; (v) USF's customers knew about the nature and purpose of the VASP System; and (vi) the VASPs provide valuable services.  Id. at ¶ 66.

The existence of the VASPs was first disclosed to Ahold shareholders in October 2003 as part of Ahold's announcements that it would be restating its earnings for fiscal years 2000 and 2001 by more than $800 million.[3]  Although USF reportedly phased out the VASP System in late 2003 and early 2004, the Complaint alleges that the defendants continued to actively conceal the VASP System.  In October 2003, Ahold included in unspecified public filings with the United States Securities and Exchange Commission a statement that USF had relationships with independently owned companies known as VASPs that "provide varying degrees of support to USF."  Id. at ¶ 85.  Furthermore, the Complaint alleges that in 2006 USF sent correspondence to customers denying any wrongdoing with regard to the VASP System.

### E.    USF Employee Testimony

Timothy Lee, a former USF executive, testified in 2006[4] that the VASPs "were companies that were set up on the behalf of U.S. Foodservice to procure product and capture the difference in the spread in the cost of goods and send it back to U.S. Foodservice."  Compl. ¶ 71. Lee continued: "Mr. Redgate's company is taking title of the product at a lower price, billing U.S. Foodservice at a higher price at U.S. Foodservice's direction.  Mr. Redgate's company . . .

---

[3]Many of the allegations of the Complaint related to Ahold's restatement of earnings are the subject of USF's motion to strike, which the Court addresses *infra*, in Part V of this Ruling.

[4]Details concerning the trial at which Lee testified are also the subject of USF's motion to strike, which the Court addresses *infra*, in Part V of this Ruling.

did business solely with U.S. Foodservice. . . .  [T]he difference comes back to U.S. Foodservices [sic] as income."  Id. at ¶ 73.

In a different lawsuit, Arthur Tsebetzis, a former senior vice president and divisions president for USF, filed a brief that stated: "USF has inflated its costs to customers via fictitious or USF-controlled middlemen and transport companies.  Since USF bills its customers on a 'cost-plus' basis – charging its customers for the cost of goods plus a certain percentage – USF has artificially and fraudulently inflated the prices its customers pay."  Id. at ¶ 79.

### F.    <u>Ahold as an Entity</u>

The plaintiffs allege that although Ahold is a separate corporation from USF, it provided direct support to USF, and in doing so conducted business directly with numerous banks, financial institutions, and landowners in the United States.  Specifically, the Complaint alleges that Ahold provided financial guarantees for debt issued by its subsidiary, Ahold Finance USA, Inc., which was used to finance the activities of its United States subsidiaries, including USF.  According to Ahold's 2002 Form 20-F filed with the SEC, as of December 31, 2002, Ahold had guaranteed more than €2 billion, and an additional $1.7 billion in bonds and loans issued by Ahold Finance USA.

The Complaint also alleges that all or a substantial portion of the United States dollar denominated bonds issued by Ahold Finance USA were sold to investors in the United States and Ahold held itself out to those investors as the ultimate guarantor of those bonds when they were being marketed.  For example, according to Ahold's 2000 Form 20-F, in July 2000, Ahold Finance USA made a public offering in the United States of $700 million in bonds to refinance and pay down USF's debt.  It is alleged that Ahold fully and unconditionally guaranteed those

bonds to United States investors who purchased them.

Ahold's 2002 Form 20-F also stated that "the Company," which the 20-F defined to include Ahold, "has guaranteed some of the obligations of the VASPs relating to purchases made on behalf of USF." USF now denies that Ahold guaranteed obligations of the VASPs.[5] Plaintiffs also allege that on December 4, 2000, USF entered into a Supply Agreement with the Sara Lee Corporation under which Ahold unconditionally guaranteed all of the payments and other obligations which USF owed to Sara Lee under the Agreement. USF then purchased products from Sara Lee that were funneled through the VASP System.

The Complaint additionally alleges that Ahold routinely entered into capital investment commitments for fixed assets such as land and buildings that were used by its U.S. subsidiaries, including, "on information and belief," by USF in the regular operation of USF's business.

_____

[5]Specifically, the Declaration of Hendrickus Boerboom, the corporate secretary of Ahold, states:

> Ahold, in its 2002 Annual Report . . . , described USF's guarantees of the VASPs by stating "the company has guaranteed some of" obligations of the VASPs relating to purchases made on behalf of USF." Although the word "Company" had been defined to mean Ahold, in at least this circumstances the word "Company" was meant to mean the consolidated reporting entity, and not merely the legal entity, Ahold. In Ahold's 2002 20-F, filed with the United States Securities and Exchange Commission, Ahold clarified that its indirect subsidiary USF, not Ahold, had issued the guarantees, stating that "USF has guaranteed some of the obligations of the VASPs to vendors relating to purchases made on behalf of USF."

Boerboom Decl. ¶ 10. The Boerboom Declaration creates a factual dispute that, in the context of this motion to dismiss, the Court must resolve in the favor of the plaintiffs. Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993) ("[A]ll factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.").

-14-

According to its 2002 Form 20-F, as of the end of 2002, Ahold had $214 million in such investment commitments for fixed assets in various locations in the United States.

The 2002 Form 20-F also states that Ahold regularly provided other corporate guarantees, in the form of "letters of assurance, comfort letters, real estate guarantees, and buy-back guarantees" given directly to suppliers and banks doing business with its U.S. subsidiaries, including USF.  Compl. ¶ 95.  For example, when USF entered into an operating lease agreement to finance the acquisition and construction of two distribution centers and an office building, the Complaint alleges that Ahold guaranteed the debt.  In 2003, Ahold was required to purchase the trust that owned those leased properties for $42 million.  In Note 30 to its financial statements contained in its 2002 Form 20-F, Ahold stated that it provided these guarantees to

> acknowledge the Company's awareness and support of the transactions and relationship entered into by its subsidiaries and franchisees. . . . [B]uy-back guarantees have been granted by Ahold to facilitate external financing for franchisees or subsidiaries.  The liability under these guarantees is secured by the value of the related assets that the Company could obtain and liquidate in the event Ahold has to perform under the guarantees.

Id. at ¶ 96.

## III.   Personal Jurisdiction Over Defendant Ahold

Ahold moves to dismiss arguing that the Court does not have personal jurisdiction over it. Specifically, Ahold claims that it is not licensed to, and does not, conduct business in the transferor forums of California, Connecticut, and Illinois, or anywhere else in the United States; has no operations and owns and leases no property in the United States; and has no other contacts to support the exercise of general jurisdiction.  Ahold also claims it has no contacts relevant to the claims in this case that could support the exercise of specific jurisdiction.

-15-

In a diversity or federal question case, personal jurisdiction is determined by the law of the state in which the district court sits.  See Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).  In multidistrict litigation, however, the transferee court must apply the law of the transferor forum to determine issues of personal jurisdiction, and may exercise personal jurisdiction only to the same extent as the transferor court.  In re Sterling Foster & Co., Inc. Sec. Litig., 222 F. Supp. 2d 289, 300 (E.D.N.Y. 2002) (citing Van Dusen v. Barrack, 376 U.S. 612, 639-40 (1964); In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 163 (2d Cir. 1987)).  Therefore, in determining whether the Court has personal jurisdiction over Ahold, it must apply the law of California, Illinois, and Connecticut.

The plaintiff bears the burden of proving that the court has jurisdiction over the defendant.  Amerbelle Corp. v. Hommel, 272 F. Supp. 2d 189, 192 (D. Conn. 2003) (citing Metro. Life Ins. v. Robertson-Ceco Corp., 84 F.3d 560, 566-67 (2d Cir. 1996)); Ensign-Bickford Co. v. ICI Explosives USA, Inc., 817 F. Supp. 1018, 1026 (D. Conn. 1993).  "A plaintiff facing a Fed. R. Civ. P. 12(b)(2) motion to dismiss made before any discovery need only allege facts constituting a prima facie showing of personal jurisdiction.  Moreover, we construe the pleadings and affidavits in plaintiff's favor at this early stage."  PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal citations omitted); see also Jarrow Formulas, Inc. v. Int'l Nutrition Co., 175 F. Supp. 2d 296, 300 (D. Conn. 2001).

