# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

————————————————————— :
IN RE: US FOODSERVICE INC.                :
PRICING LITIGATION                        :        Case No. 3:07-md-1894 (CFD)
————————————————————— :
                                          :
WATERBURY HOSPITAL, ET AL.,               :
     Plaintiffs,                         :
                                          :
v.                                        :        Case No. 3:06-cv-1657 (CFD)
                                          :
U.S. FOODSERVICE, INC.,                   :
     Defendant.                          :
————————————————————— :
                                          :
CATHOLIC HEALTHCARE WEST,                 :
     Plaintiff,                          :
                                          :
v.                                        :        Case No. 3:08-cv-4 (CFD)
                                          :
KONINKLIJKE AHOLD N.V., ET AL.,           :
     Defendants.                         :
————————————————————— :
                                          :
THOMAS & KING, INC.,                      :
     Plaintiff,                          :
                                          :
v.                                        :        Case No. 3:08-cv-5 (CFD)
                                          :
KONINKLIJKE AHOLD N.V., ET AL.,           :
     Defendants.                         :
————————————————————— :


## RULING ON MOTION FOR CLASS CERTIFICATION

## I.  Introduction

The plaintiffs, Waterbury Hospital, Frankie's Franchise Systems, Inc. ("Frankie's"), Thomas & King, Inc. ("T&K"), and Catholic Healthcare West ("CHW"), have brought a motion asking the Court to certify a proposed class under Federal Rule of Civil Procedure 23.  For the reasons that follow, the plaintiffs' motion is granted.

## II.  Procedural Background

The plaintiffs filed a Consolidated and Amended Class Action Complaint in this multidistrict litigation ("MDL") proceeding.  The MDL involves three previously filed cases: Catholic Healthcare West v. Koninklijke Ahold N.V., et al., filed in the Northern District of California; Thomas & King, Inc. v. Koninklijke Ahold N.V., et al., filed in the Southern District of Illinois; and Waterbury Hospital et al. v. U.S. Foodservice, Inc., filed in the District of Connecticut.  The United States Judicial Panel on Multidistrict Litigation previously found that the "three actions involve common questions of fact, and that centralization under [28 U.S.C. § 1407] in the District of Connecticut will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."  In re: U.S. Foodservice, Inc., Pricing Litig., 528 F. Supp. 2d 1370, 1371 (J.P.M.L. 2007).

In their Amended Complaint, the plaintiffs allege claims pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., as well as breach of contract against the defendant, U.S. Foodservice ("USF").[1]  The plaintiffs have filed a motion

---

[1] In a December 15, 2009 ruling, the Court dismissed the plaintiffs' claims against defendant Koninklijke Ahold N.V., as well as the plaintiffs' claim against USF in Count Four of the Amended Complaint for a violation of California's Unfair Competition Law ("UCL").  See generally In re Foodservice Inc. Pricing Litig., Nos. 3:07 MD 1894(CFD), 3:06 CV 1657(CFD), 3:08 CV 4(CFD), 3:08 CV 5(CFD), 2009 WL 5064468 (D. Conn. Dec. 15, 2009).  Defendant

seeking to certify the following class[2]:

> Any person in the United States who purchased products from USF pursuant to an arrangement that defined a sale price in terms of a cost component plus a markup ("cost-plus contract"), and for which USF used a VASP transaction to calculate the cost component.

## III. Factual Background[3]

USF is the second largest food distributor in the United States, providing food products and services to over 75,000 customers. Each of the plaintiffs is a customer of USF that purchased food products and other goods from USF under cost-plus contracts. Waterbury Hospital is a public hospital located in Waterbury, Connecticut, that offers meals and other food services to its patients, employees, and visitors.[4] Frankie's is a corporation located in Waterbury,

---

Gordon Redgate is still nominally a defendant. On September 17, 2008, the Court granted a joint motion to stay claims against Redgate pending the Court's approval of the parties' settlement of those claims. The Court has not yet approved any settlement with Defendant Redgate and therefore the stay remains in place. The plaintiffs' motion for class certification does not address Defendant Redgate, and this ruling only governs the plaintiffs' remaining claims against USF.

[2] Prior to the Court dismissing the plaintiffs' UCL claim in its December 15, 2009 ruling, CHW also sought certification of a California subclass for that claim.

[3] The following facts are taken from the plaintiffs' Amended Complaint, as well as from the Court's analysis of the evidentiary record, including affidavits and declarations. See Lewis Tree Servs., Inc. v. Lucent Techs., 211 F.R.D. 228, 231 (S.D.N.Y. 2002) ("In deciding whether the requirements of Rule 23 have been met, the Court may examine not only the pleadings but also the evidentiary record, including any affidavits and results of discovery." (citing Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982))).

[4] Waterbury Hospital is party to a cost-plus arrangement originally entered into with Alliant Exchange ("Alliant"), which USF acquired in 2001. Following USF's acquisition of Alliant, Waterbury Hospital continued to purchase products from USF pursuant to its cost-plus arrangement.

Connecticut, that operates a chain of franchised restaurants in Connecticut.[5] T&K is a corporation with its principal place of business in Kentucky that owns and operates eighty-eight "Applebee's Neighborhood Grill & Bar" restaurants and seven "Carino's Italian Grill" restaurants in several states.[6] CHW is a non-profit corporation comprised of dozens of hospitals and medical centers in California, Arizona, and Nevada, with its principal place of business in California.[7]

A.    Cost-Plus Contracts

As part of its food distribution service, USF enters into cost-plus contracts with its customers. Generally, cost-plus pricing arrangements involve three parties: (1) a supplier; (2) a distributor; and (3) a customer. Pursuant to a cost-plus contract, the customer agrees to purchase food from the distributor (USF) at "cost-plus," where the "cost-plus" price is derived by (1) a cost component based on the prices charged to USF by USF's suppliers ("cost"), (2) plus an agreed upon mark-up of either a fixed percentage or a set dollar amount ("plus"). The cost component of "cost-plus" is often referred to as "landed cost," and is typically based on factors such as national or regional published price lists, or invoice cost plus freight.[8]

---

[5] Frankie's is party to a cost-plus arrangement with USF, pursuant to which Frankie's and its franchisees have purchased products from USF.

[6] T&K purchased products from USF pursuant to a cost-plus arrangement it entered into with Alliant effective July 1, 2001.

[7] In 1999, CHW and its hospitals and medical centers became members of Premier, Inc., a "Group Purchasing Organization" engaged in contracting services for its members to help them manage and reduce supply costs. CHW has purchased products from USF pursuant to a cost-plus arrangement between Premier and USF's predecessor, Alliant.

[8] For example, in a 2001 cost-plus agreement between T&K and Alliant, "landed cost" is determined "based on various national or regional published price lists, plus inbound freight

-4-

The cost-plus contracts between USF and its customers typically provide that USF is entitled to receive the benefit of "promotional allowances." Promotional allowances are rebates, discounts, credits, or other incentives that USF receives from its suppliers, which reduce USF's net cost in acquiring goods from the suppliers.[9] Although the promotional allowances reduce the prices charged to USF by its suppliers, thereby reducing USF's actual "cost," USF's cost-plus contracts permitted USF to receive the benefit of the allowances without any adverse effect on the cost component USF used to calculate the price charged to its cost-plus customers.[10]

B.      VASP System

Beginning around 1998, six companies known as "Value Added Service Providers" ("VASPs") were formed. Four of the VASPs were owned by Brady Schofield and had their

---

(where applicable)" or "invoice cost plus freight (where applicable)." Kurtz Decl. Ex. 2 at 4. As evidenced in an agreement between Novation, LLC, and USF, "Landed Cost" may also be defined as

> the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight . . . to Approved Distributor's distribution center, less off-invoice discounts on off-invoice allowances (such off-invoice discounts or off-invoice allowances to mean manufacturer generated discounts or

> allowances on particular items for set periods of time and which are specifically reflected on the invoice).

Kurtz Decl. Ex. 3.

[9] Suppliers provide these promotional allowances to USF and other distributors to promote the sale of their goods.

