# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of August, two thousand and thirteen,

Before: CHESTER J. STRAUB,
DEBRA ANN LIVINGSTON,
GERARD E. LYNCH,
*Circuit Judges.*

---

In Re: US Foodservice Inc Pricing Litigation
-----------------------------------------------------------
Catholic Healthcare West, Thomas & King, Inc., Waterbury Hospital, o/b/o themselves & others similarly situated, Cason Inc., o/b/o themselves & others similarly situated, Frankie's Franchise Sys Inc., o/b/o themselves & others similarly situated,

     Plaintiffs - Appellees,

     v.

US Foodservice Inc.,

     Defendant - Appellant,

Koninklijke Ahold N.V., Gordon Redgate, Brady Schoefield,

     Defendants.

**JUDGMENT**
Docket No. 12-1311

---

The appeal in the above captioned case from an order of the United States District Court for the District of Connecticut was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the order of the district court is AFFIRMED in accordance with the opinion of this court.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE

MANDATE ISSUED ON 10/31/2013

12-1311-cv
In re US Foodservice Inc. Pricing Litig.

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2013

(Argued: May 29, 2013          Decided: August 30, 2013)

No. 12-1311-cv
———————————————————

IN RE: US FOODSERVICE INC. PRICING LITIGATION
———————————————————

CATHOLIC HEALTHCARE WEST, TOMAS & KING, INC., WATERBURY HOSPITAL
o/b/o themselves & others similarly situated, CASON INC., o/b/o themselves &
others similarly situated, FRANKIE'S FRANCHISE SYS INC., o/b/o themselves &
others similarly situated,
*Plaintiffs-Appellees,*

-v.-

US FOODSERVICE INC.,
*Defendant-Appellant,*

KONINKLIJKE AHOLD N.V., GORDON REDGATE, BRADY SCHOEFIELD,
*Defendants.*
———————————————————

Before:      STRAUB, LIVINGSTON, and LYNCH, *Circuit Judges.*

Appeal from a decision of the United States District Court for the District

of Connecticut (Droney, *J.*) certifying a nationwide class of 75,000 cost-plus

customers of U.S. Foodservice, Inc. on claims pursuant to the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, and state

contract law. Because the district court conducted a rigorous analysis of the
Rule 23 requirements, *see* Fed. R. Civ. Pro. 23, and did not abuse its discretion
in determining that common issues of fact and law would predominate over
individualized issues and that a class action is a superior mechanism for
litigating these claims, we AFFIRM.

> RYAN PHAIR, Hunton & Williams LLP,
> Washington, D.C. (James E. Hartley, JR.,
> Drubner, Hartley & Hellman; Richard
> Laurence Macon, Akin Gump Strauss Hauer &
> Feld LLP; Joe R. Whatley, Jr., Whatley Drake
> & Kallas, LLC; Richard Leslie Wyatt, Jr.,
> Hunton & Williams LLP, *on the brief*) , *for
> Plaintiffs-Appellees.*
>
> GLENN M. KURTZ (Douglas P. Baumstein, *on the
> brief*), White & Case LLP, New York, New
> York, *for Defendant-Appellant.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

   This case concerns allegations of fraudulent overbilling by U.S.
Foodservice, Inc. ("USF"), the country's second largest food distributor whose
customers have included the United States government, as well as hospitals,
schools, restaurant chains, and small businesses across the United States. This
interlocutory appeal requires us to determine whether the district court abused
its discretion in certifying a nationwide class consisting of about 75,000 USF

2

"cost-plus" customers. The gravamen of plaintiffs' complaint is that USF devised and executed a fraud to overbill these customers in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-68, and state and tribal contract law. Despite the size of the class and the fact that it implicates the laws of multiple jurisdictions, the district court correctly concluded that both the RICO and contract claims are susceptible to generalized proof such that common issues will predominate over individual issues and a class action is superior to other methods of adjudication. Accordingly, we affirm the district court's certification of this class pursuant to Federal Rule of Civil Procedure 23(b)(3).

## BACKGROUND

### A. USF and Cost-Plus Pricing

Defendant-Appellant USF was a relatively small player in the food distribution industry in the early 1990s, but by 2000 had tripled in size and become the country's second largest food distributor with over 250,000 customers, 75,000 of whom comprise the class here. USF purchases food products, including meats, seafood, produce, and condiments, from suppliers and in turn sells the items to its customers. USF distributes national brands, such as Heinz and Sara Lee, under their own label; non-branded goods, usually meats and produce; and its own private label brands, which are designed to compete

with national brands and require USF to invest in marketing, branding, and similar services.

USF sells many of its food products on a cost-plus basis that is common in the industry. Under this pricing model, the final cost to the customer is computed based on the "cost" (also "landed cost" or "delivered cost"), meaning the price at which USF purchases the goods from its supplier, and the "plus," or additional surcharge that USF charges on top of the cost, often expressed as a percentage increase over this cost. Thus, when a customer enters into a contract with USF, its contract does not guarantee it a set price such as $1 per pound of coleslaw, but rather a set increase over the cost at which USF will purchase the coleslaw (*i.e.*, a 5% mark-up). If a supplier increases the price of goods to USF, that cost is passed on to the customer. USF's contracts with its cost-plus customers provide various methods for calculating cost: some contracts base cost on nationally-published price lists, for instance, while others dictate that cost is set by USF's distribution centers based on the local market. This class action centers on contracts that set cost based on the "invoice cost," which refers to the price on the invoice from the supplier to USF.

Finally, promotional allowances – discounts provided to distributors from suppliers generally in exchange for fulfilling certain conditions, such as order minimums – are central to cost-plus pricing in the food service distribution

industry. Such allowances are more readily available to large distributors and are offered by many (but not all) suppliers to promote their products. USF's customer contracts typically permit USF to keep the benefit of any promotional allowances for itself and do not require that it pass these savings on to the customer. According to USF, without the right to retain these promotional allowances, it would not be able to realize a profit in an extremely competitive market with razor thin margins.

## B. The Alleged Fraud and Its Discovery

Plaintiffs allege that USF, beginning at least as early as 1998, engaged in a fraudulent scheme by which it artificially inflated the cost component of its cost-plus billing and then disguised the proceeds of its own inflated billing through the use of purported promotional allowances. The scheme centered on six Value Added Service Providers ("VASPs"), which plaintiffs allege were shell companies established and controlled by USF for the purpose of fraudulently inflating USF's cost to its customers.[1] According to plaintiffs, USF executives Mark Kaiser (who was convicted of securities fraud stemming from a separate fraudulent scheme orchestrated while at USF, *see United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010)) and Tim Lee created the VASPs and installed two

---

[1] The six VASPs in questions are: (1) Seafood Marketing Specialists, Inc.; (2) Frozen Farms, Inc.; (3) Produce Solutions, Inc.; (4) Private Label Distribution, Inc.; (5) Speciality Supply and Marketing, Inc.; and (6) Commodity Management Systems, Inc.

confederates, Gordon Redgate and Brady Schofield, in leadership positions at the VASPs in order to hide USF's involvement and control. Though Redgate and Schofield ostensibly owned the VASPs, USF funded the VASPs with multi-million dollar, interest-free loans. As noted by the district court, USF retained irrevocable assignment of the VASP shares, controlled "to whom and when the VASPs made payments," and guaranteed their payments to suppliers.