A.      **Fed. R. Civ. P. 4(k)(1)(A): Specific Jurisdiction in California, Illinois, and Connecticut**

The plaintiffs first argue that the Court has jurisdiction over Ahold pursuant to Fed. R. Civ. P. 4(k)(1)(A), which provides that "[s]erving a summons or filing a waiver of service

establishes personal jurisdiction over a defendant: [] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Id.  The plaintiffs argue that there is specific personal jurisdiction over Ahold in the individual transferor states of California, Illinois, and Connecticut.

Under California and Illinois law, courts may exercise specific personal jurisdiction over non-resident defendants to the full extent of due process.  See Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801-02 (9th Cir. 2004) ("Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same."); RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997) (noting the Illinois long-arm statute authorizes personal jurisdiction to the limits of the United States Constitution).  Thus, pursuant to both California and Illinois law, for a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).  Connecticut personal jurisdiction law is more stringent, see Conn. Gen. Stat. § 33-929(f),[6] but

---

[6]The statute provides:

(f) Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; (3) out of the production, manufacture or distribution of goods by such corporation with

also, of course, requires the traditional due process analysis outlined in <u>International Shoe</u>.  See

Knauss v. Ultimate Nutrition, Inc., 514 F. Supp. 2d 241, 247-48 (D. Conn. 2007).

"The central minimum contacts inquiry is whether the defendant's conduct and

connection with the forum State are such that he should reasonably anticipate being haled into

court there."  <u>LiButti v. United States</u>, 178 F.3d 114, 122 (2d Cir. 1999) (<u>citing</u> <u>Burger King</u>

<u>Corp. v. Rudzewicz</u>, 471 U.S. 462, 474 (1985)) (internal quotation marks omitted).  "The

application of [the minimum contacts] rule will vary with the quality and nature of the

defendant's activity, but it is essential in each case that there be some act by which the defendant

purposefully avails itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws."  <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958).

"In addition to the concept of a defendant purposefully availing itself of the protections of the

law of the forum State, the Supreme Court has also found minimum contacts to exist when the

defendant 'purposefully directed' the harmful effects of his activities at the forum State."

<u>LiButti</u>, 178 F.3d at 123 (<u>quoting</u> <u>Burger King</u>, 471 U.S. at 472); <u>see also</u> <u>Calder v. Jones</u>, 465

U.S. 783, 787 n.6 (1984)).  For example, in <u>Burger King</u>, the Supreme Court found that the lower

court could exercise jurisdiction over a defendant corporation that sent " 'products into the

stream of commerce with the expectation that they will be purchased by consumers in the forum

---

the reasonable expectation that such goods are to be used or consumed in this state
and are so used or consumed, regardless of how or where the goods were
produced, manufactured, marketed or sold or whether or not through the medium
of independent contractors or dealers; or (4) out of tortious conduct in this state,
whether arising out of repeated activity or single acts, and whether arising out of
misfeasance or nonfeasance.

Conn. Gen. Stat. § 33-929(f).

State' and those products subsequently injure forum consumers."  471 U.S. at 473 (quoting

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  In Libutti, the Second

Circuit held that a New York court did not have personal jurisdiction over a defendant who "did

not intend to inflict harm on or commercially effect a resident of New York."  178 F.3d at 123.

Under this so-called "effects test," the "person sought to be charged must know, or have good

reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over

him."  Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1341 (2d Cir. 1972).

Here, the Complaint does not allege that Ahold purposefully availed itself of the

protections of California, Illinois, or Connecticut, or that Ahold purposefully directed the harmful

effects of its activities at California, Illinois, or Connecticut.  In fact, the Complaint does not

make any specific allegations with respect to the three states.  Rather, the Complaint makes

general allegations about Ahold's knowledge of the VASP system and support of USF, which the

plaintiffs now argue had effects in California, Illinois, and Connecticut sufficient for the Court's

exercise of jurisdiction.  The Complaints' allegations of Ahold's knowledge of and failure to

intervene in the VASP System is not the same as an allegation that Ahold purposefully targeted

the three forum states with knowledge that injury to the plaintiffs was likely to result.  Leasco

Data, 468 F.2d at 1341.

The plaintiffs' allegations of Ahold's financial guarantees to USF are also insufficient to

serve as a basis for specific personal jurisdiction in the transferor forums.  In particular, the

Complaint alleges that "Ahold routinely provided financial guarantees for debt issued by its

subsidiary, Ahold Finance USA, Inc. that was used to finance the activities of its U.S.

subsidiaries, including USF," and that Ahold "has guaranteed some of the obligations of the

VASPs relating to purchased made on behalf of USF."  Compl. ¶ 91, 93.[7]  Once again, however, these allegations draw no connection between Ahold's guarantees and the injuries plaintiffs suffered in California, Connecticut, and Illinois.  Nor does the Complaint draw a connection between Ahold's Form 20-F and any of the transferor states.  Therefore, because the Complaint does not allege that Ahold intended to inflict harm or have a commercial effect on the plaintiffs in California, Illinois, or Connecticut, or that Ahold had good reason to know its conduct would have effects in California, Illinois, or Connecticut, the Court finds it cannot, on the basis of what the plaintiffs have alleged, exercise jurisdiction over Ahold pursuant to Fed. R. Civ. P. 4(k)(1)(A).

**B.**      **Fed. R. Civ. P. 4(k)(2): General and Specific Jurisdiction in the United States**

In the alternative, the plaintiffs argue that the Court may exercise personal jurisdiction over Ahold pursuant to Fed. R. Civ. P. 4(k)(2), which provides:

> (2) Federal Claim Outside State-Court Jurisdiction. For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> > (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> >
> > (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).  The Rule allows the Court to exercise personal jurisdiction "when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of

_____

[7]Although USF now denies that Ahold guaranteed some obligations of the VASPs, as noted *supra*, note 5, the Court must at this stage resolve this factual dispute in the favor of the plaintiffs.

jurisdiction must be 'consistent with the United States Constitution and laws.' " Porina v. Marward Shipping Co., Ltd., 521 F.3d 122, 127 (2d Cir. 2008) (quoting Fed. R. Civ. P. 4(k)(2)).

### 1.    Claims Arising Under Federal Law

In their RICO counts, the plaintiffs have asserted against Ahold claims that arise under federal law.  Although Ahold has separately moved to dismiss these claims for failure to state a claim upon which relief can be granted, the Court will assume that the "arise under" prong of the Rule 4(k)(2) test is met as long as the plaintiffs' RICO claims are not frivolous on their face.  See Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1189 (2d. Cir. 1996) ("[I]n cases where the asserted basis for subject matter jurisdiction is also an element of the plaintiff's allegedly federal cause of action, we ask only whether-on its face-the complaint is drawn so as to seek recovery under federal law or the Constitution.  If so, then we assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits.").  Here, while Ahold has raised significant questions concerning the "conduct" element of the RICO charge, the RICO claims are not frivolous on their face, and the Court will proceed to the next step in the jurisdictional analysis.  See Flag Co. v. Maynard, 376 F. Supp. 2d 849, 853 (N.D. Ill. 2005) ("[T]he complaint in the instant case is not so wholly insubstantial so as to preclude this court from analyzing personal jurisdiction under Rule 4(k)(2).").

### 2.    State Personal Jurisdiction Over Ahold

Ahold does not argue that it is subject to jurisdiction in any state's courts of general jurisdiction, and the Court will assume that jurisdiction is not proper in any state.  See, e.g., United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 41 (1st Cir. 1999) (holding that should the defendant fail to offer evidence that personal jurisdiction is available in any state court of general

jurisdiction, the Court may infer that personal jurisdiction is unavailable in any state court); Ctr.

States, Se. and Sw. Areas Pension Fund v. Reimer Express World, 230 F.3d 934, 940 (7th Cir.

2000); Flag Co., 376 F. Supp. 2d at 853 ("If the defendant does not name another state where the

suit could go forward, the second requirement of Rule 4(k)(2) is satisfied.").