[10] For example, a "Promotional Allowance" provision in USF's cost-plus contract with Frankie's provides in relevant part: "PROMOTIONAL ALLOWANCES – All programs/allowances will be negotiated jointly. Only promotional allowances exclusively negotiated by you on your behalf will be passed through to you. USF shall be entitled to cash discounts and other supplier incentives." Kurtz Decl. Ex. 1.

principal place of business in Rhode Island or Massachusetts. These VASPs were: (1) Seafood Marketing Specialities, Inc.; (2) Specialty Supply & Marketing, Inc.; (3) Produce Solutions, Inc.; and (4) Frozen Farms, Inc. The other two VASPs, Commodity Management Systems, Inc.[11] and Private Label Distribution, Inc., were owned by Gordon Redgate and had their principal place of business in New Jersey.

USF entered into Product Procurement Agreements with each VASP. Based on these agreements, USF would purchase certain food products from the VASPs to distribute to its customers. According to the plaintiffs, USF would instruct the VASPs to purchase certain products from USF's suppliers (at a price allegedly dictated by USF). USF would then buy those products from the VASPs at a markup (the size of the markup was also allegedly dictated by USF) and resell the products at "cost-plus" to its customers. After USF paid the VASPs for the products, the VASPs would remit back to USF the difference between the VASPs' actual cost (the cost of purchasing the products from the supplier) and the price the VASPs charged to USF. This difference was referred to as the "bucket." In compensation for purchasing and reselling the food products to USF, USF would pay the VASPs a nominal transaction fee.[12] Thus, USF used

_____

[11] There is a dispute as to whether Commodity Management Systems, Inc. was a VASP; however, this dispute is not material to the Court's determination of whether class certification is appropriate and, despite the Court's characterization of it as a VASP for purposes of this ruling, such a characterization is not intended to hold any precedential value.

[12] The alleged VASP "scheme" was outlined in an accounting analysis performed by Pricewaterhouse Coopers:

- The VASPs order goods and get charged (say) $18 by the [supplier]. The VASP in turn charges USF $20, which becomes USF's cost. USF charges its cost-plus customers based on the $20 cost.

- Later (calculated monthly), the VASP passes back the $2 markup, which is

the VASPs to increase the cost component of its products that it sold to its cost-plus customers; however, USF's actual "cost" was less than that reflected on its cost-plus customers' invoices.

Essentially, through the use of the VASPs, USF interjected a "middle-man" between itself and its suppliers—a fourth party to the typical three-party cost-plus transaction. The plaintiffs claim that USF funded and controlled the VASPs to increase USF's profit margin on its cost-plus contracts by falsely inflating the cost basis of the products that USF sold to its cost-plus customers.

The parties dispute the legitimacy and purpose of the VASPs. The plaintiffs allege and there is evidence that the VASPs were created solely as shell companies, intended to artificially inflate the cost component to be used in USF's cost-plus pricing agreements and, consequently, increase USF's bottom line. For instance, USF allegedly directly negotiated the supply contracts with the suppliers (instead of the VASPs) and USF allegedly dictated both the prices at which the VASPs purchased the products from the suppliers and the prices at which the VASPs sold those products to USF. Also, there is evidence that USF, instead of the VASPs, often placed purchase orders with various suppliers for "delivery" to the VASPs. In some instances, the VASPs allegedly would never take possession of the products they purchased from the suppliers; rather, the products would be shipped directly to USF.[13] The plaintiffs have also presented evidence that

_____

> recorded by USF as a promotional allowance . . . .
>
> •    USF is charged a transaction fee by the VASP (on a "per invoice" or
>       volume basis), which . . . is calibrated to allow the VASP to break even.

See Pls'. Ex. 1. at 1.

[13] In previous testimony, Gordon Redgate, owner of two of the VASPs, stated in regard to Private Brands, one of the VASPs he owned, "[a]ll we did was take paper in and paper out. . . .

-7-

USF intentionally concealed the VASPs from its cost-plus customers.

In addition to controlling and concealing the VASPs' operations, there is also evidence that USF controlled the VASPs' finances. For instance, each of the VASPs was required to grant USF a security interest in the VASP's common stock; the VASPs had to obtain consent from USF for any change in their ownership; USF controlled to whom and when the VASPs made payments;[14] and USF guaranteed the VASPs' obligations. Finally, there is evidence that USF funded many of the VASPs through short-term interest free loans and that USF accounted for most of the VASPs' business.

Despite the evidence regarding USF's control and use of the VASPs, there is also evidence in the record regarding the many legitimate business functions that the VASPs served, including: (1) quality control services; (2) purchasing; (3) brand and product development; (4) merchandising services; (5) marketing support; and (6) customer service. Additionally, Brady Schofield, owner of four of the VASPs, has testified to the legitimacy of the VASPs—namely that the VASPs are legitimate business organizations with office space, warehouse space, and many employees.

The effect of the VASP system was substantial; for example, one VASP passed back over $58 million to USF in one year (based on approximately $500 million in sales), while another

Our accounting department made the payments with the instructions that we were given by U.S. Foodservice."

[14] The product procurement agreements between USF and the VASPs required the VASPs to keep all funds received from USF in an escrow or trust account for the purpose of paying the suppliers' bills for the products USF ordered.

VASP passed back approximately $28 million (based on around $130 million in sales). Pricewaterhouse Coopers found that the "[t]otal VASP pass-back receipts over the period from April 2000 to December 2002 were $388 million."

The plaintiffs argue that USF deceived its cost-plus customers into believing that USF's cost component was calculated based on transactions with "legitimate suppliers." Based on this contention, the plaintiffs have filed RICO claims and breach of contract claims against USF, alleging that USF's use of the VASP system was fraudulent, and seek certification of the proposed class.

## IV. Discussion

Federal Rule of Civil Procedure 23 governs class certification. To certify a class under Rule 23, the plaintiffs must satisfy both Rule 23(a) and at least one of the requirements listed in Rule 23(b). See Fed. R. Civ. P. 23(a) & 23(b).

The district court must determine through "rigorous analysis" that all Rule 23 requirements are met to certify the class. See In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 40 (2d Cir. 2006). That a Rule 23 requirement overlaps with a merits issue does not prevent the court from making a determination as to whether the requirement has been met. See id. at 41. However, in assessing whether the Rule 23 requirements have been met, the court should not assess any aspects of the merits unrelated to a Rule 23 requirement. See id. (noting that the class certification proceeding should not turn "into a protracted mini-trial of substantial portions of the underlying litigation"); see also Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 & n.6 (2011) ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the

plaintiff's underlying claim.  That cannot be helped.  [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (internal quotations and citations omitted)).

"[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

A.      Rule 23(a)

To satisfy Rule 23(a), the plaintiffs must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable,
(2) there are questions of law or fact common to the class,
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Rule 23(a)'s four requirements or prerequisites are commonly referred to as numerosity, commonality, typicality, and adequacy of representation, respectively.  See In re Initial Pub. Offering Sec., 471 F.3d at 32.  Although USF does not appear to strongly dispute that the plaintiffs' proposed class meets most of the 23(a) requirements,[15] the Court will address each of them, and then turn to the disputed issue of predominance in Rule 23(b).

1.      *Numerosity*

Numerosity exists where the proposed class "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The U.S. Court of Appeals for the Second Circuit

---

[15] USF appears to only claim that the plaintiffs' claims are not typical of other class members' claims pursuant to Rule 23(a)(3) and that the plaintiffs are not adequate class representatives pursuant to Rule 23(a)(4).

has held that the numerosity requirement is generally satisfied when the proposed class is comprised of forty or more members. See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). The plaintiffs easily satisfy this requirement. Approximately 75,000 customers have bought food products from USF. Although it is not clear from the record whether all 75,000 customers purchased food products from USF pursuant to a cost-plus contract involving a VASP transaction, there is evidence of at least 200 cost-plus contracts between USF and its customers. Cf. Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993) ("Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement."). Accordingly, the Court finds that the proposed class meets the numerosity requirement.

2.    *Commonality*

"Under Rule 23(a)(2), a class action is maintainable if there are common questions of law or fact." Collins v. Olin Corp., 248 F.R.D. 95, 101 (D. Conn. 2008); see Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."). To satisfy commonality, these common questions do not have to overshadow potential individual issues; common questions must simply exist. See Collins, 248 F.R.D. at 101.

> Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Wal-Mart Stores, Inc., 131 S.Ct. at 2551 (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)).

The plaintiffs contend that USF employed a fraudulent scheme that was uniform in nature. The plaintiffs allege that USF systematically controlled the VASPs in such a manner to conceal the VASPs' existence while fraudulently inflating the price of USF's cost-plus products. Allegedly, USF placed orders for certain food products through the VASPs and uniformly charged its customers the cost-plus price based on the cost component derived through the VASPs, not USF's "actual" net cost. Despite any individual factual variations that may exist such as differences in USF's cost-plus contracts or differences in customers' knowledge of the VASP system, the plaintiffs have adequately shown a common course of conduct based on USF's alleged fraudulent pricing scheme, which is "at the core of the cause of action alleged." See Reese v. Arrow Fin. Servs., LLC, 202 F.R.D. 83, 91 (D. Conn. 2001) ("[Commonality] does not require that all questions of law or fact raised be common. Although the claims of individual class members do not have to match precisely, the critical inquiry is whether the common questions are at the core of the cause of action alleged." (internal citations and quotations omitted)).

Based on the plaintiffs' allegations and the supporting evidence in the record, the Court determines that the plaintiffs have established that at least one common question of law and fact exists: whether the defendant's use of the VASPs to calculate the cost component of the cost-plus markup price violated RICO or constituted a breach of contract.[16] See Spencer v. Hartford Fin.

---

[16] The U.S. Supreme Court recently denied class certification in Wal-Mart Stores, Inc. v. Duke because there was "nothing to unite all of the plaintiffs' claims." Wal-Mart Stores, Inc., 131 S.Ct.2541, 2557 n.10. Unlike the plaintiffs in Wal-Mart Stores, plaintiffs here are all

Servs. Grp., Inc., 256 F.R.D. 284, 290 (D. Conn. 2009) ("Where the question of law involves 'standardized conduct of the defendant towards members of the proposed class . . . the commonality requirement of Rule 23(a)(2) is usually met." (quoting Franklin v. City of Chi., 102 F.R.D. 944, 949 (N.D. Ill. 1984))). Accordingly, the Court finds that the plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

3.      *Typicality*

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  Robinson v. Metro–North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001) (internal quotations omitted); see Fed. R. Civ. P. 23(a)(3).

Here, there is no question that the plaintiffs' claims arise from the same set of events as the other members of the class—namely, USF's use of the VASPs to calculate the cost component of the price charged to its customers, including the plaintiffs and other putative class members, under cost-plus contracts.[17]  Although USF claims that individual contractual terms may need to be examined in this case due to the large number of proposed class members and the uniqueness of each class member's contract, the plaintiffs still satisfy the typicality requirement because they have sufficiently alleged "that their injuries derive from a unitary course of conduct

affected by the same practice of the defendant, namely its use of the VASPs to calculate the cost component of the cost-plus markup price.

[17] Based on the description of the proposed class, every class member necessarily must have purchased food products from USF under a cost-plus contract that was subject to VASP pricing.

by a single system." See Marisol A, 126 F.3d at 377. Consequently, despite potential minor variations in the underlying facts of class members' claims, the class representatives' claims are typical of the claims of the class.

USF argues that the plaintiffs cannot show typicality because, even after learning of the alleged fraud involving the VASPs, the plaintiffs have continued to purchase food products from USF. See Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 78 (S.D.N.Y. 2006) (finding the typicality requirement not met because the atypical plaintiff was subject to an affirmative defense based on the voluntary payment doctrine). USF's argument, however, is misplaced. First, it is undisputed that USF's VASP system ended around 2004. Thus, the voluntary payment doctrine does not affect the plaintiffs' current purchases of food products from USF which are not subject to the VASP system. Second, USF argues that the plaintiffs' alleged knowledge of the VASP system subjects them to unique defenses, which precludes a finding of typicality. See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."). While the voluntary payment doctrine may be a "unique defense," it does not bar a finding of typicality in this case. The voluntary payment doctrine is a bar to the recovery of damages for "payments voluntarily made with full knowledge of the facts." Id. While the plaintiffs' alleged knowledge of the VASP system is a strongly contested factual dispute between the parties in this case, even assuming that the plaintiffs' had *some* knowledge of the VASP system while it was ongoing, the voluntary payment doctrine would not apply as USF has not shown, at this time, that the

plaintiffs' had *full* knowledge of the facts.[18]  Accordingly, the voluntary payment doctrine does not prevent the Court from finding that the plaintiffs have satisfied Rule 23(a)'s typicality requirement.[19]

### 4.       *Adequacy of Representation*

The final Rule 23(a) requirement is adequacy of representation, which requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To determine whether the representation is adequate, the court typically inquires whether the "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 99 (2d Cir. 2007) (internal quotations omitted).  This inquiry serves to identify any conflicts of interests between the named plaintiffs and the remainder of the potential class.  See Collins, 248 F.R.D. at 102.

USF does not allege that the plaintiffs' attorneys are insufficient advocates or that any conflict of interests exist.  Instead, USF reasserts its argument that because the plaintiffs have continued to purchase from USF after learning of the VASP system, they clearly do not credit their own allegations of fraud and, therefore, are not adequate representatives.  However, as

---

[18] Although the Court must develop a sufficient evidentiary record from which to conclude whether the party moving for class certification has satisfied Rule 23, see Sirota, 673 F.2d at 571–72, the Court "should . . . refrain from deciding any material factual disputed between the parties concerning the merits of the claims."  Lewis Tree Servs., Inc., 211 F.R.D. at 231.

[19] In addition to the issue of the plaintiffs' knowledge, the voluntary payment doctrine is a New York state law doctrine.  Given that none of the plaintiffs is a New York company, it does not appear that the plaintiffs would be subject to this alleged "unique defense" and there is no indication that the doctrine, even if applicable, would "threaten to become the focus of the litigation."

discussed in the foregoing analysis regarding typicality, the plaintiffs' current purchasing preferences, including purchasing food products from USF, are not relevant to the claims in this case and do not implicate the voluntary payment doctrine. Further, the class representatives' interests are not antagonistic to the claims of the rest of the class; every member of the putative class, including the class representatives, share a collective interest in recouping the funds that they allegedly overpaid for cost-plus food products from USF. Given the evidence of USF's systematic approach to pricing cost-plus products through use of the VASPs, any alleged conflicts of interest between the named parties and the class that the plaintiffs seek to represent are not "fundamental." See In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001) ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental . . . ."). Thus, the Court finds that the plaintiffs have demonstrated that they are adequate representatives of the putative class in accordance with Rule 23(a)(4).

The Court finds that the plaintiffs have satisfied all four Rule 23(a) requirements for class certification.

B.      Rule 23(b)(3)

In addition to satisfying Rule 23(a), the proposed class must also satisfy at least one of the requirements listed in Federal Rule of Civil Procedure 23(b). See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). The plaintiffs seek certification under Rule 23(b)(3), which provides that a class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy."  Fed. R. Civ. P. 23(b)(3).

The predominance requirement, which is highly disputed here, "is a more demanding criterion than the commonality inquiry under Rule 23(a)."  Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Id. (internal quotations omitted); see Amchem Prods., 521 U.S. at 615 (noting that the requirements of Rule 23(b)(3) ensures that the class will be certified only when it would "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results" (internal quotations and citations omitted)).  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to only individualized proof."  Moore, 306 F.3d at 1252.

The plaintiffs contend that common issues of law and fact predominate both their RICO claims and their breach of contract claim.  The plaintiffs argue that the VASP scheme was common as to all class members and that each class member suffered the same injury—overpaying for certain food products based on invoices that USF sent to them which allegedly included artificially inflated cost-plus prices.  The plaintiffs further contend that no class member had knowledge of the VASP system and that USF concealed the VASPs from all class members.

In contrast, USF argues that Rule 23(b)(3)'s predominance requirement is not met because individual factual and legal issues predominate with respect to the plaintiffs' RICO

-17-

claims, breach of contract claim, and damages. USF also argues that this case is not manageable as a class action. USF claims that communications between itself and the class members regarding USF's pricing practices varied from customer to customer, thereby raising individual questions of knowledge. USF also contends that its cost-plus contracts were not uniform and therefore common issues of law and fact do not predominate. Finally, USF argues that variations in state law with respect to breach of contract claims and the admissibility of extrinsic evidence render the plaintiffs' claims not suitable for class treatment. The RICO and breach of contract issues, as well as damages, will be examined separately.