According to plaintiffs, the purpose of the VASPs was not to provide legitimate services, but to permit USF to overcharge its customers via the generation of fraudulent marked-up invoices that misrepresented USF's cost for the goods provided to its customers. USF allegedly negotiated the purchase of goods from suppliers without input from the VASPs. USF then directed suppliers to bill goods to the VASPs, but often to deliver them directly to USF.[2] The VASPs then generated a second invoice, ostensibly to "sell" the goods to USF, using a higher price dictated by Kaiser or Lee. USF purported to pay the VASPs and then used the higher VASP prices in setting the landed cost for its cost-plus pricing. USF customers unwittingly paid the inflated amounts and the VASPs then completed the scheme by kicking back the fraudulent mark-ups to USF disguised as legitimate promotional allowances. The VASPs retained

---

[2] Title for the purchased goods often passed directly from suppliers to USF without being transferred to the VASPs.

6

nominal transaction fees sufficient to cover operating expenses, including handsome salaries for Redgate and Schofield.

Plaintiffs contend that the operation of the VASP fraud was known only to a small cadre of USF employees. According to plaintiffs, the VASP kickbacks, unlike legitimate promotional allowances, were deposited into a single account that Kaiser and Lee controlled. As for USF customers, they were also kept in the dark. Although some of these customers had the right to audit USF's invoices, the invoices generated by the VASPs revealed nothing about the kickbacks to USF or USF's funding and control of the shell companies. The district court cited evidence, moreover, "that USF actually took steps to conceal the VASP system from its customers." The court's opinion refers, among other things, to a contemporaneous email in which Rob Soule, USF's Chief Accounting Officer, noted that the company's auditors were raising concerns about funds advanced to one of the VASPs: "They do not understand why USF would advance funds to any vendor." Soule further observed that the VASP in question "is not just any 'vendor,' but we do not want to publicize this fact." J.A. at 623.

In 2000, The Royal Ahold Group ("Ahold") presented USF with a proposal to acquire the rapidly growing company. In the course of conducting due diligence for the purchase, Paul Ekelschot, head of Ahold's audit committee, sent a memo to members of Ahold's executive board in which he noted that USF used

7

brokers for its private label products in order to earn promotional allowance rebates on these products and "shelter" these rebates from its clients' auditors.[3] The memo concluded that "[t]his **technique needs to be researched** to assess the tax and legal implications and associated business risks." J.A. at 795. One recipient of the memo, reacting to this information, wrote in the margin "AVISO! MOLTO PELIGROSA," meaning "Warning! Very Dangerous" in Italian. Ahold nonetheless went forward with the acquisition, and the fraud, according to plaintiffs, thereafter continued.

In January 2003, Ahold management and its auditors, Deloitte & Touche, received an anonymous letter warning that: "US Foodservice . . . ha[s] been requiring some of [its] suppliers to ship product to Ahold companies, but send the invoices to companies[] which are not owned by Ahold." J.A. at 902. The letter identified three of the VASPs at issue here as companies to which the suppliers were directed to send invoices. Deloitte subsequently conducted an inquiry and produced a memo regarding USF's VASP transactions in which it observed that the "primary beneficiary of the VASP transactions appears to be

---

[3] Earlier in the year, when USF's finance department became concerned about large payments between USF and the VASPs, David Eberhardt, USF's Deputy General Counsel, drafted agreements to formalize the relationship between USF and the entities created by Kaiser and Lee. Notably, a provision in each of the agreements prohibited the VASPs from publicly indicating any affiliation with USF and required them, if asked, to disavow any suggestion that they acted on USF's behalf.

8

USF," but that USF has no legal ownership interest in the VASPs.  J.A. at 901. The memo queried whether the VASPs should be consolidated into USF's financial statements and whether "the practice of using the VASP's invoice cost to USF as USF's invoice cost for billing customers under cost plus contracts create[s] any legal exposure."  *Id.*

Ahold thereafter procured a letter from its outside counsel, White & Case, concluding that USF faced no "serious exposure to damages from any potential claims arising from USF's use of VASPs." J.A. at  927.  The opinion, however, was based on assurances from USF, *inter alia*: that USF had no affiliation with the VASPs and none of its officers, directors, or employees had any ties, directly or indirectly, with them; that "[t]itle to products procured for USF by a VASP pass[ed] through the VASP"; that USF's cost-plus customers were "aware that USF is utilizing the VASPs to service their account"; and, finally, that the VASPs provided valuable services, that USF had "legitimate business reasons for outsourcing certain functions to independent VASPs," and that there was "no improper motive" behind the arrangement.  *Id.*  White & Case withdrew the letter in March 2003, citing "reason to doubt whether the assumptions on which we based our conclusions are valid." J.A. at 939.

Also in 2003, following the discovery of other accounting irregularities at USF, Ahold's audit committee retained the law firm of Morvillo, Abramowitz,

Grand, Iason & Silberberg, which in turn engaged PricewaterhouseCoopers LLP ("PwC") to conduct an independent forensic accounting investigation of USF to address, among other things, whether consolidation of the VASPs was required and "whether legal issues exist relative to cost-plus contracts vis a vis VASP passback earnings." PwC's subsequent report concluded that USF effectively controlled the VASPs, which raised "significant questions" concerning USF's potential liability to its cost-plus customers; PwC concluded that USF's control of the VASPs "clearly required" consolidation. J.A. at 1258, 1295.

On October 17, 2003, Ahold publicly disclosed the VASP system and consolidated the VASPs into restated financial statements for the relevant years. Its filings outlined the financial relationship between USF and the VASPs, asserted that the "VASPs provide varying degrees of support to USF," and concluded that Generally Accepted Accounting Principles "require the recognition . . . of the VASPs within [Ahold's] consolidated financial statements." J.A. at 2684. Shortly thereafter, Ahold ordered USF to phase out its use of VASPs. It subsequently sold the company for $7.1 billion, agreeing to indemnify USF for any liability to cost-plus customers over $40 million arising from the VASP scheme.

## C. The Class Action

The first lawsuit against USF in the wake of Ahold's disclosures was filed

by Waterbury Hospital, a community and teaching hospital in Connecticut. Other plaintiffs followed suit, including Thomas & King, the owner and operator of 88 Applebee's franchises, and Catholic Healthcare West, the largest not-for-profit hospital system in California.[4] The pending cases were found to involve "common factual questions concerning the propriety of USF's performance of cost-plus contracts" and were consolidated for pretrial proceedings in the District of Connecticut, *see In re U.S. Foodservice, Inc. Pricing Litig.*, 528 F. Supp. 2d 1370 (J.P.M.L. 2007), after which a consolidated amended class action complaint was filed. The district court subsequently denied USF's motion to dismiss the RICO and breach-of-contract claims. *See In re U.S. Foodservice Inc. Pricing Litig.*, Nos. 3:07-md-1894, 3:06-cv-1657, 3:08-cv-4, 3:08-cv-5, 2009 WL 5064468 (D. Conn. Dec. 15, 2009).