        3.    <u>Due Process</u>

The third prong of the Rule 4(k)(2) test requires the Court to determine whether Ahold

had adequate contacts with the United States as a whole to support personal jurisdiction.  The

constitutional requirements for jurisdiction pursuant to Rule 4(k)(2) are the same as the inquiry

for individual states except that the Court asks whether Ahold "has sufficient affiliating contacts

with the United States in general."  Porina, 521 F.3d at 127; see also Swiss Am. Bank, 191 F.3d

at 36 ("When a plaintiff depends upon [Rule 4(k)(2)] to serve as the necessary statutory

authorization for the exercise of specific personal jurisdiction, the constitutional requirements are

the same . . . but the analytic exercises are performed with reference to the United States as a

whole, rather than with reference to a particular state.").  The plaintiffs appear to argue the Court

has both general and specific jurisdiction over Ahold.

        a.    General Jurisdiction

The Court may exercise general jurisdiction if Ahold has "continuous and systematic

business contacts" with the United States.  See Helicopteros Nacionales de Columbia, S.A. v.

Hall, 466 U.S. 408, 416 (1984).  This standard requires plaintiff to prove that Ahold's contacts

approximate physical presence in the United States.  See In re Ski Train Fire in Kaprun, Austria,

257 F. Supp. 2d 717, 730 (S.D.N.Y. 2003).

Ahold is not licensed to conduct business anywhere in the United States and has no

operations or property in the United States.  The plaintiffs argue that the Court can exercise

general jurisdiction over Ahold based on the following contacts alleged in the Complaint: that

Ahold owned grocery store and food service subsidiaries in the United States; that Ahold

appointed all the members of the board of directors of USF; that Ahold retained an outside

auditor to review USF's accounting; that Ahold provided financial guarantees for debt issued by

Ahold Finance USA, Inc.; that Ahold entered into capital investment commitments for fixed

assets used by its United States' subsidiaries; and that Ahold guaranteed the payments and

obligations that USF owed to Sara Lee.

These contacts, viewed either individually or collectively, are insufficient for the Court's

exercise of general jurisdiction over Ahold.  The fact that Ahold owned USF and other United

States companies is insufficient, as ownership of United States subsidiaries does not establish

jurisdiction over the foreign parent company.  See Cannon Mfg. Co. v. Cudahy Packing Co., 267

U.S. 333, 336 (1925).  Relatedly, the other contacts that the plaintiffs allege are actions Ahold

took through USF or another of Ahold's United States subsidiaries.  In particular, the plaintiffs

allege that Ahold guaranteed debts issued by its subsidiary Ahold Finance USA, Inc. and

guaranteed USF's obligations.  These allegations of actions Ahold took in support of its United

States subsidiaries are insufficient to establish jurisdiction.  Although an exception does exist in

which a parent corporation can be subject to jurisdiction based on its subsidiary's contacts, the

exception applies only when it is alleged that the subsidiary was an "agent" or "mere department"

of the parent corporation.  Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177-78

(9th Cir. 1980), cert. denied, 449 U.S. 1062 (1980) (holding that the court did not have

jurisdiction over a parent corporation even where the parent corporation had guaranteed

obligations of the United States subsidiary to United States banks).[8]  Plaintiffs here do not allege

that USF or Ahold Finance USA were agents or "mere departments" of Ahold, rather than

separate corporate entities, and therefore the Court cannot exercise jurisdiction based on Ahold's

support of its subsidiary that is subject to general jurisdiction in the United States.  See, e.g.,

Reingold v. Deloitte Haskins & Sells, 599 F. Supp. 1241, 1253 (S.D.N.Y. 1984) ("A wholly

owned subsidiary that continues to control its day-to-day operations cannot be an 'agent' for

jurisdictional purposes.") (citing Kramer, 628 F.2d 1175); Stutts v. De Dietrich Group, 465 F.

Supp. 2d 156, 168 (E.D.N.Y. 2006) (holding it did not have personal jurisdiction over the parent

corporation based on the subsidiary's actions where the plaintiff had not alleged an identity

between the parent and the subsidiary); Ctr. States, 230 F.3d at 943 ("[W]e hold that

constitutional due process requires that personal jurisdiction cannot be premised on corporate

affiliation or stock ownership alone where corporate formalities are substantially observed and

the parent does not exercise an unusually high degree of control over the subsidiary.").

b.    Specific Jurisdiction

The Court may exercise specific jurisdiction over Ahold if the cause of action arises out

of Ahold's minimum contacts with the United States.  See Helicopteros, 466 U.S. at 414 n.8.

The plaintiffs argue that the Court can exercise specific jurisdiction over Ahold based on Ahold's

participation in the VASP System conspiracy and because Ahold "told investors in the United

_____

[8]In holding that the subsidiary was not merely the agent or alter ego of the parent
corporation, the court in Kramer viewed as significant that the executives and directors of the
parent corporation did not control the United States subsidiary's board or form a board majority.
Id. at 1177.  In the instant case, the plaintiffs do allege that after Ahold acquired all of the stock
of USF, "it exercised its authority to name all of the members of the USF board of directors."
Compl. ¶ 56.  Nevertheless, the plaintiffs do not allege that USF was merely an agent of Ahold or
that Ahold and USF did not deal with each other as distinct corporate entities.

-24-

States that USF had relationships with independently owned companies known as VASPs that 'provide varying degrees of support to USF' in the purchase of certain products from suppliers." Compl. ¶ 85.

The Court finds that these allegations are insufficient to establish specific personal jurisdiction over Ahold in the United States. The Complaint's allegations of Ahold's participation in the VASP System are lacking. The Complaint alleges that Ahold "had full knowledge of, and helped facilitate and conceal, the existence and purpose of the VASP System as a scheme to defraud USF's cost-plus customers from the time it acquired USF," and that "[i]nstead of putting a stop to the use of the VASP System following its acquisition of USF, [] Ahold approved of it, allowed it to continue and expand, and reaped the benefits of it." Compl. ¶ 5. The Complaint, however, does not make any allegations of actual Ahold-specific actions, other than knowledge, that relate to the VASP System. The allegations that Ahold had knowledge of its subsidiary's business practices are not allegations of purposeful availment sufficient to invoke the benefits and protections of the United States. The plaintiffs also argue that Ahold's statement in its Form 20-F that USF had relationships with VASPs and that Ahold provided support to USF had the effect in the United States of facilitating the continuance of the VASP System by lending to it the appearance of legitimacy. Even taking this allegation as true, it standing alone is not sufficient to establish specific personal jurisdiction over Ahold under the effects test. In particular, Ahold's Form 20-F, which was directed not at USF's customers or investors, but at Ahold's investors, cannot be interpreted as Ahold intending to inflict harm in the United States. Libutti, 178 F.3d at 123. Because the Court does not have personal jurisdiction over it, Ahold is dismissed as a defendant.

**IV.     USF's Motion to Dismiss**

    **A.     Motion to Dismiss Standard**

When considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court accepts all

factual allegations in the complaint as true and draws all reasonable inferences in the plaintiffs'

favor.  Johnson v. Rowley, 569 F.3d 40, 43 (2d Cir. 2009).  In accordance with the Supreme

Court's decision Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Court must apply a

"plausibility standard," which is guided by "[t]wo working principles," Ashcroft v. Iqbal,

___U.S. ___, 129 S.Ct. 1937, 1949 (2009).  First, although "a court must accept as true all of the

allegations contained in a complaint," that tenet "is inapplicable to legal conclusions," and

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Id.  Well-pleaded factual allegations, on the other hand, are assumed

to be true and may plausibly give rise to an entitlement to relief.  Id.  "Second, only a complaint

that states a plausible claim for relief survives a motion to dismiss," and "[d]etermining whether

a complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  Id. at 1950.  The

plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer

possibility that a defendant has acted unlawfully.  Id. at 1949.  "To meet this standard, plaintiffs

must 'nudge[ ] their claims across the line from conceivable to plausible.' "  Smartix Intern.