1.      *RICO*

The plaintiffs bring a cause of action under 18 U.S.C. § 1962(c) which states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[20] A private citizen may bring a civil RICO action if the person is "injured in his business or property by reason of a violation of [RICO's substantive provisions]." 18 U.S.C. § 1964(c); see also DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) ("To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." (internal quotations omitted)).

To establish a civil RICO claim pursuant to 18 U.S.C. §1962(c), the plaintiffs must prove

---

[20] The plaintiffs also allege a violation of 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima,

S.P.R.L. v. Imrex Co., Inc., 472 U.S. 479, 496 (1985); see also First Capital Asset Mgmt., Inc. v.

Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004).

      a.     *Conduct, Enterprise, and Pattern*

      The plaintiffs have produced evidence showing that common issues predominate over

individual issues with respect to conduct, enterprise, and pattern. First, common evidence would

be used to show that USF managed and controlled the VASPs. See DeFalco, 244 F.3d at 309

("The Supreme Court has interpreted the phrase 'to participate . . . in the conduct of [the]

enterprise's affairs' to mean participation in the operation or management of the enterprise."

(quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993))). Additionally, common evidence

will predominate in establishing that the VASPs constituted an "enterprise." See DeFalco, 244

F.3d at 306 ("A RICO enterprise 'includes any individual, partnership, corporation, association,

or other legal entity, and any union or group of individuals associated in fact although not a legal

entity.'" (quoting 18 U.S.C. § 1961(4))). Finally, common evidence, including evidence of the

thousands of VASP transactions that occurred involving USF and USF's cost-plus customers

will predominate in satisfying the RICO pattern element. See De Falco, 244 F.3d at 306 ("A

'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which

occurred after the effective date of this chapter and the last of which occurred within ten years . .

. after the commission of a prior act of racketeering activity." (quoting 18 U.S.C. § 1961(5))).

USF does not appear to contest the finding of predominance with respect to these elements.

      b.     *Racketeering Activity & Injury*

      As to the final element of a civil RICO claim—racketeering activity—the plaintiffs claim

that USF engaged in a "pattern of racketeering activity" by committing mail fraud, wire fraud, and money laundering.  See 18 U.S.C. § 1961(1); see also McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 220 (2d Cir. 2008).  "The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  United States v. Shellef, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotations and citation omitted).

The U.S. Court of Appeals for the Second Circuit has held that to certify a class based on a RICO mail and wire fraud claim, the fraud claim must be based on uniform misrepresentations made to all members of the class.  See Moore, 306 F.3d at 1253.  Material variations in the nature of the alleged  misrepresentations will render class certification improper.  See id.  USF claims that the plaintiffs' RICO fraud claim is not based on any uniform communication because the contracts of the individual plaintiffs differ markedly.  However, the alleged overriding uniform misrepresentations that USF made to all members of the proposed class are the invoices that USF sent to its cost-plus customers containing cost-plus prices that were inflated through the use of the VASP enterprise.  Although the invoices of each class member are not uniform—class members purchased different products or quantities based on their individual needs—the invoices each contained a "common misrepresentation," the cost-plus price derived from the VASP system.  Cf. Klay v. Humana, Inc., 382 F.3d 1241, 1258 (11th Cir. 2004) ("In this case, however, the plaintiffs allege that while the defendants engaged in a variety of specific communications with physicians, they all conveyed essentially the same message—that the defendants would honestly pay physicians the amounts to which they were entitled.).  Thus, while USF asserts that the difference in its customers' contracts precludes a finding of uniform

misrepresentations, the focus here is on the alleged fraudulent misrepresentations in the invoices, not the contracts.

USF contends that, even if the invoices represent the uniform misrepresentation, the plaintiffs cannot simply rely on the blanket allegation that the invoices contained fraudulent prices; rather, USF argues that the plaintiffs must demonstrate common evidence of fraud. See Allstate Ins. Co. v. Adv. Health of Prof'ls P.C., 256 F.R.D. 49, 61 (D. Conn. 2008) ("Because a fraud is [a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment, a conclusion that a representation is fraudulent requires both that the representation be false—which in turn requires the existence of a fact with which the representation is inconsistent—and the intent that such representation, known by the speaker to be false, to be taken as true by the person to whom the representation is made."). Despite USF's assertion that there are differences in its customers' contracts that preclude a finding of predominance with respect to a uniform misrepresentation, for the purposes of the plaintiffs' fraud claim, the contracts appear to be sufficiently similar for purposes of demonstrating common evidence of fraud. First, there is no evidence that the plaintiffs were aware of the VASP system or its purpose. In fact, there is evidence that USF actually took steps to conceal the VASP system from its customers, which is a common misrepresentation. Additionally, although the definition of "cost" varied slightly from contract to contract, there is common evidence with respect to cost-plus pricing, including benchmark data showing the amounts actually billed by the suppliers, the amount the VASPs charged USF, and the cost used to generate customer invoices. See Pls.' Ex. 63 (memorandum from Deloitte & Touche stating that for those individuals whose contracts state that sales price is defined as "invoice cost plus a stipulated margin," "invoice

cost" is "consistently defined").  Cf. Allstate Ins. Co., 256 F.R.D. at 62 (noting how the plaintiffs

failed to allege "any external facts or benchmarks by which to judge the accuracy, fraudulence,

misleading nature, or truthfulness of Defendants' submissions" to the plaintiffs).

The U.S. Supreme Court recently held that a plaintiff does not need to demonstrate "first-

person" reliance in a RICO claim based on mail fraud, see Bridge v. Phx. Bond & Indem. Co.,

553 U.S. 639, 649 (2008); however, the Supreme Court noted that "none of this is to say that a

RICO plaintiff who alleges injury by reason of a pattern of mail fraud can prevail without

showing that *someone* relied on the defendant's misrepresentations."  Id. at 658 (emphasis in

original).  In the absence of reliance by anyone, it would be difficult, if not impossible for the

plaintiff to establish "but for" and proximate causation.  See id.  The Supreme Court concluded

that although a RICO plaintiff alleging a pattern of mail fraud must establish at least third-party

reliance to prove causation, reliance is not automatically transformed into an element of the

claim.  See id.  Therefore, while reliance is not a necessary element, the plaintiffs must still prove

"but for" and "proximate causation."  See also McLaughlin, 522 F.3d 215, 222 (2d Cir. 2008)

(noting that for a RICO injury to occur "by reason of" a defendant's violation, the plaintiff must

show both "but for" causation (also referred to as "transaction causation" or "reliance") and

"proximate" causation (also referred to as "loss causation")).

Here, although reliance is not necessary, the plaintiffs principally rely on the proposed

class members' reliance on USF's invoices to establish causation and injury.[21]  The plaintiffs

_____

[21] The only injury that the plaintiffs allege is overpayment, based on USF's allegedly
fraudulent inflation of the cost-component of its cost-plus products.  Therefore, it is unclear how
the plaintiffs could demonstrate causation in this case if they do not prove reliance on the
misrepresentations.  See Dungan v. Academy at Ivy Ridge, No. 06-CV-0908, 2008 WL 2827713,
at *2 (N.D.N.Y. July 21, 2008) ("While first-person reliance may not be an essential element of

claim that reliance can be demonstrated by their payment of the allegedly fraudulent invoices.

See McLaughlin, 522 F.3d at 225 n.7 ("[P]ayment may constitute circumstantial proof of reliance

upon a financial representation."); Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223,

238 (C.D. Cal. 2003) (finding that, in a fraud case, the plaintiffs could demonstrate reliance by

showing that they paid the "Debit Memos"); Chisolm v. TranSouth Fin. Corp., 194 F.R.D. 538,

561 (E.D. Va. 2000) (noting that plaintiffs who paid deficiency judgments "clearly made

payments in reliance upon the assurance that the process of repossession, sale and all subsequent

steps were taken in conformity with the law" and noting that to "conclude otherwise would . . .

run counter to the traditional presumption in favor or factors operating under rational economic

choice"); cf. Klay, 382 F.3d at 1259 ("It does not strain credulity to conclude that each plaintiff,

in entering into contracts with the defendants, relied upon the defendants' representations and

assumed they would be paid the amounts they were due.").