Following class discovery, plaintiffs moved to certify the class on these claims on July 31, 2009. Both sides submitted considerable evidence at the class certification stage, including representative samples of the contracts at issue, evidence as to the structure, operation, and concealment of the VASPs, and

---

[4] The United States also brought suit, alleging that USF "falsely and fraudulently inflated the prices it charged the United States under its cost-based contracts to supply agencies of the United States with food products." Complaint, *United States v. U.S. Foodservice, Inc.*, 1:10-cv-06782 (S.D.N.Y. Sept. 13, 2010). These claims were brought pursuant to the False Claims Act, 31 U.S.C. § 3729, and the common law of fraud and unjust enrichment. *See id.* The parties settled upon USF's agreement to pay approximately $30 million. Appellee's Br. at 2.

competing expert testimony on industry standards and damages calculations. USF argued, in particular, that the VASPs provided legitimate services; that because VASPs are common in the industry, customers were aware that USF could set cost in the manner it did; and that its customers based their purchasing decisions on the total prices USF charged – which were competitive with the prices available from competitors – and not on a belief that the "cost" component of USF's invoice price reflected the price at which the supplier provided the goods.

After hearing oral arguments, the district court granted the motion for class certification in full and certified a Rule 23(b)(3) class as:

> Any person in the United States who purchased products from USF pursuant to an arrangement that defined a sale price in terms of a cost component plus a markup ("cost-plus contract"), and for which USF used a VASP transaction to calculate the cost component.

*In re U.S. Foodservice Inc. Pricing Litig.*, Nos. 3:07-md-1894, 3:06-cv-1657, 3:08-cv-4, 3:08-cv-5, 2011 WL 6013551, at *1 (D. Conn. Nov. 29, 2011). The district court found that plaintiffs had presented evidence that supported their fraud allegations, including: (1) that USF placed orders directly with the suppliers for "delivery" to the VASPs; (2) that USF "intentionally concealed the VASPs from its cost-plus customers"; and (3) that USF controlled the VASPs' finances, guaranteeing their obligations, dictating to whom and when they made

12

payments, and funding many of the VASPs through short-term, interest-free loans. *Id.* at *2-3. The court noted that the magnitude of the VASP operation was "substantial," with one VASP alone passing back over $58 million to USF in a single year based on about $500 million in sales. PwC, the district court observed, "found that the '[t]otal VASP pass-back receipts over the period from April 2000 to December 2002 were $388 million.'" *Id.* at *3.

The court did not reach the merits whether the VASPs were shell companies created to perpetrate a fraud or whether, as USF contends, they were employed to provide legitimate services to USF in keeping with industry practice. The court noted that the legitimacy of USF's use of the VASPs is contested and that evidence in the record indicates that some VASPs performed legitimate business functions, including: "(1) quality control services; (2) purchasing; (3) brand and product development; (4) merchandising services; (5) marketing support; and (6) customer service." *Id.* Regardless, the court determined that certification was appropriate because plaintiffs had demonstrated, and USF had failed to rebut, that the relevant issues were susceptible to generalized proof such that individualized questions would not predominate and render the class unmanageable.

USF moved this court for leave to file an interlocutory appeal challenging class certification, and that motion was granted on April 3, 2012.

### DISCUSSION

We review a district court's decision to certify a class under Rule 23 for abuse of discretion, the legal conclusions that informed its decision *de novo*, and any findings of fact for clear error. *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 18 (2d Cir. 2003); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40-41 (2d Cir. 2006). A district court abuses its discretion when "(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *Parker*, 331 F.3d at 18 (alteration in original) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168-69 (2d Cir. 2001)).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks and citation omitted). Federal law permits individual claims to be litigated as a class action provided that the party seeking certification "affirmatively demonstrate[s] his compliance with Rule 23." *Id.* (internal quotation marks omitted). The party must establish that the four threshold requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are satisfied and demonstrate "through evidentiary proof" that the class satisfies at least one of

14

the three provisions for certification found in Rule 23(b). *Id.* USF does not

dispute that the Rule 23(a) factors are met, but protests that the district court

erred in finding Rule 23(b)(3)'s requirements satisfied.

To certify a class pursuant to Rule 23(b)(3), a plaintiff must establish: (1)

predominance – "that the questions of law or fact common to class members

predominate over any questions affecting only individual members"; and (2)

superiority – "that a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To certify

a class, a district court must "make a 'definitive assessment of Rule 23

requirements, notwithstanding their overlap with merits issues,' . . . must

resolve material factual disputes relevant to each Rule 23 requirement," and

must find that each requirement is "established by at least a preponderance of

the evidence." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010); *Myers v. Hertz

Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (plaintiffs bear the burden of

"establish[ing] by a preponderance that common questions [will] predominate

over individual ones"); *see also*, *In re IPO*, 471 F.3d at 33 ("[T]he important point

is that the requirements of Rule 23 must be met, not just supported by some

evidence.").

15

Upon a complete review of the record, we conclude that the district court conducted a rigorous analysis based on the relevant evidence, properly resolved factual disputes, and did not abuse its discretion in concluding that common issues predominate as to plaintiffs' RICO and breach of contract claims and that a class action is a superior method of litigating these claims.

*   *   *

We first briefly outline the substance of plaintiffs' claims against USF. To prevail on their civil RICO claim, plaintiffs must show "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (citation omitted). Here, plaintiffs allege that USF and its VASPs constituted an enterprise as defined in 18 U.S.C. § 1961(4) that engaged in a pattern of racketeering activity, namely mail and wire fraud, *see* 18 U.S.C. §§ 1341, 1344, in violation of 18 U.S.C. § 1962(c).[5] Specifically, they assert that USF devised a scheme to defraud its customers in which it mailed to customers phony invoices generated by the

_____

[5] Section 1962(c) makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" is in turn defined to include a litany of so-called predicate acts, including "any act which is indictable" under the mail and wire fraud statutes. 18 U.S.C. § 1961(1)(B).

16

VASPs to inflate prices above what the customers were contractually obligated to pay. Similarly, the plaintiffs assert that USF breached the terms of its cost-plus contracts by using the VASP invoices to calculate the cost component of the amounts billed to customers, thereby causing these customers to pay prices higher than they should have paid under the contracts.