Corp. v. MasterCard Intern, LLC, No. 08-5303-cv, 2009 WL 3449017, *1 (2d Cir. Oct. 28, 2009)

(quoting Twombly, 550 U.S. at 555).

    Where, as here, a RICO claim's predicate acts include allegations of fraud, the

circumstances constituting the alleged fraud must be pled with particularity.  See Fed. R. Civ. P.

9(b); Moore v. PaineWebber, Inc., 189 F.3d 165, 172 (2d Cir.1999).  In its review of a 12(b)(6) motion to dismiss, the Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

### B.    Count One: 18 U.S.C. § 1962(c)

The Complaint charges USF with violating 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To state a civil RICO claim pursuant to Section 1962(c), the plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, 473 U.S. at 496.  The plaintiffs charge that USF[9] was employed by or associated with the "VASP System Enterprise"–which they allege was made up of USF and the six VASPs–to conduct or participate in the enterprise's affairs through a pattern of mail fraud, wire fraud, and money laundering.

Plaintiffs' alleged civil RICO claims must also satisfy the standing requirements of 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" has the right to "recover threefold the damages he sustains."  18 U.S.C. § 1964(c).  Therefore, under Section 1964(c), a civil RICO claimant only has standing to sue if it shows: "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's 'business or property[]'; and (3) that such injury was 'by reason of' the substantive RICO

––––––––––––––––––––

[9]RICO defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."  Id. § 1961(3).  Therefore, corporations can be liable if they conduct an enterprise's affairs through a pattern of racketeering activity.

violation."  City of New York v. Smokes-Spirits.com, Inc, 541 F.3d 425, 439 (2d Cir. 2008).

        1.    <u>RICO Enterprise</u>

USF moves to dismiss the Section 1962(c) claim arguing that the Complaint fails to plead

a RICO enterprise that is distinct from the alleged predicate acts of racketeering activity.

Although an enterprise may be "any union or group of individuals associated in fact," <u>United</u>

<u>States v. Turkette</u>, 452 U.S. 576, 583 (1981), it "must be separate from the pattern of

racketeering activity," <u>First Capital</u>, 385 F.3d at 173.[10]  The "enterprise is an entity," while the

"pattern of racketeering activity is . . . a series of criminal acts as defined by the statute."

Turkette, 452 U.S. at 583. (<u>citing</u> 18 U.S.C. § 1961(1)).  Nevertheless, "the evidence used to

prove the pattern of racketeering activity and the evidence establishing an enterprise may in

particular cases coalesce."  <u>Boyle v. United States</u>, ___ U.S. ___, 129 S.Ct. 2237, 2245 (2009)

(<u>quoting</u> <u>Turkette</u>, 452 U.S. at 583).

Section 1961(4) states that an " 'enterprise' includes any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity."  18 U.S.C. § 1961(4).  An enterprise is "proved by evidence of

an ongoing organization, formal or informal, and by evidence that the various associates function

as a continuing unit."  <u>Turkette</u>, 452 U.S. at 583.  An enterprise can be broken down into three

structural parts: "a purpose, relationships among those associated with the enterprise, and

longevity sufficient to permit these associates to pursue the enterprise's purpose."  <u>Boyle</u>, 129

S.Ct. at 2244.

----

    [10]The enterprise must also be "distinct from the person conducting the affairs of the enterprise."  <u>Id.</u>  There is no dispute that the plaintiffs have sufficiently alleged that the "person," here USF, is distinct from the VASP System Enterprise.

The alleged VASP System Enterprise[11] consists of USF and the six VASPs–Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands.  Compl. ¶ 98.  The alleged purpose of the VASP System Enterprise was to "falsely inflate the cost component of the price charged to USF's cost-plus customers."  Id. at ¶ 4.  The Complaint alleges a relationship among USF and the associated VASPs, including that the VASP owners Redgate and Schofield associated with a USF executive who supervised the VASPs on a day-to-day basis.  Id. at ¶ 51.  The Complaint alleges that the VASPs would buy and mark-up, at USF's direction, goods that USF required, id. at ¶ 41, and that "Redgate had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs," id. at ¶ 51.  Moreover, the Complaint alleges that the "VASP System was a self-contained scheme that operated independently from any single USF cost-plus arrangement."  Id. at ¶ 52.  The Complaint further alleges longevity sufficient to permit these associates to pursue the enterprise's purpose in that it alleges the enterprise existed from 1998 through 2004.  Id. at ¶ 53.  Therefore, the VASP System Enterprise is sufficiently alleged in accordance with Section 1961(4), Turkette, and Boyle.

The Court additionally finds that the alleged VASP System Enterprise is separate and distinct from USF's alleged pattern of racketeering activity.  The plaintiffs allege that USF participated in the conduct of the VASP System Enterprise through multiple acts of mail fraud, wire fraud, and money laundering.  Specifically, the Complaint alleges that "USF engaged in

---

[11]Because the Court finds the VASP System Enterprise is separate and distinct from the alleged pattern of racketeering activity, it does not address the plaintiffs' alternative allegation of the "Individual VASP Enterprises."  Compl. ¶ 102.

thousands of separate fraudulent transactions in furtherance of its scheme to falsely inflate the cost component and the mark-up charged to its cost-plus customers," id. at ¶ 53, and that the

> [m]ail and wire fraud included: contracts and invoices that intentionally mislead [sic] USF's cost plus customers about the manner in which USF would compute prices charged to them; invoices that falsely and fraudulently misrepresented the amounts that USF's cost-plus customers owed USF under the terms of its cost-plus arrangements; materials that falsely and fraudulently supported the basis of the cost component used by USF to calculate the prices charged to its customers pursuant to its cost-plus contract; and materials that falsely and fraudulently described USF's relationship with the VASPs,

id. at ¶ 108. Although related in the larger scheme, each allegedly fraudulent invoice, for example, was a racketeering activity separate from the ongoing association of USF and the six VASPs. That the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in this case overlap does not mean the plaintiffs have not separately alleged an enterprise and a pattern of racketeering activity. Boyle, 129 S.Ct. at 2245; Turkette, 452 U.S. at 583.

### 2. Pattern of Racketeering Activity

USF next moves to dismiss the Section 1962(c) count arguing that the plaintiffs have not alleged a pattern of racketeering activity with sufficient particularity. To establish the requisite "pattern of racketeering," a plaintiff must identify "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). " '[R]acketeering activity' consists of no more and no less than commission of a predicate act." Sedima, 473 U.S. at 495 (citing 18 U.S.C. § 1961(1)). Section 1961(1) sets out an exhaustive list of predicate acts, including those alleged in the Complaint: mail fraud, wire fraud, and money laundering. 18 U.S.C. § 1961(1).

### a. Mail and Wire Fraud

Mail fraud occurs "whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.' " Bridge v. Phoenix Bond & Indem. Co., ___ U.S. ___, 128 S.Ct. 2131, 2138 (2008) (quoting 18 U.S.C. § 1341).  "The gravamen" of a mail fraud "offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information." Id. (internal quotations and citations omitted).  "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996).

"In order to successfully plead this fraud claim, [the] complaint must specify the circumstances constituting fraud 'with particularity.' " Id. at 634 (quoting Fed. R. Civ. P.  9(b)).[12] Generally, "Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Moore, 189 F.3d at 173 (internal quotations and citations omitted).  "The plaintiffs must also identify the purpose of the mailing within the defendant's fraudulent scheme." Id. (internal quotations and citations omitted).  The Complaint must additionally "allege facts that give rise to a strong inference of fraudulent intent . . . by (1) alleging facts to show that defendants had both motive and opportunity to commit

---

[12]The Rule provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." S.Q.K.F.C., Inc., 84 F.3d at 634.