     USF argues that proof of each class member's reliance on the alleged misrepresentations

(the invoices) requires highly individualized proof, therefore precluding a finding of

predominance.  See Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205,

220 (5th Cir. 2003).  In Sandwich, the plaintiffs advanced a similar "invoice theory," claiming

that they could demonstrate reliance by paying the invoices that contained material

misrepresentations (inflated premiums).  The U.S. Court of Appeals for the Fifth Circuit held that

the "invoice theory" ignored the defendants' defense that the plaintiffs were aware that the

premiums were being calculated in a different way (the defendants maintained that potential class

members *negotiated* premiums that varied from the filed rates, and introduced evidence to that

---

the RICO claims, it remains a central focus of the allegations and claims in this case.").

effect.)  The Fifth Circuit found that "[k]nowledge that the invoices charged unlawful rates, but did so according to a prior agreement between the insurer and the policyholder, would eliminate reliance and break the chain of causation."  Id.  The court reasoned that although common evidence might permit a reasonable jury to find for some policyholders, the court would still need to admit proof demonstrating a lack of reliance by individual plaintiffs.  See id. at 221.  Therefore, the "invoice theory" did not demonstrate a common manner of proving reliance.

Here, USF claims that, as part of its defense, it will show that many of its customers, including potential class members, had knowledge of the alleged fraudulent conduct.  Despite USF's assertions, the record lacks evidence that any of USF's customers had knowledge of USF fraudulently inflating the cost component of its products through the operation of the VASPs.  For instance, the deposition testimony that USF claims shows its customers' knowledge of its pricing practices does not speak to individualized conceptions of knowledge as in Sandwich.  Rather, most of the deposition testimony that USF relies on contains broad generalizations made by USF's customers about the customers' general understanding of industry pricing practices.  See, e.g., Def's. Ex. 12 at 230–33; Def's. Ex. 13 at 91–92; Def's. Ex. 14 at 134–35; Def's. Ex. 1529 at 82–83.[22]  Additionally, USF's purported expert, Frank Dell, concluded that "USF's business with the VASPs was consistent with well-known and common industry practice, [so] all or most of USF's cost-plus customers would have understood that USF had control or influence

---

[22] USF has only shown that some class members had knowledge that pricing and USF's profits varied between its private brands and national brands.  There is no evidence that USF's customers knew of the existence of the VASP system, the purpose of the VASPs, or the VASP's effect on the customers.

over the invoice cost used in the cost-plus formula under their contracts."[23]  Dell Decl. at ¶¶ 5,

21.  Such evidence does not raise the concern of issues of individual knowledge predominating.

Cf. In re Monster Worldwide, Inc. Secs. Litig., 251 F.R.D. 132, 137 (S.D.N.Y. 2008) (finding

"evidence" of individual knowledge to be speculation).  Instead, the evidence, including Dell's

conclusion, is limited to information about what the industry practice was and, therefore, what

USF believes USF's customers should have understood.  Moreover, there is no evidence of

separate agreements or understandings between USF and its customers regarding its cost-plus

pricing practices.[24]  In fact, the plaintiffs' purported expert, Stacy Moore, stated that based on her

experience and knowledge of the industry, USF's alleged fraudulent pricing practice was not

common and no USF customer had any reason to know of it.  See Pls.' Reply Ex. 2 at ¶ 42.  And

although it was the industry standard to include promotional allowances for the distributor, this

acknowledgment does not bear on individualized proof, but rather generalized standards.  Also,

with respect to promotional allowances, the evidence appears to distinguish USF's use of the

VASPs from industry-standard promotional allowances.[25]  Finally, there is also other evidence

---

[23] Similarly, Charnette Norton, another purported expert, opines in an affidavit that USF customers who purchased products on a cost-plus basis understood that food service distributors such as USF control or influence the cost component of such goods by using a middle man and include promotional allowances for themselves.  See Norton Aff. at ¶ 3.  Again, like Dell's declaration, Norton's affidavit only contains generalizations about what customers are "generally aware" of.  Thus, even if Norton's statements are found to be true, that does not affect a finding of predominance.

[24] Also, reliance on cost-plus pricing is more quantifiable, and thus more appropriate for class treatment than reliance on a product's quality based on marketing materials.  See McLaughlin, 522 F.3d at 225 n.7 (distinguishing reliance upon financial representations from reliance upon inferences drawn from marketing and branding).

[25] Even if the VASP passbacks or "buckets" are found to constitute promotional allowances, promotional allowances are common to all class members and do not require

showing that the plaintiffs could prove USF's concealment of the VASPs through generalized proof. See, e.g., Pls.' Ex. 53 (internal audit memo stating: "The company does not pass PA [promotional allowances] to its clients of whom many have a cost plus contract. The Company uses brokers for its private label programs in order to shelter and earn similar 'rebates' on its private label brands and *to hide PA's from clients' auditors*." (emphasis added)).

Therefore, in the absence of evidence of actual individual knowledge of the VASPs' existence and USF's pricing practices, USF's "knowledge defense" does not require individualized examination into the intent and understanding of each customer. Consequently, the Court finds that common questions of law and fact with respect to the plaintiffs' RICO claims will predominate over any individual issues of knowledge that may exist. Cf. Klay, 382 F.3d at 1260 ("[E]ven if many plaintiffs' claims require . . . individualized consideration, such inquiries are outweighed by the predominating fact that the defendants allegedly conspired to commit, and proceeded to engage in, a pattern of racketeering activities to further their Managed Care Enterprise. It is ridiculous to expect 600,000 doctors across the nation to repeatedly prove these complicated and overwhelming facts.").

2.      *Breach of Contract*

In addition to their RICO causes of action, the plaintiffs also claim that USF breached the terms of its cost-plus contracts by using invoice costs from the VASPs to calculate the cost component of the price it billed its cost-plus customers. The plaintiffs claim that they are injured because they paid prices higher than they otherwise would have for cost-plus products, absent USF's alleged breach of their cost-plus contracts.

_____

individual examination.

-26-

As with their RICO claim, the plaintiffs assert that, through common evidence, they can prove that USF funded, operated, and controlled the VASPs in order to artificially inflate the cost component of its food products, and in so doing breached its contracts with its various cost-plus customers. USF argues that individualized factual and legal issues will predominate the plaintiffs' breach of contract action. In particular, USF claims that, given the wide geographical scope of USF's cost-plus customers, the Court will need to apply the contract law of all fifty states to the individual customers' breach of contracts claims. In addition, USF contends that there are too many factual variations among its cost-plus customers' contracts to render class treatment appropriate in a breach of contract action.

Courts have held that "breach of contract claims can be appropriate for class treatment, but only where they are subject to generalized proof." Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Exp. (USA), Inc., No. 08-CV-761C, 2011 WL 815209, at *6 (W.D.N.Y. Mar. 2, 2011) (citing McCracken v. Best Buy Stores, L.P., 248 F.R.D. 162, 168 (S.D.N.Y. 2008)). "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." Castano v. American Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996). However, "if a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility." Klay, 382 F.3d at 1262. Whether a contract has been breached is a question of contract interpretation that does not vary from state to state. See id.

In support of their assertion that common legal issues predominate, the plaintiffs argue that the class members' cost-plus contracts with USF are subject to and governed by the Uniform Commercial Code ("UCC"). The plaintiffs claim that their claims fall under UCC §§ 1-201, 1-

303, 1-304, and 2-103.[26]  While USF contends that even with the general uniformity of the UCC, there are still differences in each state's implementation and application of the UCC, the evidence shows that all fifty states have adopted nearly all of these provisions.[27]  See Pls.' Exs. 75, 87.  While USF argues that although these sections of the UCC might be "textually" uniform, they may be interpreted differently, see, e.g., Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595. 605 (S.D.N.Y. 1982) (noting that "even within the U.C.C. . . . state law may differ"), none of the decisions that USF relies on directly addresses a breach of contract claim, but rather breach of warranty claims.  Absent any evidence of significant variation in states' breach of contract law and states' adoption of the relevant UCC provision, the Court finds that common legal issues are likely to predominate the plaintiffs' breach of contract claim.[28]

While common legal issues are likely to predominate the plaintiffs' breach of contract action, the plaintiffs must still show that common facts and evidence are also likely to predominate.  Central to the plaintiffs' breach of contract claim is the need to show that the VASPs were prohibited in USF's cost-plus contracts (i.e., whether the VASPs constituted "vendors"), and whether the "buckets" were promotional allowances.  The plaintiffs assert that the evidence presented regarding these questions will be common to all members of the proposed

---

[26] UCC Section 1-201 deals with General Definitions, 1-303 deals with "course of performance, course of dealing, and usage of trade," 1-304 deals with the obligation of good faith, and 2-103 deals with definitions.