## A. Predominance

### i) The RICO Claim

The predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Eli Lilly & Co.*, 620 F.3d at 131 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (in securities fraud class action, explaining that "Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof[,]" but rather, requires "that common questions *predominate* over any questions affecting only individual class members" (internal quotation marks and alterations omitted)). USF argues that this has not been shown as to the RICO claim because: (1) a misrepresentation necessary to prove mail or wire fraud

17

cannot be established through common evidence; (2) plaintiffs' reliance on any purported misrepresentation by USF, necessary here to prove causation, cannot be shown using common evidence; and (3) plaintiffs suffered no injury to their business or property that can be shown with common evidence.   We disagree with each of these contentions.

a) *Misrepresentation*

We have previously observed that fraud claims based on uniform misrepresentations to all members of a class "are appropriate subjects for class certification" because, unlike fraud claims in which there are material variations in the misrepresentations made to each class member, uniform misrepresentations create "no need for a series of mini-trials." *Moore*, 306 F.3d at 1253.  Here, the district court did not abuse its discretion in determining that USF's alleged misrepresentation was uniform and susceptible to generalized proof.  Specifically, plaintiffs allege that the VASP-related invoices mailed from USF to its cost-plus customers included the same fraudulent misrepresentation: namely, that the cost component of USF's billing was based on the invoice cost from a legitimate supplier and not from a shell VASP controlled by USF and established for the purpose of inflating the cost component.  While each invoice obviously concerned different bills of goods with different mark-ups, the material misrepresentation – concealment of the fact of a mark-up inserted by the VASP – was the same in each.

18

The allegations here are most akin to those in *Klay v. Humana, Inc.*, where plaintiffs alleged that defendant HMOs systemically underpaid doctors by uniformly misrepresenting to them that the HMOs were "honestly pay[ing] physicians the amounts to which they were entitled." 382 F.3d 1241, 1258 (11th Cir. 2004), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). There, the Eleventh Circuit upheld certification of the physician class on the basis that the doctors' RICO claims were "not simply individual allegations of underpayments lumped together," but rather focused on a centralized corporate conspiracy to defraud, which could be proven through generalized evidence – and which, absent certification, would have to be re-proven in each case. *Id.* at 1257-58. Similarly here, the thrust of the RICO claim is USF's scheme to create and employ the VASPs to inflate the invoices so as to overbill each class member *in the exact same manner*.

USF contends that the customer invoices cannot be deemed to misrepresent cost without reference to the parties' underlying contractual arrangement, defeating any resort to generalized proof. But even assuming *arguendo* that this is correct, the district court specifically found after reviewing the evidence that USF's cost-plus contracts are substantially similar in all material respects. *In re U.S. Foodservice*, 2011 WL 6013551, at *14. This finding is supported, moreover, by Deloitte, Ahold's auditor, which reviewed the contracts to determine USF's potential legal exposure and concluded that the

19

key term of "invoice cost" is "consistently defined." J.A. at 900-01. In short, because the question whether the invoices materially misrepresented the amounts due USF is common to all plaintiffs, the class will "prevail or fail in unison" on this point – rendering certification appropriate. *Amgen*, 133 S. Ct. at 1191.

   *b) Causation*

   USF next contends that reliance is "a necessary part of the causation theory advanced by the plaintiffs," *Eli Lilly*, 620 F.3d at 133, and that individualized issues will predominate as to reliance because "the key issue in this case is customer knowledge of the alleged pricing practice at issue," Appellant's Br. at 25. USF argues that the district court simply "assumed" that USF's customers were "ignorant of USF's influence or control over the landed cost and [promotional allowances]" and that it failed to analyze or even acknowledge evidence to the contrary. Customer reliance on its supposedly inflated invoices, USF maintains, "can be determined only by adducing evidence from the 75,000 customers," and not by generalized proof. Appellant's Br. at 26-27. We disagree.

   As we have noted, "proof of misrepresentation – even widespread and uniform misrepresentation – only satisfies half of the equation" in cases such as this because plaintiffs must also demonstrate reliance on a defendant's common

misrepresentation to establish causation under RICO.[6] *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). Certification is inappropriate where "reliance is too individualized to admit of common proof." *Id.* at 224-25 (concluding that certification was improper where many factors other than defendants' alleged misrepresentations about health consequences of light cigarettes may have led individuals to purchase them). The fact that class members will show causation by establishing reliance on a defendant's misrepresentations, however, does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate. *See id.*

Such is the case here. First, payment, as we have said, "may constitute circumstantial proof of reliance upon a financial representation." *Id.* at 225 n.7. As in *Klay*, the defendant here is alleged to have sent the plaintiffs false billing information (albeit in this case misrepresenting the amount of money due rather than, as in *Klay*, that the proper amount had been paid). *Klay*, 382 F.3d at 1259. In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the

---

[6] While the Supreme Court has clarified that first-party reliance is not an element of a RICO claim predicated on mail fraud, *see Bridge*, 553 U.S. at 649, it may be, as it is here, "a necessary part of the causation theory advanced by the plaintiffs." *Eli Lilly*, 620 F.3d at 133.

amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed. Fraud claims of this type may thus be appropriate candidates for class certification because "while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)." *Id*.

USF therefore errs in suggesting that "there is no common evidence of individual customer knowledge" as to its allegedly fraudulent billing scheme. Provided the plaintiffs are successful in proving that USF inflated their invoices and misrepresented the amount due, proof of payment constitutes circumstantial evidence that the plaintiffs *lacked* knowledge of the scheme. Moreover, and as found by the district court, the record also contains generalized proof of USF's *concealment* of its billing practices, including the Ekelschot memo in which the head of Ahold's audit committee observed that USF used the VASPs to earn promotional allowance rebates on private label products and "*to hide [these rebates] from clients' auditors*." J.A. at 795 (emphasis added). As the district court found, "there is evidence that USF actually took steps to conceal the VASP system from its customers" and "the record lacks evidence that any of USF's customers had knowledge of USF fraudulently inflating the cost component of its products through the operation of the VASPs." *In re U.S. Foodservice*, 2011

WL 6013551, at *9, 11.  Upon a review of the record, we conclude that these findings are not in error.

USF claims that this case is not like *Klay*, but like *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 319 F.3d 205 (5th Cir. 2003), in which the Fifth Circuit held that a class action premised on the fraudulent overcharge of insurance premiums, supposedly in excess of regulatory rates, had been improperly certified.  In *Sandwich Chef*, however, as the Fifth Circuit concluded, the district court "did not adequately account for individual issues of reliance that will be components of defendants' *defense* against RICO fraud." *Id.* at 220 (emphasis added).  There, the defendants had produced evidence that class members had individually negotiated premiums, demonstrating awareness that "the amounts being charged varied from rates filed with regulators," and that policyholders had nonetheless "agreed to pay such premiums." *Id.*  Such evidence, reflecting individualized arrangements on the part of putative class members wholly aware of the truth regarding the alleged misrepresentations on which the class was said to have relied, "preclude[d] a finding of predominance of common issues of law or fact." *Id.* at 221.  Critically, however, the record here contains *no such individualized proof* indicating knowledge or awareness of the fraud by any plaintiffs.

USF contends, to the contrary, that the district court "failed to rigorously analyze or resolve [an] overwhelming evidentiary record" demonstrating that

many class members were not deceived as to the nature of its billing practices. Appellant's Br. at 27. We are not persuaded. Much of the evidence contained in the "ten tranches of evidence" on which USF relies is of marginal relevance, at best, to the question whether USF's customers had knowledge of the disputed billing practices. For example, USF relies heavily on a 2006 email from an employee at Premier, Inc. ("Premier"), a purchasing agent for some of USF's cost-plus customers, alerting clients that USF had been sued "for pricing practices" and noting the employee's belief that USF had been "transparent and ethical" in its relationship with Premier. As the district court noted, Premier was not a cost-plus customer, but a "Group Purchasing Organization" that helped members like Catholic Healthcare West manage and reduce supply costs. And suffice it to say that this single-paragraph email sheds little light on the question whether any USF customer was aware of USF's billing practices during the relevant period.