USF argues that the Complaint fails to plead mail and wire fraud with particularity. Specifically, USF argues that the plaintiffs fail to plead the statements with sufficient specificity, to plead reasonable reliance, and to plead scienter.

i.    <u>Specificity of the Statements</u>

The plaintiffs allege that USF and the VASPs participated in a scheme to falsely inflate the cost component of the price charged to USF's cost-plus customers.  In furtherance of this scheme, the Complaint alleges USF used the wires and mails to send invoices to their cost-plus customers, as follows:

> 44.    Pursuant to USF's arrangements with the VASPs, USF would direct the VASPs to purchase particular products in particular amounts and at particular prices.  At USF's direction, the VASPs would then falsely inflate the cost of the products and resell them to USF.  USF, in turn, would then sell these products to its customers using the falsely inflated cost component invoiced by the VASP.  A fixed percentage or set dollar amount then would be added on to the falsely inflated cost component to arrive at the prices charged by USF to its cost-plus customers.

* * * * *

> 46.    USF deceived its cost-plus customers into believing that USF's cost component was calculated based on using transactions with only legitimate suppliers.  The VASP System was designed to, and did, induce USF's customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF.  Moreover, such reliance was reasonable under the circumstances because Defendants intentionally used the VASP System to hide the scheme from USF's customers and concealed from, and at no time fully disclosed to, USF's cost-plus customers the existence and true purpose of the VASP System.

* * * * *

-32-

53.     On information and belief, between 1998 and 2004, USF engaged in thousands of separate fraudulent transactions in furtherance of its scheme to falsely inflate the cost component and the mark-up charged to its cost-plus customers.  Details regarding the dates, times, products purchased, and the amount by which the cost component was falsely inflated, which occurred on a daily basis for a period of several years from at least 1998 until 2004, remain to be determined through the discovery process.

* * * * *

108.    The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, *inter alia*:

    a.     contracts and invoices that intentionally mislead USF's cost plus customers about the manner in which USF would compute prices charged to them;

    b.     invoices that falsely and fraudulently misrepresented the amount that USF's cost-plus customers owed USF under the terms of its cost-plus arrangements;

    c.     materials that falsely and fraudulently supported the basis of the cost component used by USF to calculate the prices charged to its customers pursuant to its cost-plus contracts; and

    d.     materials that falsely and fraudulently described USF's relationship with the VASPs.

Compl. ¶¶ 44, 46, 53, 108.  USF urges that these allegations are insufficient under Fed. R. Civ. P. 9(b) because they do not identify the specific content of the mails or wires, the time or place of specific mails or wires, or who was involved in transmitting those mails or wires.

The Rule 9(b) heightened pleading standard "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); see also United States ex rel. Tiesinga v. Dianon Sys., Inc., 231 F.R.D. 122, 123 (D. Conn. 2005) ("The purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information to frame a response.").  In

-33-

general, for a complaint to be in compliance with Rule 9(b) it must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).  However, "courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents." Tiesinga, 231 F.R.D. at 123.  As one court explained:

> It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.

In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 333 (D. Conn. 2004) (internal quotation marks omitted).  Thus, "dates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the defendant on notice as to the circumstances of the charged misrepresentations." Harris v. Wells, 757 F. Supp. 171, 174 (D. Conn. 1991); see also Int'l Motor Sports Group, Inc. v. Gordon, 98 CIV 5611, 1999 WL 619633, *4 (S.D.N.Y. Aug. 16, 1999) (concluding that "Rule 9(b) requires only that a complaint provide adequate information to allow the defendants to frame a response" and that it "does not require that a complaint plead fraud with the detail of a desk calendar or a street map" (internal citations and quotation marks omitted)).

The Complaint does not make allegations of the exact content, date, or sender of specific mail or wire transmissions alleged to be the predicate acts of mail or wire fraud.  Nevertheless, the Court finds that the plaintiffs' allegations are sufficient in the context of this case because

-34-

they have put the defendants on notice of the circumstances of the alleged fraud.  Specifically,

USF is on notice that the plaintiffs allege that, in furtherance of the larger scheme to defraud, the

purpose and operation of which the plaintiffs plead in great detail, USF sent thousands of

invoices on a nearly daily basis from 1998 through 2004 to customers buying products that had

been funneled through a VASP.  See, e.g., City of New York v. Joseph L. Balkan, Inc., 656 F.

Supp. 536, 545 (E.D.N.Y. 1987) ("As can be readily inferred from the alleged *modus operandi* of

the schemes, there were numerous mailings of standardized documents containing identical false

representations . . . .  To burden the complaint with specific allegations of hundreds of such

instances would serve little purpose, particularly since defendants seem to be in the best position

to provide the details they demand." (internal citation omitted)); see also In re Sumitomo Copper

Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998) ("In complex civil RICO actions involving

multiple defendants, therefore, Rule 9(b) does not require that the temporal or geographic

particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be

stated with particularity.  In such cases, Rule 9(b) requires only that the plaintiff delineate, with

adequate particularity in the body of the complaint, the specific circumstances constituting the

overall fraudulent scheme." (internal citations omitted)).  Here, the Complaint describes how the

invoices furthered the scheme by forwarding the allegedly falsely inflated cost information to the

plaintiffs buying products on a cost-plus basis.  The defendants can adequately frame a response

to these allegations, and Rule 9(b) requires nothing more.

ii.     Reliance

USF next urges that the Complaint does not sufficiently allege reliance.  The United

States Supreme Court recently held reliance is not an element of a RICO cause of action alleging

-35-

predicate acts of mail or wire fraud.  Bridge, 128 S.Ct. at 2144 ("[N]o showing of reliance is

required to establish that a person has violated § 1962(c) by conducting the affairs of an

enterprise through a pattern of racketeering activity consisting of acts of mail fraud.").  Even so,

the Court finds that the plaintiffs have alleged reliance, as follows:

> USF deceived its cost-plus customers into believing that USF's cost component
> was calculated based on using transactions with only legitimate suppliers.  The
> VASP system was designed to, and did, induce USF's customers to rely on USF's
> material representations, enter into contracts with USF, place orders for products
> from USF, and make payments to USF.  Moreover, such reliance was reasonable
> under the circumstances because Defendants intentionally used the VASP system
> to hide the scheme from USF's customers and concealed from, and at no time
> fully disclosed to, USF's cost-plus customers the existence and true purpose of the
> VASP System.

Compl. ¶ 46.  USF argues that the plaintiffs' characterization of the VASPs as not "legitimate" is

a conclusory allegation, and is therefore not entitled to credit on this motion to dismiss.  The

Court disagrees.  The plaintiffs have made numerous factual allegations that the VASPs were not

legitimate, including that they were not independent from USF and existed solely to falsely

inflate the prices charged to USF's cost-plus customers.  USF's argument that this

characterization is inaccurate is not a matter the Court may decide on a motion to dismiss.

### iii.   Scienter

USF also argues that the plaintiffs have failed to plead scienter.  In addition to pleading

the circumstances constituting fraud with particularity, the plaintiffs must also "allege facts that

give rise to a strong inference of fraudulent intent."  S.Q.K.F.C., Inc., 84 F.3d at 634.  The

plaintiffs "can do so by (1) alleging facts to show that defendants had both motive and

opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness."  Id.

The plaintiffs have sufficiently alleged scienter.  Although USF attempts to persuade the Court that certain factual allegations in the Complaint should not be viewed as evidence of conscious misbehavior or recklessness, it is not the Court's role on a motion to dismiss to make factual determinations.  Rather, the Court notes several factual allegations in the Complaint that give rise to a strong inference of fraudulent intent, including the following: Smith's April 12, 2001 memorandum to Ahold's CFO stating that "USF has engaged in setting up friendly third parties, which allow them to establish pads to income"; Lee's testimony regarding "self-generated promotional allowances" that served no other purpose than to "have a higher billing cost"; the PwC report's explanation that the VASPs were "designed to enable mark-up on items for which normal vendor Pas do not exist"; and the Tsebetzis affidavit stating that "USF has inflated its cost to customers via fictitious or USF-controlled middlemen and transport companies . . . . USF has artificially and fraudulently inflated the prices its customers pay." Compl. ¶¶ 58-59, 62-64, 72-78, 79.  Finally, that Ahold made certain disclosures concerning the VASPs in 2003 does not negate the plaintiffs' allegations of fraudulent intent from as early as 1998.  In conclusion, the plaintiffs have sufficiently alleged the predicate acts of mail and wire fraud.

b.   <u>Money Laundering</u>

The RICO cause of action also alleges the predicate acts of money laundering in violation of 18 U.S.C. §§ 1956 & 1957.  "To allege a violation of 18 U.S.C. § 1956, it must be pleaded that (1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4)

with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds." Bernstein v. Misk, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997) (internal quotations omitted). "To violate 18 U.S.C. § 1957, a defendant must have (1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity." Id.