[27] Louisiana has not adopted Article 2.

[28] If the Court subsequently finds that variations in state law are substantive and problematic, "the Court may employ subclasses or decertify those state law subclasses whose adjudication becomes unmanageable."  Cassese v. Wash. Mut., Inc., 255 F.R.D. 89, 97–98 (E.D.N.Y. 2008).

class.

As to the first issue, whether the VASPs were "vendors," the plaintiffs claim that the terms "vendor" and "supplier" are unambiguous in the contracts and, therefore, do not require any individualized proof. Additionally, even if the terms are ambiguous, the plaintiffs contend that the terms could be proven through "trade usage evidence." USF argues that by allowing extrinsic evidence of what the term "vendor" means, the evidence becomes more individualized. However, section 1-303(d) of the UCC provides uniformity to any issue that may arise over the meaning of "vendor" in USF's cost-plus contracts. UCC § 1-303(d) states that "[a] course of performance or course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Additionally, the plaintiffs assert that they would be able to rely on evidence of the VASPs' conduct and USF's internal documents to provide generalized proof that the VASPs were not vendors. See, e.g., Pls.' Ex. 27 (e-mail noting that one of the VASPs was "not just any 'vendor,' but we do not want to publicize this fact").

Extrinsic evidence, however, is a double-edged sword in this context. While such evidence may help to provide uniformity to the meaning of the term "vendor" in USF's cost-plus contracts, courts have found that the need to rely on extrinsic evidence in a breach of contract claim weighs against class certification. See Sacred Heart Health Sys., Inc. v. Humana, 601 F.3d 1159, 1176–77 (11th Cir. 2010) ("Even the most common of contractual questions—those arising, for example, from the alleged breach of a form contract—do not guarantee predominance

if individualized extrinsic evidence bears heavily on the interpretation of the class members'
agreements."); see also Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1107 n.10
(10th Cir. 2005) (noting that pleading a breach of contract claim on behalf of approximately
10,000 individuals would have presumably made certification less likely, particularly when
issues of individual conduct come into play); Coca-Cola Bottling Co. of Elizabethtown, Inc. v.
Coca-Cola Co., 95 F.R.D. 168, 178 (D. Del.1982) (declining to certify a class even where the
"contracts to be construed [were] identical in their material parts" because "myriad . . . contract
issues lurk[ed] in th[e] lawsuit, . . . [i]n particular, [the fact that] each unamended bottler's course
of dealing with [Coca-Cola] would be relevant to construing the contract language, inasmuch as
it could indicate knowledge of or acquiescence in [Coca-Cola's] pricing policies").  Additionally,
the application of multiple states' laws with respect to the use of extrinsic evidence in a breach of
contract case weighs against certification.  See, e.g., Bowers v. Jefferson Pilot Fin. Ins. Co., 219
F.R.D. 578, 583–84 (E.D. Mich. 2004) (finding class certification not appropriate in a breach of
contract action where there was significant variation in the laws of the relevant states with
respect to the use of extrinsic evidence); Jim Ball Pontiac-Buick-GMC, 2011 WL 815209, at *7
("[C]ourts have found class certification improper due to significant variations in the states' laws
with regard to the use of extrinsic evidence.").  While it is unclear to what extent extrinsic
evidence will be necessary in the plaintiffs' breach of contract claim, there is at least a concern
that such evidence could predominate.

      USF also claims that individual factual issues with regards to whether its customers
complied with the "substantial majority" rule in the customers' cost-plus contracts are likely to
predominate.  According to Jonathan Kass's Declaration, many of USF's cost-plus contracts have

a "minimum purchase provision," which states that the buyer must make USF its "prime vendor" and must purchase a set percentage (usually eighty percent or eighty-five percent) of its food supplies from USF. See Def's. Ex. 2, Kass Decl. at ¶¶ 18–19. Kass asserts that some of USF's cost-plus contracts required compliance with these provisions in order for the customer to receive the "pricing terms" or "markup schedule."[29] USF argues that non-compliance with these provisions is material as to whether the plaintiffs and other proposed class members would be entitled to the cost-plus pricing under their contract and, accordingly, whether their breach of contract claim could succeed on the merits.[30] However, it appears that these minimum purchase provisions were not material. For example, Waterbury Hospital's contract with USF provides that if the eighty percent threshold is not met, then a plan shall be initiated to "improve purchasing levels." In fact, even the defendant's expert stated that the eighty-percent threshold is a "dream figure" that does not appear to be monitored unless non-compliance is "really grievous." See Pls.' Ex. 81, Dell Dep. at 294–95. Thus, while the issues of various affirmative defenses in a breach of contract class action may weigh against certification, the Court finds that such a concern is not material here. Cf. Weiss v. La Suisse, 226 F.R.D. 446, 454 (S.D.N.Y. 2005) (declining to certify a class in a breach of contract where affirmative defenses could include issues of non-compliance with contract provisions by various plaintiffs in various ways); In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 303–04 (S.D.N.Y. 2003).

---

[29] Former Executive Vice President and General Counsel of USF David Eberhardt has asserted that the reasons for these differences between contracts are that the distribution agreements are all negotiated separately by USF with hundreds of different purchasers. Eberhardt Aff. ¶ 3.

[30] For example, according to the Declaration of Amy Waterfield, plaintiff Waterbury Hospital never reached the eighty-percent requirement mandated under its contract.

Finally, USF also claims that its cost-plus contracts include fundamental differences that would require individualized examination. For example, differences between contracts including how "cost" is defined, the manner in and extent to which "plus factors" are imposed, the application of certain surcharges, and the ability of a customer to choose the vendors from whom goods are obtained, would require individualized examination. Some contracts include provisions limiting the forum in which any contractual disputes may be resolved, as well. However, based upon the Court's review of the contracts and the principal issues to be decided in the plaintiffs' breach of contract claim, the Court finds that the alleged differences between the various contracts are immaterial, and therefore do not affect the certification of a class. See, e.g., Pls.' Ex. 98, Dell Dep. at 307 (stating that review of all of USF's contracts was not necessary because "they all essentially said the same thing" and because it "was well understood in the industry what a cost plus contract is"); cf. Sacred Heart Health Sys., 601 F.3d at 1176 (finding that differences in material terms of the agreements created an "unnecessarily high risk" of abridgment of defendant's rights by utilizing the class action form). For instance, the defendant's contention that differing language regarding whether USF could retain promotional allowances could predominate appears to be immaterial because the plaintiffs' theory is that the VASP "passbacks" were not promotional allowances. Instead, the principal issue is whether any cost-plus contract permitted USF to use a VASP invoice to calculate its cost-plus prices, which does not appear to require individualized proof. Accordingly, the Court finds that the plaintiffs have shown that both common legal and factual issues are likely to predominate their breach of contract claim.

3. *Damages*

At the class certification stage, the Court's inquiry is limited to determining whether, if individual damages will vary, "there is nevertheless a possible and reasonable means of computing damages on a class-wide basis, for example, by using a formula or statistical analysis." Spencer, 256 F.R.D. at 305. "Only where the individualized [damages] inquiry will be fact-specific and require extensive judicial resources have courts determined that a damages issue should preclude class certification, at least as to the issue of damages." Id.; see also McLaughlin, 522 F.3d at 231 ("[I]ndividual damages . . . is nonetheless a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues.").

The plaintiffs claim that although there may be individual questions regarding damages, these questions are insufficient to defeat certification because the plaintiffs can prove all of the class members' damages through common evidence. Conversely, USF argues that the plaintiffs' damages model is inconsistent with existing law and is "faulty."