Upon a review of the record, we conclude that the district court did not err in finding that "there is no evidence that the plaintiffs were aware of the VASP system or its purpose." *In re U.S. Foodservice*, 2011 WL 6013551, at *9. But even if this were not the case, most of the remaining proof to which USF points hardly draws into question plaintiffs' Rule 23 showing, and for a simple reason: such proof, far from demonstrating that factual questions regarding the knowledge of individual class members will predominate over questions common

24

to the class, is in fact *generalized* proof concerning common arrangements in the food distribution industry.  Thus, USF cites the testimony of its expert, Frank Dell, that pursuant to "well-known and common industry practice," USF's customers would have understood that USF had influence over the invoice cost used in the cost-plus formula and that it received promotional allowances.  USF relies on survey evidence suggesting, *inter alia*, that USF customers purchasing on a cost-plus basis understand both "that foodservice distributors, such as USF, ha[ve] an internal profit or inside margin in the cost component of their private label sold on a cost plus basis" and that such distributors use middleman vendors.[7]

We agree with the district court that such evidence "does not raise the concern of issues of individual knowledge predominating."  *See In re U.S. Foodservice*, 2011 WL 6013551, at *11.  As the district court recognized, the parties "dispute the legitimacy and purpose of the VASPs," with USF contending that the VASPs provided service to USF, particularly regarding its private label products; that USF, as is common in the food service industry, legitimately influenced and even set the "cost" component in its cost-plus pricing based on the service provided; and that the monies supposedly funneled back to USF were in

---

[7] USF additionally points to the testimony of plaintiffs' expert, Thomas Maronick, to the effect that pursuant to industry practice, USF would have a "say" in determining the price of their private label products.

fact proper promotional allowances. *Id.* at *2. USF points to generalized proof supporting this defense – proof wholly consistent with class action treatment – but the record does not contain a single piece of evidence suggesting "actual individual knowledge" on the part of a specific customer "of the VASPs' existence and USF's pricing practices." *Id.* at *11; *see Katz v. China Century Dragon Media, Inc.*, 287 F.R.D. 575, 588-89 (C.D. Cal. 2012) (finding predominance requirement satisfied in securities fraud class action where there was no evidence indicating "the likely need for individualized assessments of class members with respect to the[ir] knowledge" of alleged misrepresentations); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 118-19 (S.D.N.Y. 2011) ("Sheer conjecture that class members 'must have' discovered [the misrepresentations] is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendants' assertions."). In such circumstances, conjectural "individualized questions of reliance," which are "far more imaginative than real[,] . . . do not undermine class cohesion and thus cannot be said to predominate for purposes of Rule 23(b)(3)." *Amgen*, 133 S. Ct. at 1197 (internal quotation marks omitted). For if bald speculation that some class members might have knowledge of a misrepresentation were enough to forestall certification, then no fraud allegations of this sort (no matter how uniform the misrepresentation, purposeful the concealment, or evident plaintiffs' common reliance) could proceed on a class basis – a conclusion that this Court has already declined to reach. *See McLaughlin*, 522 F.3d at 224-25.

Whether, as plaintiffs claim, the VASPs were created for the purpose of misrepresenting cost and were then kept secret so as to deceive customers about overbilling or whether, instead, they provided legitimate service to USF for which it appropriately billed its customers, is a question subject to generalized proof – and a question that, barring class action treatment, will have to be endlessly re-litigated in individual actions. We conclude that the class will "prevail or fail in unison" on this point – so that, in either case, questions of fact common to class members will predominate over questions regarding individual customers' reliance. The district court acted well within its discretion in rejecting USF's claim to the contrary. *See Amgen*, 133 S. Ct. at 1191.

c) *Injury*

USF next contends that the district court abused its discretion in certifying a RICO class because RICO damages cannot be reliably ascertained on a class-wide basis. According to USF, the proper measure of RICO damages here is the difference between the price paid by each plaintiff for the goods it purchased and the market price available when the goods were bought, so that regardless whether USF deceived customers in purporting to carry out its obligations under its cost-plus contracts, plaintiffs were harmed by USF's fraud *only* if they purchased goods from USF that they could have obtained more cheaply elsewhere. Because such a calculation "would require the consideration of the prices for thousands of products, on a daily, weekly and monthly basis, over a period of years, in hundreds of different markets, for tens of thousands of

customers," class-wide issues as to damages, USF contends, do not predominate, and certification was inappropriate.  Appellant's Br. at 45.

USF again misses the mark.  Our case law is clear that "damages as compensation under RICO § 1964(c) for injury to property must, under the familiar rule of law, place [the injured parties] in the same position they would have been in but for the illegal conduct." *Commercial Union Assurance Co., PLC v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994).  Granted, we have said that because RICO "compensates only for injury to 'business or property,'" a victim who is induced to part with his property by the misrepresentations of a fraudster is generally not entitled to "benefit of the bargain" damages – meaning recovery of what the fraudster promised, as opposed to the property the victim lost. *McLaughlin*, 522 F.3d at 228 (quoting 18 U.S.C. § 1964(c)); *see also Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989); *Heinold v. Perlstein*, 651 F. Supp. 1410, 1412 (E.D. Pa. 1987) ("Where, as here, the only property to which a plaintiff alleges injury is an expectation interest that would not have existed but for the alleged RICO violation, it would defy logic to conclude that the requisite causation exists.").  This case, however, is not about such inducement, but concerns a fraud that occurred after plaintiffs already had a protectable interest in their cost-plus contracts with USF.  *See Heinold*, 651 F. Supp. at 1411 (distinguishing between RICO violations that induce the formation of a contract and RICO violations that "interfere[] with a contract extant at the time of that conduct"); *see also Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir.

1987) (holding RICO victim entitled to recover benefits due under contract where defendants engaged in fraud after the formation of contract in order to deprive victim of benefits of its bargain).