The Supreme Court and the Second Circuit have recently provided guidance on the concealment element of the money laundering statute. In Cuellar v. United States, ___ U.S. ___, 128 S.Ct. 1994 (2008), the Supreme Court held that a conviction under the transportation prong of the money laundering statute "requires proof that the purpose-not merely effect-of the transportation was to conceal or disguise [the nature, location, source, ownership, or control of the illegal proceeds]." Id. at 2005. Since Cuellar, the Second Circuit has extended the Supreme Court's concealment requirement as to the transportation prong of the money laundering statute to the transaction prong of the statute. See United States v. Huezo, 546 F.3d 174, 179 (2d Cir. 2008) ("Thus, Cuellar confirms that a conviction for transaction money laundering, like a conviction for transportation money laundering, requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds."). These cases, then, require that the plaintiffs allege that USF conducted some transaction in order to conceal or disguise the nature, location, source, ownership, or control of the funds involved in the transaction.

The Complaint makes the following specific allegations of money laundering:

113.    Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956 in that, knowing that funds they received from Plaintiffs and other Class members constituted the proceeds of unlawful activity including mail and wire fraud, Defendants conducted and attempted to conduct certain financial transactions affecting interstate commerce involving these proceeds.

114.    These proceeds were the portions of payments received by USF from Plaintiffs and other Class members as a result of the scheme alleged herein, *i.e.*, payments for the falsely inflated cost components used by USF to calculate the price charged to its customers, and payments for USF's increased mark-ups resulting from USF's use of falsely inflated costs to calculate such mark-ups.

115.    These financial transactions conducted by Defendants were intended to promote the carrying on of the mail and wire fraud by making the VASPs appear to have a legitimate business purpose, and to hide from Plaintiffs and other Class members the false "cost" added to USF's invoices.

116.    Defendants further had knowledge that these financial transactions were designed to, and did, conceal and disguise the nature, location, source, ownership or control of the proceeds of the mail and wire fraud, by making it appear that the full invoice amount belonged to the VASPs, when in fact the VASPs kicked back a portion of the invoice price, representing the proceeds of the mail and wire fraud, to USF, and thus hiding the falsely inflated cost component from its clients' auditors.

117.    Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1957 in that they knowingly engaged in and attempted to engage in monetary transactions affecting interstate commerce and involving funds received from Plaintiffs and other Class members, which Defendants knew to be the proceeds of mail and wire fraud and criminally derived property from unlawful activity as described above, of a value greater than $10,000.

Compl. ¶¶ 113-17.  Thus, in the Complaint, the funds that the plaintiffs claim the defendants

laundered are those that USF received from the plaintiffs in purported fulfillment of the cost-plus

arrangements.  The plaintiffs allege that USF's receipt of the plaintiffs' payments based on

VASP-set cost was designed to hide from the plaintiffs the "false cost" added to USF's invoices.

Now, in opposition to the motion to dismiss, however, the plaintiffs claim that the buckets, as opposed to the plaintiffs' payments, were the funds that were laundered.  See Pls.' Mem. at 29 ("[T]hese 'buckets' of money sent from the VASPs to USF were structured to hide the 'cost' falsely added by the VASP System and were concealed from USF's cost-plus customers.").  USF argues that the plaintiffs' money laundering predicate must fail because the Complaint does not sufficiently allege that the transactions were designed to conceal some unlawful transaction.

Although a close question post-Cuellar, the Court finds that the plaintiffs have adequately alleged predicate acts of money laundering.  The plaintiffs allege that the buckets were designed to conceal the nature and source of the funds, i.e., that the source of the funds was the VASPs' allegedly falsely inflated invoice cost.  This is sufficient for the purposes of this motion to dismiss.  Of course, if faced with a motion for summary judgment, the plaintiffs will need to produce evidence that the purpose of the buckets was not just to compensate USF, but also to hide the nature or source of that compensation.

USF also argues that the Complaint fails to allege that the predicate acts of money laundering proximately caused the plaintiffs' injuries.  Under 18 U.S.C. § 1964(c), the plaintiffs must alleged that their injury was "by reason of" the substantive RICO violation.  "Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise."  Sedima, 473 U.S. at 497.  Therefore, "the plaintiff's injury must have been proximately caused by a pattern of racketeering activity violating [18 U.S.C. §] 1962 or by individual RICO predicate acts."  Baisch v. Gallina, 346 F.3d 366, 373 (2d Cir. 2003) (internal quotations omitted).  RICO

patterns or acts are deemed to "proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence."   Hecht, 897 F.2d at 23.

The plaintiffs' alleged injury is the falsely inflated costs they paid pursuant to their cost-plus arrangements as a result of the VASPs' selling USF the products at a marked-up price.  The money laundering charges stem from the allegation that after overcharging the plaintiffs for the goods that were funneled through the VASP System, USF conducted a financial transaction in receipt of the buckets, with the knowledge that the buckets represented proceeds from the alleged mail and wire fraud, and the purpose of which was to maintain the appearance that the cost charged to the plaintiffs was the actual cost charged by the VASP to USF.  Thus, USF argues that the plaintiffs injury cannot have been proximately caused by the alleged acts of money laundering that occurred after their injury.

The plaintiffs have sufficiently alleged that the pattern of racketeering activity, including money laundering, was the proximate cause of their injuries.  Here, the fact that the VASPs would kick back to USF the buckets of marked-up cost is what enabled USF to pay the VASPs the marked-up cost, which in turn enabled USF to charge the plaintiffs the marked-up cost.  See, e.g., Astech-Marmon, Inc. v. Lenoci, 349 F. Supp. 2d 265, 269 (D. Conn. 2004) (finding that acts including bribes and kickbacks paid by and to the defendants to direct lucrative city contracts away from the plaintiffs bore a direct relationship to the plaintiffs alleged injury).  The cases USF cites are distinguishable; for example, while the Ninth Circuit in Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n, 298 F.3d 768 (9th Cir. 2002) found that the defendant's "role in the Conspiracy, while important, was not a substantial factor in the sequence of responsible

causation," id. at 774 (internal quotations omitted), here the VASPs' kickback of the buckets to USF was undoubtedly a substantial factor in the sequence of responsible causation of plaintiffs' alleged injury.  To conclude, the plaintiffs have sufficiently alleged predicate acts of money laundering.

      3.   <u>Standing</u>

USF argues that plaintiffs Frankie's and Cason do not have standing to assert a RICO claim because first, Cason it is not party to a cost-plus contract, and second, Frankie's has no cost-plus agreement with respect to private label goods and USF has the contractual the right to set the cost component of the price under its agreement with Frankie's.  Thus, USF argues that Cason and Frankie's cannot allege causation or injury.

A plaintiff must demonstrate the following to satisfy RICO's standing requirements: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation."  <u>Motorola Credit Corp. v. Uzan</u>, 322 F.3d 130 (2d Cir. 2003) (internal quotation marks omitted).  Here, the Complaint clearly alleges that "Cason has purchased products on a 'cost-plus' basis from USF," and that "Frankie's is a party to a cost-plus arrangement with USF."  Compl. ¶¶ 10-11.  The Court finds that these allegations, in combination with the balance of the Complaint which alleges that customers who bought products from USF pursuant to cost-plus arrangements suffered injury caused by USF's participation in a pattern of racketeering activities, are sufficient to establish standing under RICO.