First, USF claims that the plaintiffs' damages model is inconsistent with existing law because it calculates damages on the benefit of the bargain theory, rather than "out of pocket loss." The general rule of damages for RICO is that the plaintiffs may recover for out-of-pocket losses caused by the fraud. See McLaughlin, 522 F.3d at 227. That is to say, the fraudulent defendant is only liable for the losses the plaintiffs actually suffered. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994). USF claims that the plaintiffs did not suffer any "out-of-pocket losses" because USF provided the best prices and services for comparable goods at the time of each order. See In re Zyprexa Prods. Liability Litig., 253 F.R.D. 69, 188 (E.D.N.Y. 2008) (finding that damages were the "difference between what was paid for

Zyprexa and the actual value of the product"). However, the plaintiffs do not allege that they were defrauded as to the actual value of the product. Instead, the plaintiffs' damages are based on USF's alleged fraudulent pricing.

The plaintiffs' damages model is based on USF's data and provides for a universal calculation of damages. The plaintiffs' damages expert, John Damico, asserts that his damages model connects an item "sold" by a VASP to USF to a corresponding item sold to a cost-plus customer to determine the amount the customer was overcharged. See Damico Dec. at ¶ 22. According to Damico, damages are calculated by "computing the difference between the cost derived from the USF purchase order identified by our model and the cost of the product to the VASP found in the CASP sales, and . . . by calculating the additional amount of overbilling resulting from application of the relevant plus percentage to the inflated cost component." Id. at ¶ 27.

USF claims that the plaintiffs' method of calculating damages is unreliable because it is based on pricing assumptions that are not uniform across USF's three computer pricing systems.[31] For example, LeeAnn Manning claims that the "P-system" does not breakdown "cost" and "plus" into component parts like the "A-System." Therefore, any analysis of these components for customers in the "P-System" (such as Frankie's) would require manual calculation. See Manning Decl. at ¶ 23. In response to this criticism, Damico "refined" his

---

[31] According to LeeAnn Manning's Declaration, the three different systems (A, P, and I) encompass separate divisions: those that were formerly part of Alliant (A), those that were part of PYA Monarch (P), and those acquired over time (I). See Manning Decl. at ¶ 14.

methodology to be applicable to the "P-System," utilizing the "DWA_COST_CALC"[32] as the basis for cost. Damico claims that, according to the data and deposition testimony he reviewed, this cost basis is the best and most reliable manner of calculating cost for "P-System" customers.[33] Id. at ¶ 16.

USF also argues that it was entitled to set costs based on various measures such as "price lists" and, therefore, to determine whether an individual plaintiff was overcharged, each possible method of charging the plaintiffs must be calculated. Similarly, USF stresses that each customer's contract was different, and that certain products or certain locations may have been excluded from the "cost-plus" pricing arrangement. However, while USF may have been entitled to use other methods of pricing, it appears to have almost always used an invoice to calculate prices. Cf. Pls.' Ex. 78, Lesley Dep. at 108–11 (noting that cost, regardless of whether it was landed or TMC, was based off the invoices received from vendors); Pls.' Ex. 79, Stewart Dep. at 44–45 (noting that "product cost" was based on the "invoice cost" whether it was with LICSU pricing or market cost). But see Def's. Ex. 16 at 58, 119–20, 182.

It is a rare case where computation of each individual's damages is so complex, fact-specific, and difficult that the burden on the court is intolerable. See Klay, 382 F.3d at 1260. At the class certification stage, USF should be focused on disputing the use of the methodology

_____

[32] According to the Declaration of Robert Stewart, "DWA" stands for "District Weighted Average."

[33] USF disputes this assertion and claims that the error rate in Damico's analysis is still too high. For example, Damico apparently made 759 "matched" transactions where the matching was "unreasonable," allegedly resulting in overstated damages. See Manning Decl. at ¶¶ 31–38. Nonetheless, at the class certification stage, the plaintiffs do not need to demonstrate that their analysis captures all of the correct variables, but rather that it is possible to use a single formula to estimate class-wide damages. See In re EPDM, 256 F.R.D. 82, 101 (D. Conn. 2009).

itself, not the results of the methodology. In re EPDM, 256 F.R.D at 96. "In other words, if the defendants' experts are merely disputing the results of the plaintiffs' experts' analysis rather than the feasibility of using a single formula methodology, that would be a merits issue, not a class certification issue." Id. Here, the only feasibility-related issue is the potential need for manual input of certain customers and the time necessary to complete this analysis for thousands of potential plaintiffs. See Rodney v. Northwest Airlines, Inc., 146 F. App'x 783, 791 (6th Cir. 2006) (holding that the variables that would be needed to be plugged into the formula are too specific to the individuals); see also LaBauve v. Olin Corp., 231 F.R.D. 632, 677–78 (S.D. Ala. 2005) (individualized questions about damages predominated when had to examine the particular types of property, the extent of the contamination, genesis of duration of contamination, etc.). Despite the parties' disagreement about how damages should be calculated, there is no indication that the damages calculation would require individualized proof. Thus, even though some "individualized damages issues" exist, the Court finds that, given the common issues with respect to RICO liability, common issues still predominate. See In re Visa Check, 280 F.3d at 139–40.

4.    *Superiority*

In addition to finding that common factual and legal issues predominate, Rule 23(b)(3) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Four factors are "pertinent" to this inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or

undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The only issue with respect to superiority that USF disputes is the manageability of a class action. While managing upwards of 75,000 class members and witnesses is no easy task, it is certainly preferable and superior to litigating 75,000 lawsuits. See Spencer, 256 F.R.D. at 306 ("Rule 23 provides for a comparative inquiry—not whether a class action suit is a good method of adjudicating the claims, but whether it is "superior to other available methods.").

5.    *Statute of Limitations*

Finally, USF claims that the statute of limitations weighs against certifying a class for the plaintiffs' RICO and contract claims. There is a four-year statute of limitations for civil RICO claims, which starts to run "when the plaintiff discovers—or should reasonably have discovered—the alleged injury." Spencer, 256 F.R.D. at 307–08 (internal quotations omitted).

The plaintiffs claim that the statute of limitations should be tolled based on USF's alleged fraudulent concealment of the VASP pricing scheme.[34] The Supreme Court has recognized that fraudulent concealment tolls the statute of limitations in civil RICO claims as long as plaintiffs performed due diligence. Klehr v. A.O. Smith Corp., 521 U.S. 179, 195-96 (1997). Thus the law on the issue is uniform for all plaintiffs. "Courts have overwhelmingly held that, even when the issue of fraudulent concealment involves both common and individual questions, the

---

[34] The plaintiffs argue that the earliest any of the proposed class members could have reasonably found out about the VASPs was October 16, 2003, which was when the VASPs' existence was publicly disclosed in an SEC filing. Accordingly, the plaintiffs argue that their RICO claim is at least tolled until that point. However, USF claims that because the plaintiffs have asserted a toll for that period, individual factual inquiries must be performed. See Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 323–33 (4th Cir. 2006).

common question of whether USF successfully concealed the existence of the alleged conspiracy predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs." In re NASDAQ Market-Makers Antitrust Lit., 169 F.R.D. 493, 520 (S.D.N.Y. 1996) (finding the active misrepresentations to the market to be susceptible to common proof); see also Abramovitz v. Ahern, 96 F.R.D. 208, 218 (D. Conn. 1982) ("The issue of fraudulent concealment is common to all class members."). Here, the plaintiffs have produced common evidence showing that USF intended to conceal the VASPs and, therefore, it cannot reasonably be expected that the plaintiffs could have discovered the injury until they became more fully aware of VASPs existence and purpose. Therefore, common issues regarding fraudulent concealment exist and the statute of limitations does not bar certification of the RICO class.[35]

As to the contract claims, USF argues that plaintiffs have not identified the applicable limitations period, rendering the class definition inadequate. Plaintiffs in response have demonstrated that all but eight states follow UCC § 2-275(1), which applies a four-year statute of limitations to breach of contract for sale claims. Of those eight states, only one (Colorado) applies a limitations period of less than four years. Plaintiffs suggest that if Colorado's shorter period becomes an issue, then a subclass of Colorado purchasers can be created. Cf. Clausnitzer v. Fed. Express Corp., 248 F.R.D. 647, 655 (S.D. Fla. 2008) (denying class certification in part because the applicable limitations periods ranged from three to twenty years and because plaintiffs had not laid forth a proposed subclass scheme).