USF, having entered into contracts that entitled its customers to "cost-plus" pricing, is alleged to have systematically deceived them into believing they were being afforded such pricing when, in fact, they were being overcharged. The key inquiry in such a circumstance is not what price customers could have procured elsewhere at the point of purchase, but rather the amount of overcharge – the amount customers paid USF as a result of its deception. The measure of damages as compensation for *this* injury is straightforward: customers are entitled to the difference between the amount they paid on fraudulently inflated cost-plus invoices and the amount they should have been billed (or, stated differently, the price increase due to the use of VASPs).[8] We accordingly conclude that USF's contention that the district court abused its

---

[8] Plaintiffs' proposed measure for damages is thus directly linked with their underlying theory of classwide liability (that the misrepresentations on the invoices caused overpayments) and is therefore in accord with the Supreme Court's recent decision in *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), which reversed a Rule 23(b)(3) class certification on the ground that plaintiffs' theory of damages was flawed. *Id.* at 1432-33. In *Comcast*, the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis. *Id.* at 1433-35 (finding that plaintiffs' damages "model failed to measure damages from the particular antitrust injury on which petitioners' liability in this action is premised"). As discussed in Part B, *infra*, the district court carefully examined plaintiffs' damages model, finding it appropriate and feasible to redress the common harms alleged, and therefore did not abuse its discretion in determining that common issues predominate.

discretion in certifying the RICO class because RICO damages cannot be shown on a class-wide basis is without merit.

ii) The Contract Claims

Certifying plaintiffs' breach of contract claims raises additional concerns because the contracts here are not uniform and they implicate the laws of many jurisdictions. USF argues common questions will not predominate as to these claims for three reasons: (1) the contracts vary materially from each other and individualized extrinsic evidence will predominate in the interpretation of key terms; (2) some of the contracts require customers to satisfy minimum purchase requirements before they are entitled to cost-plus pricing, a matter that is not subject to common proof; and, finally, (3) the contracts are governed by the laws of 48 states, as well as tribal law. For the following reasons, we disagree.

*a) Contract Variations and Extrinsic Evidence*

USF argues, first, that the contracts here have materially different terms and that the variations among them defeat plaintiffs' attempt to establish predominance as to the contract claims. Moreover, determining the issue of breach pursuant to the "numerous different definitions of the terms 'vendor' and [promotional allowance] in the numerous and varying contracts," USF maintains, will require "reference to individualized extrinsic evidence." Appellant's Br. at 49. USF asserts that resolution of the issue of breach can therefore not be attained through generalized proof and that the district court

abused its discretion in ruling that Rule 23(b)(3)'s predominance requirement is satisfied as to the contract claims. We are not persuaded.

To be clear, courts properly refuse to certify breach of contract class actions where the claims require examination of individual contract language. *See, e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998); *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 304 (D. Conn. 2009) (declining to certify class for breach of contract claims where contracts defined cost and value differently such that the language of each contract "would need to be carefully considered to determine whether defendants breached each contract at issue"); *cf. Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (decertifying class of early retirees in ERISA case where "side deals" contained myriad variations as to what each retiree was promised). In such cases, however, courts have determined that the language variations were material to the issue of breach. Here, USF's own expert testified that the contracts "essentially all [say] the same thing" and that in the food service industry, "[i]t [is] well understood . . . what a cost plus contract is," J.A. at 2938. Similarly, USF's own auditor found that USF's contracts are consistent in how they define invoice cost, J.A. at 900-01. The district court's conclusion that USF's cost-plus contracts are substantially similar in all material respects, *see In re U.S. Foodservice*, 2011 WL 6013551, at *14, is amply supported by the record.

USF contends that resolving the contract claims will require introduction of evidence of contract negotiations and course of performance evidence to determine whether individual customers knew about USF's use of VASPs and "acquiesce[d] in it without objection." U.C.C. § 1-303(a)(2). To be sure, extrinsic evidence can illuminate the meaning of ambiguous contract terms, and the terms of the contracts here, each of which is governed by the Uniform Commercial Code ("UCC"), may in theory "be explained or supplemented" by extrinsic evidence of the parties' "course of performance, course of dealing, or usage of trade." *Id*. § 2-202; *see also id*. § 1-303(d)-(e) (noting that course of performance, course of dealing, and trade usage are "relevant in ascertaining the meaning of the parties' agreement, . . . and may supplement or qualify the terms of the agreement"); *accord Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), *aff'd on other grounds by* 545 U.S. 546 (2005).[9] USF's argument as to the importance of individualized extrinsic evidence as to the contract claims, however, simply mimics its claim that the issue of individual customer

---

[9] The UCC defines "course of performance" as the parties' conduct in the transaction in question provided that "(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." U.C.C. § 1-303(a). In contrast, "course of dealing" focuses on the parties' conduct in previous transactions that can "fairly be regarded as establishing a common basis of conduct for interpreting their expressions and other conduct" in the transaction in question. *Id.* § 1-303(b). Finally, "usage of trade" does not involve any inquiry into the conduct of the individual parties, but rather covers "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." *Id.* § 1-303(c).

knowledge defeats certification of the RICO class, and it fails for the same reason.  Just as the record contains no evidence regarding individualized customer knowledge, it likewise includes no evidence of any USF customer's contract negotiations or individualized conduct in performing pursuant to the contract that tends to show either that the customer understood his contract to authorize the VASP arrangements or that he otherwise acquiesced in them. USF proffers expert testimony regarding accepted industry practice (namely, that it is common knowledge that food distributors employ VASP-like arrangements), but this is generalized trade usage evidence appropriately considered on a class-wide basis.

The fact that each of these contracts is governed by the UCC, moreover, further supports the district court's conclusion that common issues will predominate in the adjudication of these contract claims.  Plaintiffs allege, *inter alia*, that USF breached its cost-plus contracts because the use of VASPs to inflate costs was dishonest, commercially unreasonable, and a breach of USF's implied duty of good faith. *See* Cmplt. ¶¶ 152-53; *see also* U.C.C. §1-203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.").  The UCC's implied duty of good faith, in turn, requires not only "honesty in fact" between contracting parties but also "the observance of reasonable commercial standards of fair dealing in the trade." U.C.C. § 2-103(1)(b) (defining "good faith" for merchants); *see id.* § 1-201(b)(20) (defining "good faith" for non-merchants).  *See also* U.C.C. § 1-203 cmt.

(explaining that the duty of good faith is implemented by the provisions on course of dealing and trade usage, and "directs a court toward interpreting contracts within the commercial context in which they are created, performed, and enforced."); 1B Larry Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 1-304:42 (3d ed. 2012) ("U.C.C. § 1-201(b)(20) establishes an objective test for good faith: whether the party acted in observance of reasonable commercial standards of fair dealing.  The commercial reasonableness of the party's behavior relates solely to the fairness of the behavior.").

We agree with the district court that the question of breach with regard to plaintiffs' contract claims will focus predominantly on common evidence to determine whether, in fact, USF used controlled middlemen to inflate invoice prices and whether such a practice departs from prevailing commercial standards of fair dealing so as to constitute a breach.  *See* U.C.C. § 2-103(1)(b).  In this regard, we find the Eleventh Circuit's decision in *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, instructive.  There, plaintiffs alleged that Exxon breached its contracts with its dealers by overcharging them on fuel purchases.  *Id.* at 1252.  Though the contracts were not identical, the Eleventh Circuit affirmed the class certification because the dealer agreements were materially uniform insofar as they imposed the same duty of good faith on Exxon.  Thus, the question of whether Exxon had violated its duty was common to all class members.  *Id.* at 1261.  The same holds true here.