**C.**    **Count Two: 18 U.S.C. § 1962(d)**

The Complaint charges USF with violations of 18 U.S.C. § 1962(d), which makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of Section

-42-

1962."  18 U.S.C. § 1962(d).  USF does not dispute that the plaintiffs have alleged an agreement

to support a Section 1962(d) claim, but rather argue that because the Section 1962(c) claim is

insufficiently alleged, the Section 1962(d) conspiracy claim is necessarily insufficient.  Because a

Section 1962(c) claim is not necessary to state a Section 1962(d) claim, Beck, 529 U.S. at 507,

and because the Court found the Section 1962(c) claim to be sufficiently alleged, USF's

argument for dismissal of the Section 1962(d) count fails.

###        D.        **Count Three: Breach of Contract**

In Count Three, the plaintiffs charge USF with breach of their cost-plus arrangements.

The plaintiffs specifically allege the following: (1) that USF breached the plaintiffs' cost-plus

arrangements by using VASP invoices to calculate the cost component of their purchases; (2) that

USF acted dishonestly and in a commercially unreasonable manner to manipulate the invoice

costs used to calculate the cost component of the price; and (3) that USF breached its implied

duty of good faith and fair dealing by intentionally directing VASPs to falsely inflate the amounts

they invoiced USF and/or purchasing products through the VASPs for the purpose of increasing

its cost component.  USF argues that the Complaint fails to state a claim for breach of contract.

####            1.        Cason's Breach of Contract Claim

USF first argues that Cason's breach of contract claim must be dismissed because it does

not allege it is party to a cost-plus contract, but rather that "USF has invoiced Cason on a weekly

basis for products Cason purchased on a 'cost-plus' basis since at least 2000."  Compl. ¶ 10.

Cason argues that the alleged course of conduct with USF as a cost-plus customer is sufficient to

support a breach of contract claim.

Cason has alleged it frequently bought products from USF on a cost-plus basis.  Although

USF argues Cason has not alleged that a term of an agreement was breached, in fact Cason has alleged that the cost-plus term was breached each time it bought products on a cost-plus basis that were funneled through the VASP System.  In particular, Cason alleges that USF breached the cost-plus term of those agreements when it used VASP invoices as the cost component of the cost-plus arrangement.  While more will be required at a later stage of litigation, this allegation is sufficient to survive a motion to dismiss.

2.    <u>Breach of Contract</u>

USF next argues that plaintiffs' "theory that USF was required to sell private label products at a loss" is implausible, and should not survive a motion to dismiss under Twombly. USF Mem. at 12-13.  Because the Court finds inaccurate USF's characterization of the allegations of the Complaint, it will deny USF's motion to dismiss on that basis.

USF also argues that the contracts at issue permitted the VASP System operation. Quoting language from the contracts themselves, USF argues that the plaintiffs' breach of contract claim must as a matter of law fail because none of the contracts contains any limitation on setting invoices prices, and some of the contracts specify USF's right to set invoice costs. Whatever the precise meaning of these contractual terms, it is not at all clear, as a matter of law, that USF had the contractual right to use the VASPs in the manner alleged in the Complaint–that is, that USF has the contractual right to dictate to the VASPs the price the VASPs charged USF. Rather, the contractual language USF cites states that the cost component charged to cost-plus customers will be based on "various nationally published price lists"; "respective USF Foodservice distribution center on a district-wide basis and is intended to reflect the local market replacement cost or current market average cost of procured products"; and "invoice cost . . . or

local market replacement cost."  It is not apparent to the Court that USF's alleged dictating to the VASPs of the invoice cost to be charged to USF is the same as setting that price based on "various nationally published price lists," or that such collaboration is consistent with invoice cost being "issued by the vendor."  The evidence required to determine whether USF's sale of goods to the plaintiffs complied with these contractual terms is not before the Court, nor would it be appropriate for the Court to make this determination on a motion to dismiss.  Instead, the Court finds that the plaintiffs have sufficiently alleged a breach of contract in alleging that USF's direction of the VASPs' price-setting, and use of those prices in charging the plaintiffs for goods, was in violation of their cost-plus agreements.

USF additionally argues that the contracts, as a matter of law, permitted USF to retain "all the promotional allowances provided by the VASPs."  The Complaint does not claim that USF was not permitted to keep promotional allowances, but instead alleges that the buckets were not legitimate promotional allowances because they were "not dependent on USF achieving any distribution contingency or USF providing any benefit to the VASPs."  Compl. ¶ 47.  The Complaint plainly alleges that the buckets the VASPs paid to USF were not supplier incentives, but were rather "self-generated," and therefore were not legitimate promotional allowances. Compl. ¶ 73.  Again, the Court will not rule on the merits of the allegations at this time.

Finally, USF argues that the plaintiffs have not stated a claim for breach of the duty of good faith and fair dealing because USF's pricing was consistent with the contract terms.  The plaintiffs allege that USF violated its duty of good faith and fair dealing through its deceptive manipulation of the pricing terms of the cost-plus arrangements.  Once again, the Court declines to rule on the merits at this time.

### E.      **Count Four: California Business and Professions Code §§ 17200 *et seq.***

In Count Four, on behalf of CHW and the California Subclass, the plaintiffs assert that USF engaged in unlawful, unfair, and fraudulent business practices in violation of the California Unfair Competition Law ("UCL").  CHW alleges that USF used falsely inflated invoices to illegally dispose of CHW's and the California Subclass members' property.  USF argues that dismissal is mandated because the contract governing the cost-plus arrangement between USF and CHW contains a choice-of-law provision that dictates Illinois law is applicable.

In 1999, CHW became a member of Premier, a Group Purchasing Organization engaged in contracting services for its members to help them manage and reduce supply costs.  CHW has purchased products from USF pursuant to a cost-plus arrangement entered into by Premier and USF's predecessor, Alliant Foodservice.  Premier's contract with Alliant, to which CHW was a third-party beneficiary, was in effect from 2000 through 2005.  As to choice of law, the contract states as follows: "This Agreement is being delivered and executed in the State of Illinois.  In any action brought by or against [Premier Purchasing Partners, L.P.], the validity, construction and enforcement of this Agreement shall be governed in all respects by the laws of the State of Illinois."  Eberhardt Decl. Ex. 3, Premier Contract § 15.1.  The contract lists both Premier and Alliant as having their place of business in the state of Illinois.  Id. at Cover Sheet.  USF argues that dismissal of the California UCL is mandated here where the Premier contract to which CHW is a third-party beneficiary is governed by Illinois law.  The plaintiffs argue that the contract's choice-of-law provision is limited in scope, and therefore does not apply to their UCL claim, which arises not from the contract, but from USF's racketeering activity, mail fraud, wire fraud, and money laundering in its separate operation of the VASP System.

The parties agree that California law governs the effect of the contract's choice-of-law provision.  See Menowitz, 991 F.2d at 40 ("[T]ransferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed.").  A broadly worded choice of law clause, such as that a contract shall be "governed by" the law of a particular state, applies to "all causes of action arising from or related to" the contract "regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates."  Nedlloyd Lines, B.V. v. Superior Court, 834 P.2d 1148, 1155 (Cal. 1992).  Applying Nedlloyd, the Eastern District of California held that a contract stating the "Agreement shall be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia" required dismissal of a California UCL claim.  Cont'l Airlines, Inc. v. Mundo Travel Corp., 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) ("A valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL.").  More specifically, the Continental Airlines court held that the plaintiff's unfair competition claim was governed by the contractual choice of law provision because the contract created the relationship between the plaintiff and the defendant, in the course of which the defendant allegedly engaged in improper behavior giving rise to the unfair competition claim. Id. at 1070.  Additionally, in Medimatch, Inc. v. Lucent Tech. Inc., 120 F. Supp. 2d 842, 862 (N.D. Cal. 2000), the contract language at issue was as follows: "construction, interpretation and performance of this Agreement shall be governed by the local laws of the State of New Jersey." Id. at 861.  The Medimatch court held that the choice-of-law provision encompassed the plaintiff's unfair competition claim, and it therefore dismissed the UCL claim.  Id. at 861-62.