---

[35] The Court's determination at the class certification stage regarding the statute of limitations does not foreclose USF from presenting evidence and argument at trial or on summary judgment that some class members' claims are barred by the applicable statue of limitations. See Spencer, 256 F.R.D. at 308.

The point of accrual of the claim is not an individualized question either. The statute of limitations for breach of contract can also be tolled when a defendant fraudulently conceals from a plaintiff the source of the breach. See, e.g., Four Seasons Solar Products Corp v. Southwall Technologies, Inc., 100 Fed. Appx. 12, 13 (2d Cir. 2004) (applying New York law). Unlike plaintiffs' RICO claims, which are based on a federal statute, their breach of contract claims and relevant defenses are based in state statutory and common law; further, the U.S. Court of Appeals for the Second Circuit has not addressed the question of whether fraudulent concealment in a breach of contract case can be treated on a class-wide basis. Therefore, the Court asked the parties to provide supplemental briefing as to the uniformity of the law surrounding fraudulent concealment and its effect of tolling the statute of limitations in breach of contract actions. Both parties conducted a thorough review of the law in all fifty states, and their supplemental memoranda revealed that some variation exists in the law, but this variation can be addressed in a class-wide manner.

As the briefs revealed, the statute of limitations for Article 2 breach of contract cases is tolled either by fraudulent concealment or the related doctrine of equitable estoppel in all states except Florida, Ohio, and Nevada.[36] This list is not markedly more expansive than the list

---

[36] Florida has not adopted the statute of limitations of the U.C.C. and instead imposes a five year limitations period. Fla. Stat. Ann. § 95.11(2)(b) (West 2011). Although at one point fraudulent concealment was recognized in Florida, the U.S. District Court for the Middle District of Florida held that, given recent case law, the Florida Supreme Court would "find the doctrine of fraudulent concealment no longer available to toll" the relevant statute of limitations. Pacific Harbor Capital, Inc. v. Barnett Bank N.A., No. 2:97-cv-416-FTM-24D, 2000 WL 33992234, at *7 (M.D. Fla. Mar. 31, 2000). Ohio's statute of limitations for contracts for sale does not provide for tolling for the plaintiff's lack of knowledge. Ohio Rev. Code Ann. § 1302.98. Nevada allows tolling in certain specific circumstances by statute, none of which appear to apply here. See Nev. Rev. Stat. Ann. § 11.207 (West 2010). The parties have not presented, and the Court has not found, any decisions discussing a common law fraudulent concealment rule in

compiled by the court in <u>Allapattah Services, Inc. v. Exxon Corp.</u>, 188 F.R.D. 667 (S.D. Fla. 1999).  In that case, the district court held that class-wide treatment of fraudulent concealment for the purpose of tolling the statute of limitations was appropriate in spite of the fact that two of the jurisdictions relevant in that dispute, Florida and Ohio, do not apply fraudulent concealment doctrine.  <u>Id.</u> at 673.

Given that almost every state allows the statute of limitations in this case to be tolled if the plaintiffs can demonstrate fraudulent concealment, the factual issues related to fraudulent concealment can be treated on a class-wide basis.  The common issue of fact in those jurisdictions that recognize fraudulent concealment doctrine is whether the VASP invoices misrepresented USF's costs so that the alleged breach of contract was concealed.  Any steps that USF took to conceal its scheme would be common to all plaintiffs.

USF also points to certain differences in the law of the states that do apply fraudulent concealment doctrine in this context to argue that those differences will make class-wide treatment unmanageable.  This Court disagrees.  According to the parties' supplemental briefs, in fourteen of the tolling jurisdictions, reliance is required as an additional element of fraudulent concealment (Alabama, Alaska, California, Colorado, Illinois, Iowa, Maine, Maryland, New Mexico, North Carolina, Pennsylvania, Rhode Island, Texas, Wisconsin)[37].  Defendant also

---

Nevada.  USF argues that Missouri does not allow tolling of its statute of limitations for contracts for sale.  However, the provision that they point to appears to have been repealed; the applicable provisions, Mo. Ann. Stat. §§ 400.2-725 and 516.280, allow for tolling in this case.

[37] Kentucky's common law recognizes both deliberate fraudulent concealment and equitable estoppel.  Deliberate concealment does not require reliance, but equitable estoppel does.  <u>Golden Oak Mining Co. v. Lucas</u>, No. 2008-CA-002148-MR, 2011 WL 2416600, at *8 (Ky. Ct. App. June 17, 2011) (equitable estoppel); <u>Lashlee v. Sumner</u>, 570 F.2d 107, 110 (6th Cir. 1978) (deliberate concealment).  Plaintiffs also cite Virginia as requiring reliance, but

-40-

demonstrates that five jurisdictions (Connecticut, Iowa, Maryland, Pennsylvania, Virginia) require clear and convincing evidence to demonstrate fraudulent concealment.[38]

Both of these issues were present in the <u>Allapatah</u> case, and the court found those differences to be "not insurmountable so as to require decertification."  188 F.R.D. at 675; <u>see also</u> <u>Simon v. Philip Morris Inc.</u>, 2000 WL 1745265, at *29 (E.D.N.Y. Nov. 16, 2000) (noting that plaintiffs demonstrated the "relative uniformity among fraudulent concealment laws"). Further, plaintiffs are prepared to show that all of USF's customers involved in the case relied upon USF's misrepresentations.  If necessary, the Court at a later time can create a subclass of plaintiffs in those jurisdictions that require either reliance as an element or clear and convincing evidence of fraudulent concealment.

Defendant argues that there are additional differences in the states' laws which preclude certification.  First, they argue that some states require an affirmative act whereas others require only a failure to act as an element of fraudulent concealment.  However, plaintiffs are prepared to demonstrate an affirmative act, namely the creation of false invoices, on the part of the defendant; their case does not depend on the defendant's mere failure to act.  Similarly, even though some states require intent or knowledge on the part of the defendant, plaintiffs are arguing that USF intentionally acted to deceive all the plaintiffs.  Thus any intent or scienter elements could be commonly proved.

reliance does not appear to be an element of fraudulent concealment in Virginia.  <u>See</u> <u>Schmidt v. Household Finance Corp., II</u>, 661 S.E.2d 834, 840 (Va. 2008).

[38]  This list of states with heightened burdens of proof varies from the list created by the Allapattah court, which included Connecticut, Maryland, Pennyvania, Vermont, Virginia, and Washington.  This Court believes, based on its own research, that the list provided by USF in this case is correct.

USF also contends that a substantial number of jurisdictions - fifteen, according to the defendant's supplemental brief - require the plaintiff asserting fraudulent concealment to prove that it exercised some degree of diligence.  However, courts in other contexts have held that the predominating question in fraudulent concealment is the fact of concealment on the part of the defendant, not the diligence on the part of the plaintiff.  See, e.g., Weil v. Long Island Savings Bank, FSB, 200 F.R.D. 164, 175 (E.D.N.Y. 2001) ("[T]he crucial question here is whether the defendants have concealed the nature of this scheme. This question is common to all members of the class.").  Thus even in those jurisdictions where a showing of diligence is required, common factual issues related to the fraudulent concealment predominate.

Finally, Defendant points out that some states toll the statute of limitations until the point of actual discovery, whereas others toll up to the point of constructive discovery.  This difference does not matter in this case because point at which plaintiffs should have discovered the breach is the same as the point at which they did discover the breach; even if these points differ, the questions of constructive discovery and actual discovery are both common to all of the plaintiffs.

Thus while the law does vary and could require the Court to create subclasses of plaintiffs in the future, common questions still predominate and both the legal and factual issues related to the tolling of the statute of limitations for the breach of contract claim can be treated on a class-wide basis.

## V.     Conclusion

Accordingly, the plaintiffs' motion for class certification [Dkt. #216] is GRANTED.

SO ORDERED this 29th day of November 2011, at Hartford, Connecticut.

  /s/ Christopher F. Droney_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**