Like the district court, we anticipate that adjudication of the breach of contract claims will largely parallel adjudication of the RICO claims. The common issues will include USF's creation and control of the VASPs, the actual services, if any, the VASPs provided, USF's efforts to hide the true nature of the VASPs from its customers (which in the breach of contract setting is circumstantial proof that customers did not know of and never acquiesced in USF's course of performance), and trade usage concerning controlled middlemen like the VASPs. Since the record does not indicate the existence of material differences in contract language or other significant individualized evidence, we conclude that the district court did not abuse its discretion in concluding that common issues will predominate over any individual issues, and that USF's claim to the contrary should be rejected.

### b) Minimum Purchase Requirements

USF next contends that many of the contracts impose minimum purchase requirements on customers as a precondition to their entitlement to cost-plus pricing. Compliance with this "condition precedent" to USF's obligation to provide cost-plus pricing, USF contends, raises individualized issues not subject to generalized proof, defeating predominance as to the contract claims. The district court concluded, to the contrary, that these minimum purchase obligations are not material, and do not draw into question the predominance of common issues as to the contract claims. We agree with the district court.

The minimum purchase requirements at issue here stipulate that to be entitled to the benefits of the contract, including cost-plus pricing, customers must purchase a minimum percentage of their food supplies from USF. For instance, the Thomas & King contract provides that the specified margins are contingent on Thomas & King "purchasing 85% of [its] total purchases in each specified product category from [USF]," J.A. at 1544. We agree with USF that if the minimum purchase requirements in many of its contracts had ever been enforced, individualized questions could potentially predominate regarding these contracts, as each plaintiff might be required to introduce evidence showing that it had complied with the requirements set forth in its contract to establish USF's breach.

But that is not this case. Here, the district court found that the minimum purchase requirements in the contracts were not enforced by USF and thus are not material to the question whether USF breached its agreements. The factual finding of non-enforcement is entitled to deference unless clearly erroneous. *See Parker*, 331 F.3d at 18. Given the absence of any evidence showing that USF ever enforced these requirements, as well as testimony from USF's own expert describing such requirements as "dream figure[s]" that food distributors do not even monitor for customer compliance, we cannot say that the district court's determination was clearly erroneous. In light of this factual finding, the district court did not abuse its discretion in determining that the provisions are not

36

material to the question of breach, and thus that they create no need for individualized evidence of compliance.

### c) Variations in State Contract Law

USF next argues that certification was improper because this multi-state class action implicates the laws of many jurisdictions. We agree that putative class actions involving the laws of multiple states are often not properly certified pursuant to Rule 23(b)(3) because variation in the legal issues to be addressed overwhelms the issues common to the class. *See, e.g., Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183 (11th Cir. 2010). However, these concerns are lessened where the states' laws do not vary materially. *See Klay*, 382 F.3d at 1262 ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). Thus, the crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues. *See Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) ("[N]ationwide class action movants must creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class

certification does not present insuperable obstacles.'" (quoting *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986))).

Here, they do not. As courts have noted, state contract law defines breach consistently such that the question will usually be the same in all jurisdictions. *See Klay*, 382 F.3d at 1263 ("A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey."); *see also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("[C]ontract law is not at its core diverse, nonuniform, and confusing" (internal quotation marks omitted)). The uniformity is even more pronounced in this matter, moreover, as all the jurisdictions implicated have adopted the UCC. USF's principal contention to the contrary is that despite such adoption, state and tribal laws differ as to the admissibility of extrinsic evidence. But plaintiffs' papers in support of their motion for class certification demonstrate that all the relevant jurisdictions have adopted U.C.C. § 1-303, governing the introduction of such evidence. *See* J.A. at 2648-50. In the absence of any showing by USF disputing this, we conclude that the district court did not abuse its discretion in determining that variations in state contract law do not preclude certification.

iii) Fraudulent Concealment and Tolling

In yet another effort to refute the district court's conclusion that plaintiffs have established predominance for the purpose of Rule 23(b)(3), USF argues: (1) that plaintiffs must rely on USF's alleged fraudulent concealment to toll the various statutes of limitations implicated in this action, in order to render timely

their RICO and contract claims; (2) that different jurisdictions employ various legal standards for tolling statutes of limitations; and (3) that, as a result, common issues of law or fact do not predominate, and the district court abused its discretion in concluding otherwise.  For the following reasons, we disagree.[10]

At the start, we agree with the district court that fraudulent concealment can be demonstrated via class-wide, generalized evidence.  Granted, some jurisdictions whose law may apply to plaintiffs' contract claims require that a "plaintiff asserting fraudulent concealment prove it exercised some degree of diligence" to discover the claims.  *See In re U.S. Foodservice*, 2011 WL 6013551, at *19.  Similarly, a plaintiff seeking to toll the statute of limitations for a civil RICO claim must demonstrate that he was "reasonably diligent in trying to discover his cause of action."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 182 (1997).  The district court found, however, that plaintiffs "produced common evidence showing that USF intended to conceal the VASPs and, therefore, it cannot reasonably be expected that the plaintiffs could have discovered the

---

[10]  Both parties presented the district court with an analysis of the relevant statute of limitations principles in all 50 states, though plaintiffs argue, *inter alia*, that upon proper application of choice of law principles, the law of only one to three states will be germane.  Like the district court, we do not reach this choice of law issue in light of our conclusion that even assuming the laws of multiple jurisdictions apply, common issues predominate.

With regard to variations in the statutes of limitations themselves, the district court found that such variations did not pose an insuperable obstacle to class certification because only one state imposes a statute of limitations less than four years and subclasses may be created as needed to manage statute of limitations issues.  *See In re U.S. Foodservice*, 2011 WL 6013551, at *17.  USF does not dispute the propriety of this ruling on appeal.

injury until they became more fully aware of VASPs['] existence and purpose." *In re U.S. Foodservice*, 2011 WL 6013551, at *17. And while some contracts provided customers audit rights, common evidence indicates that USF purposefully designed the VASP system to be invisible to customer audits, and USF's own expert testified that an audit could not have uncovered the VASP arrangements. In the absence of any individualized evidence that plaintiffs were not deceived by USF's attempts to conceal the truth about the VASPs or that plaintiffs had the necessary tools to uncover the fraud prior to public disclosure of the VASP system in 2003, the district court did not abuse its discretion in determining that common evidence of this concealment will predominate in resolving whether the relevant statutes of limitations were tolled. *Cf. McLaughlin*, 522 F.3d at 233-34 (decertifying class in part because defendants introduced evidence indicating that plaintiffs knew truth about light cigarettes and were not deceived by false advertising).