Although the choice-of-law provision in the Premier Contract–"the validity, construction

and enforcement of this Agreement shall be governed in all respects by the laws of the State of

Illinois"– is drawn more narrowly than the language in <u>Continental Airlines</u> and <u>Nedlloyd</u>, it is

substantially similar to the language in <u>Medimatch</u>.  Moreover, the rationale of <u>Continental</u>

<u>Airlines</u> is applicable; CHW's unfair competition claim should be governed by the contract's

choice-of-law provision because the contract created the relationship between CHW and USF,

and in the course of that relationship USF allegedly engaged in improper behavior giving rise to

the unfair competition claim.  Adjudication of the UCL claim would require the Court to

construe the contract.  Thus, the Court finds that the UCL claim is encompassed by the choice of

law provision.

"When there is a valid, bargained-for choice-of-law provision in a contract, California

courts apply the approach outlined in the Restatement Second of Conflict of Laws Section

187."[13]  <u>Van Slyke v. Capital One Bank</u>, 503 F. Supp. 2d 1353, 1360 (N.D. Cal. 2007) (<u>citing</u>

---

[13]The relevant portion of the Restatement provides:

(1) The law of the state chosen by the parties to govern their contractual rights and
duties will be applied if the particular issue is one which the parties could have
resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and
duties will be applied, even if the particular issue is one which the parties could
not have resolved by an explicit provision in their agreement directed to that issue,
unless either
   (a) the chosen state has no substantial relationship to the parties or the
   transaction and there is no other reasonable basis for the parties' choice, or
   (b) application of the law of the chosen state would be contrary to a
   fundamental policy of a state which has a materially greater interest than
   the chosen state in the determination of the particular issue and which,
   under the rule of § 188, would be the state of the applicable law in the
   absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187.

-48-

Nedlloyd, 834 P.2d 1148).  In summary, the Court

> must first analyze whether the chosen state has a substantial relationship to the
> parties or their transaction.  If the first prong is met, a court must then determine
> whether the chosen state's law is contrary to a fundamental policy of California.
> If so, then the court must weigh whether California has a materially greater
> interest than the chosen state in the determination of a particular issue.

Id. (citing Nedlloyd, 834 P.2d 1148).

The plaintiffs do not argue that Illinois does not have a substantial relationship to the

contract.  Moreover, "[t]hat one of the parties resides in a foreign state gives the parties a

reasonable ground for choosing that state's law."  Id. at 594.  Here, it appears that both of the

parties to the contract–Premier and Alliant–had their place of business in Illinois at the time they

executed the contract.  Therefore, Illinois has a substantial relationship to the contract and the

parties had a reasonable basis for selecting Illinois law.

The second inquiry is whether application of Illinois law would be contrary to a

fundamental public policy of California.  Medimatch, 120 F. Supp. 2d at 862 ("[A] choice of law

made by sophisticated commercial parties through arms length negotiation will be enforced

unless the chosen law conflicts with a fundamental public policy of California.") (citing

Nedlloyd, 834 P.2d 1148).  CHW's only argument as to why application of Illinois law is

contrary to California's fundamental public policy is that to "allow Illinois law to displace

California's UCL statute would deny CHW, a California citizen, the protection it is afforded by

this important California statute."  Pls.' Mem. at 46.  However, courts in California have clearly

stated that "merely because plaintiff's claims might implicate California statutes is not sufficient

to establish that application of [another state's] law to the claims would be contrary to any of the

policies embodied in the statutes."  Cardonet, Inc. v. IBM Corp., No. C-06-06637 RMW, 2007

WL 518909, *4 (N.D. Cal. 2007).  Indeed, "the mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." Medimatch, 120 F. Supp. 2d at 862.  Because CHW has not forwarded any fundamental public policy of California that would be contravened by application of the law chosen by the parties to the contract, the Court need not determine whether California or Illinois has a materially greater interest in application of its law.  Therefore, the Court will apply Illinois law and dismiss CHW's UCL claim.

## V.      USF's Motion to Strike

Arguing they are irrelevant and prejudicial, USF moves to strike from the Complaint allegations concerning accounting irregularities unrelated to the VASP System, as well as the resulting civil and criminal investigations, settlements involving Ahold, USF, or their executives, and criminal convictions or guilty pleas of USF executives.  The plaintiffs argue that allegations regarding USF's securities fraud are indeed relevant to plaintiffs' claims because "[m]any of the same individuals who were involved in the securities fraud are also alleged to have been involved in the fraudulent conduct at issue in this case.  Moreover, both the conduct that gave rise to the securities fraud and the conduct at issue in this case involves the manipulation of income related to sales at USF."  Pls.' Mem. Opp'n at 49-50.

Fed. R. Civ. P. 12(f) permits a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Id.  When "deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would

be admissible." Lipsky v. Commw. United Corp., 551 F.2d 887, 893 (2d Cir. 1976).  Evidentiary

questions "should especially be avoided at [] a preliminary stage of the proceedings," as

"[u]sually the questions of relevancy and admissibility in general require the context of an

ongoing and unfolding trial in which to be properly decided."  Id.  Nevertheless, courts do at

times strike allegations.  Id. (upholding the district court's ruling striking allegations of the

complaint where such allegations could have no possible bearing on the action); see also Corr.

Officers Benevolent Ass'n of Rockland County v. Kralik, 226 F.R.D. 175, 177 (S.D.N.Y. 2005)

(striking as irrelevant both allegations referring to a prior settlement involving similar parties and

issues and exhibits relating to that settlement); Gotlin v. Lederman, 367 F. Supp. 2d 349, 363-64

(E.D.N.Y. 2005); Toto v. McMahan, Brafman, Morgan & Co., No. 93 Civ. 5894, 1995 WL

46691, at *16 (S.D.N.Y. Feb. 7, 1995) ("Frequently courts will strike references that have

criminal overtones.").

    The Court will grant the defendants' motion to strike in full.  First, particularly given

Ahold's dismissal for lack of personal jurisdiction, the Court will strike the allegation in ¶ 17

concerning Ahold's agreement to indemnify USF.  Second, the Court will grant the motion to

strike as to the allegation in ¶ 164, as it relates only to a charge against Ahold.  Third, the Court

will grant the motion to strike concerning all allegations related to USF's overstatement of

promotional allowances, as such accounting irregularities, as well as the resultant investigations,

convictions, or other resolutions, are unrelated to plaintiffs' allegations of USF's fraudulent

activities involving the VASP System.  Plaintiffs' argument that many of the same people were

allegedly involved in both the promotional allowance accounting irregularities and the VASP

System is insufficient to make those irregularities and investigations relevant.  Specifically, the

Court strikes the following: the second, third, and fourth sentences of ¶ 61; the first sentence of ¶ 62; "after discovering accounting fraud at USF" in the first sentence of ¶ 68; the second sentence of ¶ 68; all of ¶ 69; reference to the criminal trial of Mark Kaiser in the first sentence of ¶ 71; and "USF's scheme to inflate its reported earning by recording completely fictitious promotional allowances" in ¶ 85.  Finally, the Court will also strike ¶ 70 of the Complaint regarding information the DOJ has requested from Ahold in relation to its civil investigation of USF's billing practices, including the use of the VASPs, with regard to contracts with federal agency customers.  Although the plaintiffs allege that the civil investigation is likely related to the "same type of fraudulent contracting and billing practices at issue in this case," the fact of the DOJ's investigation or the information the DOJ has requested is irrelevant to this case.

**VI.**    <u>**Conclusion**</u>

Ahold's motion to dismiss [Dkt. # 50] is GRANTED.  USF's motion to dismiss [Dkt. # 53] is GRANTED IN PART and DENIED IN PART; remaining against USF are Counts One, Two, and Three.  USF's motion to strike [Dkt. # 58] is GRANTED.

**SO ORDERED.**

Dated this 15th day of December, 2009 at Hartford, Connecticut.


                                          **/s/ Christopher F. Droney**
                                          **CHRISTOPHER F. DRONEY**
                                          **UNITED STATES DISTRICT JUDGE**