The other variations among potentially applicable tolling standards identified by USF do not change this analysis. First, surveys of state law conducted by both parties reveal that all but three states apply the doctrine of fraudulent concealment or the related doctrine of equitable estoppel to toll the statute of limitations for contract claims. USF points out that 14 of these states provide that a statute of limitations is tolled for fraudulent concealment only if the plaintiff relied on a misrepresentation by the defendant, and that five states require that plaintiffs demonstrate fraudulent concealment by clear and

convincing evidence.[11]  *See* J.A. at 3201-33.  But just as payment of inflated invoices constitutes circumstantial evidence that can be used to establish, for RICO purposes, that plaintiffs relied on the invoices' misrepresentation as to the cost component of USF's pricing, so too may such evidence be used to establish reliance for fraudulent concealment purposes.  And the mere fact that five states impose a heightened standard of proof for fraudulent concealment does not draw into question the district court's conclusion as to predominance, but instead suggests simply the possibility that the district court, in a case in which generalized proof will resolve many issues, may choose to handle other less numerous and less substantial issues through the creation of a limited number of homogeneous subclasses.  *See* Fed. R. Civ. P. 23(c)(5) (authorizing creation of subclasses); *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) ("Rule 23 gives the district court flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear.").  In sum,

---

[11] USF also highlights variations in state law as to (1) whether an affirmative act of concealment by defendants is required as opposed to simple silence; (2) whether intent / knowledge on behalf of the defendant is required; and (3) whether the statute of limitations begins to run on actual discovery or constructive discovery. We find no error, however, in the district court's conclusion that these differences are immaterial. Plaintiffs allege an affirmative act  by defendants who acted with an intent to deceive, and "the point at which plaintiffs should have discovered the breach is the same point at which they did discover the breach." *In re U.S. Foodservice*, 2011 WL 6013551, at *19.

41

fraudulent concealment issues may sometimes preclude certification under Rule 23(b)(3), but they do not do so here.

## B. Expert Testimony

USF also challenges the district court's reliance on the plaintiffs' damages expert John Damico, who testified that individual damages could be calculated on a class-wide basis with a simple formula using data extracted from USF's databases, and plaintiff's industry expert Stacy Moore, who testified that the VASP system "was not common industry practice and [USF's] customers would not – and by USF's design, could not – have known that USF was engaging in such conduct," J.A. at 2986. USF argues that the district court erred by considering this testimony without first conducting a *Daubert* hearing to determine the evidence's admissibility.[12] The record establishes, however, that the district court performed its gatekeeping function and that it resolved the disputes regarding expert testimony in plaintiffs' favor.

The Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification

---

[12] Under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, expert testimony is admissible if the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact or issue. 509 U.S. 579, 592 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93; *see also* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert* to non-scientific testimony).

stage.[13] In *Wal-Mart*, the Court offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances. *See* 131 S. Ct. at 2553-54 ("The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so . . . ." (internal citation omitted)). In *In re IPO*, we disavowed our earlier statement that "an expert's testimony may establish a component of a Rule 23 requirement simply by not being fatally flawed," 471 F.3d at 41, without deciding whether or when a *Daubert* analysis forms a necessary component of a district court's rigorous analysis. *But see id.* at 41 (noting that a district judge must be afforded "considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements").

We need not reach that question here either, as the record indicates that even though the district court did not conduct a *Daubert* hearing, it considered the admissibility of the expert testimony on the papers after USF had indicated that it was "happy to rely on the papers." S.A. at 608, 719; *see United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (noting that the "formality of a

---

[13] The Supreme Court certified this precise question in *Comcast Corp., see* 133 S. Ct. 24 (mem.) (certifying question "[w]hether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis"), but did not reach it because the defendant had not objected to consideration of the expert testimony below, *see* 133 S. Ct. at 1435-36 (Ginsburg, *J.*, dissenting).

separate hearing" is not always required for a district court to "effectively fulfill[] its gatekeeping function under *Daubert"*).  As its opinion makes clear, the district court did make the requisite findings, concluding with respect to Damico's proposed damages model that it is appropriately "based on USF's alleged fraudulent pricing," "provides for a universal calculation of damages" because USF "almost always used an invoice to calculate prices," and that "the only feasibility-related issue is the potential need for manual input of certain customers." *In re U.S. Foodservice*, 2011 WL 6013551, at *15-16.  Similarly the court concluded that industry practice can be used to establish whether "USF customer[s] had any reason to know of" USF's VASP pricing.  *Id.* at *11.[14]  We therefore see no reason to disturb the district court's considered conclusions on the issue of expert testimony.  *See United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (noting that *Daubert* inquiry is flexible, that "district courts enjoy considerable discretion in deciding on the admissibility of expert testimony," and that "[w]e will not disturb a ruling respecting expert testimony absent a showing of manifest error").

---

[14] USF's argument that the district court erred in relying on Moore's testimony is actually a red herring.  The district court cited Moore only once in its opinion – referring to her only as a "purported expert" – and its analysis regarding the predominance of industry standards over questions of individual customer knowledge was not dependent on her declaration.  *See In re U.S. Foodservice*, 2011 WL 6013551, at *11.

## C. Superiority

USF asserts, finally, that even if common issues predominate in this class action, so that the district court did not err in reaching this conclusion, certification was still improper because a class action is not a superior method of adjudicating these claims. USF does not address any of the Rule 23(b)(3) factors,[15] however, and argues only that no economies would be achieved over individual litigation because absent this action individual customers would not bring suit. We do not find this reasoning persuasive.

As the Supreme Court has said, Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery. *See Amchem Prods., Inc.*, 521 U.S. at 617. Here, substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of "time, effort and

---

[15] Rule 23 instructs that matters pertinent to a finding of superiority include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

expense, and promote uniformity of decision." Fed. R. Civ. P. 23 advisory committee's notes. USF raises no significant argument to the contrary.

## Conclusion

Despite the size and geographic scope of this class, close inspection of this case reveals that any class heterogeneity is minimal and is dwarfed by common considerations susceptible to generalized proof. The claims of each class member will be governed by the same substantive law, either RICO or the UCC. Moreover, the uniform nature of USF's alleged fraud and USF's concerted effort to shield its scheme from scrutiny place each customer in the same position as to these issues and ensure the cohesiveness of the class. USF itself, moreover, relies heavily on common proof – namely, trade usage evidence – in articulating its defense and has identified no individualized evidence or legal issues drawing into question the district court's conclusion that common issues will predominate. We discern no abuse of discretion in the district court's determination that certification was appropriate. Accordingly, for the foregoing reasons, we affirm the district court's order certifying the class.

46

MANDATE

D. Conn.
07-md-1894
Droney, J.

# United States Court of Appeals

FOR THE

## SECOND CIRCUIT

———————

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 3rd day of April, two thousand twelve.

Present:

  Jon O. Newman,
  Robert A. Katzmann,
  Barrington D. Parker,
   *Circuit Judges*.

———————————————————

US Foodservice Inc.,

    *Petitioner*,

v.            11-5193-mv

Catholic Healthcare West, *et al.*,

    *Respondents*.

———————————————————

Petitioner, through counsel, moves for: (1) leave to appeal the district court's order granting class certification, pursuant to Federal Rule of Civil Procedure 23(f); and (2) leave to file its unredacted appendix under seal.

Upon due consideration, it is hereby ORDERED that: (1) the Rule 23(f) petition is GRANTED; and (2) the motion for leave to file the unredacted appendix under seal is GRANTED. Petitioner is directed to review Second Circuit Local Rules 12.1 and 31.2.

    FOR THE COURT:
    Catherine O'Hagan Wolfe, Clerk

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 10/31/2013