**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| *In re U.S. Foodservice, Inc.*<br>*Pricing Litigation* | Case No. 3:07-md-1894 (AWT) |
| This Document Relates To: All Matters | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**<u>FOR FINAL APPROVAL OF SETTLEMENT AGREEMENTS</u>**

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................... 5

II.  BACKGROUND ........................................................................................................... 6

   A.   The Parties' Claims and Defenses ......................................................................... 6

   B.   Nature and State of Proceedings ............................................................................ 7

      1.   The USF Settlement............................................................................................ 7

      2.   The Redgate Settlement ..................................................................................... 8

III. ARGUMENT................................................................................................................. 9

   A.   The Proposed Settlements Should Be Approved Because They Are Fair, Reasonable, and
Adequate ......................................................................................................................... 9

      1.   The Grinnell Factors Weigh in Favor of Approving the Settlement ......................... 10

         a)   The Class's Reaction to the Settlement ................................................................. 10

         b)   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible
Recovery and the Attendant Risks of Litigation............................................................... 12

         c)   Complexity, Expense, and Likely Duration of the Litigation.................................... 14

         d)   Risks of Establishing Liability and Damages ......................................................... 16

         e)   Risks of Maintaining the Class Action Through Trial............................................. 19

         f)   The Stage of the Proceedings and the Amount of Discovery Completed.............. 20

         g)   The Ability of the Defendants to Withstand Greater Judgment ............................ 21

      2.   The Settlement Is Presumptively Fair because it is the Product of Informed Arm's
Length Negotiations........................................................................................................ 22

   B.   The Plan of Allocation is Fair, Reasonable, and Adequate ............................................. 23

   C.   Class Notice Complied with the Preliminary Approval Order and Satisfied Due Process
Requirements ...................................................................................................................... 24

IV. CONCLUSION.................................................................................................................. v27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Charron v. Pinnacle Grp. N.Y. LLC,*
   874 F. Supp. 2d 179 (S.D.N.Y. 2012)..............................................................14, 16, 24

*Charron v. Wiener,*
   731 F.3d 241 (2d Cir. 2013)....................................................................................14, 19

*Chavarria v. New York Airport Serv., LLC,*
   2012 WL 2394797 (E.D.N.Y. June 25, 2012) ...........................................................22

*City of Detroit v. Grinnell* Corp.,
   495 F.2d 448 (2d Cir. 1974)......................................................................................10

*Collins v. Olin Corp.,*
   2010 WL 1677764 (D. Conn. Apr. 21, 2010) ...........................................................14

*Comcast v. Behrend,*
   133 S.Ct. 1426 (2013)...............................................................................................18

*D'Amato v. Deutsche Bank,*
   236 F.3d 78 (2d Cir. 2001)....................................................................................9, 20

*Dupler v. Costco Wholesale Corp.,*
   705 F. Supp. 2d 231 (E.D.N.Y. 2010) ......................................................................20

*Frank v. Eastman Kodak Co.,*
   228 F.R.D. 174 (W.D.N.Y. 2005).............................................................................16

*Gilliam v. Addicts Rehab. Center Fund,*
   2008 WL 782596 (S.D.N.Y. March 24, 2008) .........................................................12

*Gross v. Waywell,*
   628 F. Supp. 2d 475 (S.D.N.Y. 2009).......................................................................15

*Hertzberg v. Asia Pulp & Paper Co.,*
   197 F. App'x 38 (2d Cir. 2006)................................................................................21

*In re Am. Bank Note Holographics, Inc., Sec. Litig,*
   127 F. Supp. 2d 418 (S.D.N.Y. 2001).......................................................................10

*In re China Sunergy Sec. Litig.,*
   2011 WL 1899715 (S.D.N.Y. May 13, 2011) ...........................................................12

*In re Global Crossing Sec. & ERISA Litig.,*
   225 F.R.D. 436 (S.D.N.Y. 2004) .........................................................10, 16, 17, 20

*In re Host Am. Corp. Sec. Litig.,*
   2008 WL 659579 (D. Conn. Mar. 7, 2008) ..............................................................10

*In re PaineWebber Ltd. P'ships Litig.,*
   171 F.R.D 104 (S.D.N.Y. 1997) ..............................................................................16

*In re Sony SXRD Rear Projection Television Class Action Litig.,*
   2008 WL 1956267 (S.D.N.Y. May 1, 2008) .............................................................21

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.,*
   2012 WL 3589610 (D. Conn. Aug. 20, 2012) .......................................10, 12, 20, 21

*In re Union Carbide,*
   718 F. Supp. 1099 (S.D.N.Y. 1989)..........................................................................13

*In re Veeco Instruments, Inc. Sec. Litig.,*
   2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...........................................................17

*Kiefer v. Moran Foods, LLC,*
   2014 WL 3882504 (D. Conn. Aug. 5, 2014) ...........................................................21

*Malchman v. Davis,*
    706 F.2d 426 (2d Cir.1983)......................................................................... 9

*Maley v. Del Global Tech's Corp.,*
    186 F. Supp. 2d 358 (S.D.N.Y. 2002).......................................................... 22

*Newman v. Stein,*
    464 F.2d 689 (2d Cir. 1972)........................................................................ 12

*O'Connor v. AR Res., Inc.,*
    2012 WL 12743 (D. Conn. Jan. 4, 2012)..................................................... 21

*Phillips Petroleum v. Shutts,*
    472 U.S. 797 (1985)..................................................................................... 25

*Soberal–Perez v. Heckler,*
    717 F.2d 36 (2d Cir. 1983).......................................................................... 24

*Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d. Cir. 2005).................................................................... 9, 22

**Statutes**
18 U.S.C. § 1961.................................................................................................... 6

**Rules**
Fed. R. Civ. P. 23(c)(2)(B)......................................................................... 24, 25, 26
Fed. R. Civ. P. 23(c)(3).................................................................................... 24, 25
Fed. R. Civ. P. 23(e)......................................................................................... 9, 24

I.      INTRODUCTION

By all measures, Plaintiffs' settlements with U.S. Foods, Inc., f/k/a U.S. Foodservice, Inc. ("USF"), its former parent Koninklijke Ahold N.V. ("Ahold"), and Gordon Redgate (collectively, "the Settlements") deserve final approval.  These settlements, which were only reached after more than seven years of hard fought litigation, represent one of the largest resolutions of a RICO class action.  Assuming the Court grants Class Counsel's fee and expense request in full, and making reasonable assumptions about the amount of dollar value claims to be made between now and the claim deadline, the anticipated payout to class members is likely to be an amount equal to or exceeding their actual estimated damages in this groundbreaking nationwide RICO and breach of contract case.  As a testament to the excellent result achieved in this case, not a single objection to the Settlements or Class Counsel's fee petition has been filed, after nearly 200,000 class members received direct notice via U.S. mail, millions viewed advertisements of the settlement in *The Wall Street Journal* and on industry websites, and over 300,000 visited the class website since it went live on August 11, 2014.[1]

---

[1] In an effort not to burden the Court with excessive or duplicative submissions, this memorandum assumes familiarity with prior proceedings in this case, and in particular, with Class Counsel's Motion for Award of Fees and Expenses From the Common Fund and an Incentive Award for Lead Plaintiffs and the Joint Declaration submitted therewith [Dkt. 510].

## II.     BACKGROUND

### A.     The Parties' Claims and Defenses

Plaintiffs filed their first class action complaint against USF on October 19, 2006, on behalf of themselves and a proposed class of cost-plus customers who purchased products from USF between 1998 and 2005. Additional complaints also naming Gordon Redgate as a defendant followed shortly thereafter, and the cases were consolidated in the U.S. District Court for the District of Connecticut by the Judicial Panel of Multidistrict Litigation on May 23, 2008. Plaintiffs filed a Consolidated and Amended Class Action Complaint [Dkt. 34] on June 30, 2008, ("the Complaint") which alleged claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., as well as breach of contract claims.

Plaintiffs specifically alleged that, beginning around 1998, USF devised and perpetrated a scheme to overbill its cost-plus customers by interposing six middle-man companies called Value-Added Service Providers ("VASPs") between itself and its food suppliers, in order to improperly increase the reported "cost" of goods that its customers purchased on a cost-plus basis. The alleged VASPs were (i) Seafood Marketing Specialists, Inc., (ii) Frozen Farms, Inc., (iii) Produce Solutions, Inc., (iv) Private Labels Distribution, Inc., (v) Specialty Supply & Marketing, Inc., and (vi) Commodity Management Systems, Inc.[2]  Plaintiffs further alleged that USF funded the VASPs with millions of dollars in advances, which the VASPs held in trust to pay the suppliers from which they purchased goods on USF's behalf, and that USF controlled the VASPs' "buy" and "sell" prices.  Plaintiffs claimed that the VASPs enabled USF to misrepresent the true "cost" of the goods it routed through the VASPs and sold to cost-plus customers, and created a deceptive paper trail that made these misrepresentations undetectable.   USF denied

---

[2] The parties agree that these VASP entities ceased operations by December 31, 2005, and that the class is thus properly confined to customers who made qualifying purchases between January 1, 1998 and December 31, 2005.

Plaintiffs' claims and asserted that the VASPs were important vendors that provided necessary services in USF's supply chain and in the creation of USF's private label products. USF also claimed that it was expressly permitted to be compensated for such services pursuant to its contracts with cost-plus customers. USF contended that its pricing practices were consistent with those contracts and foodservice industry standards; that the majority of VASP sales were of products marketed under USF's own private labels, for which it was allegedly understood that USF could set the costs; that neither the VASPs' nor USF's pricing practices were hidden from customers; and that customers did not make purchases based on any misunderstanding about USF's pricing practices.

### B.   Nature and State of Proceedings

This case has been extensively litigated for more than seven years.  As of today, this Court has granted in part and denied in part USF's and Ahold's motions to dismiss [Dkt. 121], granted Plaintiffs' motion for class certification [Dkt. 218], and issued rulings on five of thirteen hotly contested discovery motions. The Second Circuit unanimously upheld this Court's class certification ruling on August 30, 2013, and denied USF's petition for en banc rehearing, and the U.S. Supreme Court denied USF's petition for certiorari on April 28, 2014.

Earlier this year, Plaintiffs reached Settlement Agreements with USF and Gordon Redgate after extensive arm's-length negotiations and formal mediation.

### 1.   The USF Settlement

After many failed settlement negotiations, Plaintiffs and USF agreed to the principal terms of a Settlement on May 20, 2014, (the "USF Settlement") at the close of a two-day mediation session. The May 2014 mediation session was overseen by former United States

District Court Judge Layn R. Phillips.  Joint Dec. ¶ 24.[3]  It included extensive pre-mediation briefing and evidentiary presentations, in which each party highlighted the strengths and weaknesses of its respective case. Joint Dec. ¶ 25. The parties were able to settle the case only after considering and weighing the positions expounded by their opponents and with the guidance of Judge Phillips. The USF Settlement provides for the payment of $297 million by Ahold,[4] in exchange for dismissal of the litigation with prejudice and certain releases from the class. Ex. A.

### 2.    The Redgate Settlement

On September 4, 2008, the Plaintiffs and Defendant Gordon Redgate ("Redgate") agreed to the principal terms of a settlement agreement in a Memorandum of Understanding that would settle Plaintiffs' claims against Redgate.  On July 13, 2014, the parties formalized the principal terms outlined in the Memorandum of Understanding in the Proposed Stipulation and Settlement Agreement (the "Redgate Settlement"). Exh. B.  Once the parties executed the Memorandum of Understanding, Redgate (a) cooperated with Class Counsel in providing hundreds of thousands of pages of non-privileged documents and information in his possession, custody, and control relating to the claims asserted in the Complaint; (b) met and/or conferred with Class Counsel as reasonably requested by them regarding Plaintiffs' claims; (c) coordinated the cooperation of numerous former employees of the VASPs he operated so that Class Counsel could learn from them how the VASPs operated; (d) voluntarily appeared for a deposition; and (e) voluntarily

---

[3] Citations to "Joint Dec." are to the Joint Declaration of Richard L. Wyatt, James E. Hartley, R. Laurence Macon, and Joe R. Whatley in Support of Class Counsel's Motion for Award of Fees and Expenses from The Common Fund and for Award of Incentive and Reimbursement Payment for Class Representatives.  [Dkt. 510]

[4] On July 5, 2007, Ahold sold USF to a consortium of Clayton, Dubilier & Rice Fund VII, L.P. and Kohlberg Kravis Roberts & Co. L.P. for $7.1 billion. As part of the sale, Ahold committed to indemnify and hold USF harmless from and against damages (including losses, liabilities, obligations, and claims of any kind) and litigation costs (including attorneys' fees and expenses) suffered, incurred or paid after the sale that exceeded $40 million. As of fiscal year 2009, USF had incurred $40 million in costs related to these matters, so Ahold is responsible for satisfying the settlement payment in this case.

agreed to appear upon reasonable notice to testify at trial or hearing in this action as requested by Plaintiffs, despite the fact that he does not reside in the District of Connecticut.  In return for Redgate's cooperation throughout the case, the Redgate Settlement dismisses this litigation with prejudice as to Redgate and provides for certain releases.  The Redgate Settlement does not provide monetary benefit to the class, but was critical to Plaintiffs' ability to reach a settlement with USF, which provides substantial payment for the class's damages.

## III.   ARGUMENT

### A.   The Proposed Settlements Should Be Approved Because They Are Fair, Reasonable, and Adequate

Federal Rule of Civil Procedure 23(e) requires court approval of settlements in class cases.  To approve a class action settlement, a court must determine that the proposed terms are "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  "This requires an assessment of both procedural and substantive fairness." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 113 (2d. Cir. 2005); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citing *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983)) ("The District Court determines a [class action] settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms.").  Courts conduct this analysis keeping in mind that there is strong public policy supporting the settlement of class actions.  *Wal-Mart Stores, Inc.*, 396 F.3d at 117.

To determine procedural fairness, courts examine the "negotiating process leading to the settlement," and can presume "fairness, adequacy, and reasonableness" when a class settlement is reached "in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Id.* at 116-17.

To evaluate the substantive fairness of a settlement, courts in the Second Circuit consider the "*Grinnell* factors," which include: (1) the reaction of the class to the settlement the complexity, expense, and likely duration of the litigation; (2) the range of reasonableness of the settlement fund in light of the best possible recovery; (3) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; (4) the complexity, expense, and likely duration of the litigation, (5) the risks of establishing liability; (6) the risks of establishing damages; (7) the risks of maintaining the class action through the trial; (8) the stage of the proceedings and the amount of discovery completed; (9) the ability of the defendants to withstand a greater judgment. *See City of Detroit v. Grinnell* Corp., 495 F.2d 448, 463 (2d Cir. 1974). Although not every factor must weigh in favor of approval of the settlement, and a court may consider the factors together to determine whether to approve the settlement, here each and every one of the factors squarely weighs in favor of approval. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

1.      **The *Grinnell* Factors Weigh in Favor of Approving the Settlement**

a)      **The Class's Reaction to the Settlement**

Of all the *Grinnell* factors that a court must consider in making the determination to approve or reject a settlement, "the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.... [T]he lack of objections may well evidence the fairness of the [s]ettlement." *In re Host Am. Corp. Sec. Litig.*, 2008 WL 659579, at *1 (D. Conn. Mar. 7, 2008) (citing *In re Am. Bank Note Holographics, Inc., Sec. Litig,* 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)); *see also In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *5 (D. Conn. Aug. 20, 2012) (citation omitted) ("[T]he absence of objectants may itself be taken as evidencing the fairness of a settlement.").

On August 11, 2014, Class Counsel caused the court-authorized Claims and Notice Administrator Gilardi & Co. LLC ("Gilardi") to mail notice of the Settlements directly to nearly two hundred thousand potential class members.  Declaration of Ross Murray ¶ 4 (.  In addition, Class Counsel, through established a case website, published notice in *The Wall Street Journal* and posted advertisements with links to the case website on a number of leading industry websites.  *Id.* ¶ 5.  Despite more than 329,103 hits on the case website and thousands of claims already filed well in advance of the December 19, 2014 claim deadline, not one class member has objected to the terms of the Settlements, Class Counsel's request for attorney's fees and expenses, or the request for incentive and reimbursement payment to class representatives.[5]  Instead, responses to the settlement have been overwhelmingly positive.  As the reaction of the class to the settlement is the most significant factor for the Court to consider, the fact that there have been no objections weighs heavily in favor of approval.

In addition, of the nearly two hundred thousand potential claimants that were mailed notice of the Settlements, only four entities initially requested exclusion from the Settlements; one of those has asked to withdraw its request for exclusion, and one appears not to be a class member at all, leaving only two class members that have elected to be excluded from the Settlements.  Of all four, none requested exclusion because they disliked the terms of the Settlements.  Instead, each had a unique reason for exclusion that was unrelated to the terms of the Settlements:[6]

---

[5] The deadline for objections and opt-outs passed on September 25, 2014 [Dkt. 508]
[6] Murray Dec. ¶ 9 , Exs. D-E to Murray Dec, Declaration of Torsten M. Kracht ¶¶ 2-5.

- **McDowell Senior Center f/k/a Marion Senior Center**. USF's data shows that McDowell has relevant purchases of $8,956. A representative from McDowell has since informed Class Counsel that they would like to withdraw their request to opt out and that they indeed do wish to participate in the Settlements.

- **Clossman Catering LLC**. According to USF sales data, Clossman Catering did not purchase relevant products from the VASPs. It requested exclusion because it is involved in state court litigation with USF (unrelated to the claims in our case) and wants to opt out to avoid any argument by USF that a release in this case could apply to its current state court case against USF.

- **The Estate of Bryan Fogle**. USF's data shows that Mr. Fogle has relevant purchases of $135. The executor of his estate advised Class Counsel that she has requested exclusion so as not to complicate the probate process.

- **The University of Washington**. USF's data shows The University of Washington has relevant purchases of $8,558. A representative from the University of Washington advised Class Counsel that as a matter of policy, the university does not want to participate in class claims and releases.

Thus, no class member has objected to the Settlements or Class Counsel's Fee Petition, and only two have decided not to participate in the Settlements, both for reasons unrelated to the terms of the Settlements. The lack of any objection, despite wide publication and active interest in the Settlements weighs strongly in favor of approval.

    b)  **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The next *Grinnell* factors the Court must consider in evaluating the substantive fairness of the Settlements are the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation. As with the other factors, the touchstone for this comparison is reasonableness, and "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion[.]" *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). In addition, courts must compare the potential of a larger recovery with the benefit of the settlement's immediacy. *See Gilliam v.*

*Addicts Rehab. Center Fund*, 2008 WL 782596, at *5 (S.D.N.Y. March 24, 2008) (recognizing that an expedient result can be preferable "even if it means sacrificing speculative payment of a hypothetically larger amount years down the road.") (internal quotes and citation omitted).[7] Courts have approved incredibly small percentages where the risks of litigation were great and the possible recoveries quite large.  *See In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that "average settlement amounts in securities fraud class actions where investors sustained losses over the past decade ... have ranged from 3% to 7% of the class members' estimated losses") (internal quotation marks and citation omitted); *In re Union Carbide*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) (acknowledging that "a settlement can be approved even though the benefits amount to a small percentage of the recovery sought" and that the "essence of settlement is compromise.") (internal quotation marks and citation omitted).

Plaintiffs' experts have calculated the average overcharge resulting from USF's alleged VASP scheme as 8.82475% of every dollar a class member spent on a relevant product. Applying this formula, Class Counsel estimates that the USF Settlement with USF will provide generous compensation to Claimants, likely equal at least to their actual damages.

As of October 17, 2014, the claims agent has received over $330 million in validated claims dollars against the settlement fund.  A claim dollar means a dollar spent by a class member purchasing products under a cost-plus arrangement where USF used a VASP invoice to calculate cost to the class member.  It does not equal the alleged overcharge, but instead reflects the entire amount paid by a class member for the relevant product.  Thus, to the extent class

---

[7] *See also In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *7 ("Here, the parties indicate that the settlement represents approximately 3.5% of Lead Plaintiff's 'most aggressive estimate of maximum provable damages' which 'exceeds the average recovery in shareholder litigation.'…In light of the legal and factually complexity, the unpredictability of a lengthy trial and the appellate process as discussed above, the settlement amount is well within the range of reasonableness for similar securities cases.").

members receive payouts from the settlement fund at 8.82475% or higher of their claim amounts, they will have recovered at least their actual damages.

Traditionally, claims against settlement funds tend to peak during the notice period (which here ran from approximately August 11, 2014 through September 30, 2014), and then increase again shortly before the expiration of the claim-filing deadline (here, December 19, 2014). Even if the volume of filed claims were to increase five times in size before the claim deadline, and if Class Counsel's fee and expense application were granted in full, class members would still be receiving compensation from the settlement fund approximately equal to their actual damages. Such a high recovery is nearly unheard of in class settlements and is a truly exceptional result for the class.

### c) Complexity, Expense, and Likely Duration of the Litigation

Another of the *Grinnell* factors the Court must weigh is the complexity, expense, and likely duration of the litigation. In deciding whether this factor supports approval of the settlement terms, courts consider the level of complexity of the area of law, the difficulty of proving the claims and defenses, and how long the case is likely to continue.[8] Under this factor, the Court must conduct a forward-looking analysis to determine how difficult it will be for Plaintiffs to continue the case to judgment.

To the best of Class Counsel's knowledge, this case—with nearly two hundred thousand identified class members—consists of one of the largest nationwide breach-of-contract classes

---

[8] *See, e.g. Collins v. Olin Corp.*, 2010 WL 1677764, at *3 (D. Conn. Apr. 21, 2010) ("Should this case continue, counsel for the plaintiffs face complex issues of environmental law. In order to try to prove their case, the plaintiffs would have to identify and retain a variety of expert witnesses … In addition to the complex issues of proof, securing expert testimony in these areas would be expensive for the plaintiffs. Furthermore, rejecting this proposed settlement would force this case to continue into its seventh year of litigation, with much time still ahead."); *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 196 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1941, 188 L. Ed. 2d 961 (2014) ("The path from this stage of the litigation to a final judgment on the issue of Defendants' liability for violation of the RICO statutes and the New York Consumer Protection Act would be long, complicated, and expensive.").

ever certified, and one of the only nationwide RICO and breach-of-contract classes ever certified and upheld on appeal.  USF itself characterized the nationwide class as "unprecedented" in a filing last year before the Second Circuit.  *See In re U.S. Foodservice Pricing Litig.*, Case No. 11-5193, Dkt. No. 1, at 1 (2d Cir. Dec 14, 2011).  Compounding the magnitude of the class size and claims at issue is the sprawling nature of the VASP scheme itself.  Plaintiffs' complaint alleges a large-scale nationwide conspiracy between USF and the VASP owners, which, at its core, played out over an eight-year period from 1998 to 2005.

Plaintiffs have already collected extensive factual discovery, but before Plaintiffs could proceed to summary judgment or trial, dozens of additional depositions would need to be taken and, depending on the outcome of the pending discovery motions, many more documents would need to be produced and reviewed.  As of the date the USF Settlement was reached, the schedule contemplated at least another year and a half before the case would come before the Court for trial.

Additionally, there is no guarantee Plaintiffs would win the case on summary judgment or at trial.  RICO claims are complex and notoriously difficult to prove.  As one court observed in dismissing the plaintiffs' claims under RICO and denying their leave to amend:

> This outcome should come as no surprise to any counsel versed in the formidable intricacies and pitfalls inherent in RICO litigation. These challenges bear out in the minimal rate of success plaintiffs have achieved in prosecuting RICO actions…the statistical record indicates that in 98 percent of the RICO appellate cases surveyed, which do not include RICO actions dismissed by the district courts but not appealed, plaintiffs and counsel invested extensive time and energies in litigation only to come away with a total loss.

*Gross v. Waywell*, 628 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2009).  Plaintiffs also face considerable risks associated with proving liability and damages, as discussed below, in Section c.  Thus, the Settlements provide the class with a certain (and substantial) recovery immediately, and avoid the considerable risk that the litigation will stretch on for years and could ultimately

end in a result less favorable for the class.  Because taking this case to judgment and through subsequent appeals would likely take years, because it would cost the class millions in additional expenses, and because there is no guarantee that the class would prevail on its claims, the Court should weigh this factor in favor of approving the Settlements.

### d)        Risks of Establishing Liability and Damages

Under the next *Grinnell* factor, the Court must consider the risks of establishing liability and damages as compared to a certain recovery for Plaintiffs now.  Even where, as here, "Class Counsel believes that Plaintiffs have a strong case … under the civil RICO statute … 'Litigation inherently involves risks.'" *Charron,* 874 F. Supp. 2d at 199 (citing *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D 104, 126 (S.D.N.Y. 1997)).  "The Court is not required to decide the merits of the case or resolve unsettled legal questions … or to foresee with absolute certainty the outcome of the case … Rather, the Court must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *Frank v. Eastman Kodak Co*., 228 F.R.D. 174, 185-86 (W.D.N.Y. 2005) (internal citations omitted).  And, "Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case." *In re Global Crossing,* 225 F.R.D. at 459 (finding that Plaintiffs faced the risk of "substantial legal and factual defenses" and that "expert testimony on a number of complex disputed legal and factual matters" enhanced the risks).  Here, Plaintiffs have alleged on behalf of a very large class RICO and breach-of-contract violations related to USF's nationwide business practices.  Plaintiffs face serious litigation risks stemming from: (1) the legal complexity of Plaintiffs' claims, (2) the expanse of evidence at issue, and (3) the disarray of USF's data necessary to calculate damages.

First, RICO claims are complex, require rigorous proof, and "[r]aise such multifaceted issues of fact as whether a pattern exists and whether underlying predicate acts and a RICO

injury can be established." *In re PaineWebber*, 171 F.R.D. at 125.  Exacerbating this inherent

risk is the fact that USF has and would continue to challenge Plaintiffs on almost every aspect of

their RICO and breach-of-contract claims,[9] the governing law that applies,[10] and the viability of

the nationwide class.[11]  Also in heated dispute in this litigation are industry standards governing

product pricing and the use of third-party intermediaries.  Under USF's theory of the case,

Plaintiffs' complaint challenges a long-standing pricing practice that pervaded one of the

nation's largest industries: wholesale food distribution. Even at the class certification stage, the

parties presented survey evidence and experts to attest to industry standards and norms.  If the

case were to proceed to summary judgment or to trial, both parties would depend heavily on

surveys and expert testimony. As in *In re Global Crossing Sec. & ERISA Litigation*, dependence

on expert testimony, and confrontation of alleged industry standards, further compounds the

litigation risk in this case. 225 F.R.D. at 459.

Second, the facts at issue in the case arose nearly a decade ago and in far flung locations

throughout USF's vast enterprise.  Further complicating matters, in light of USF's alleged

concealment of the entire RICO scheme from its customers, if this case were to continue,

Plaintiffs would face "the difficult task of proving their case almost exclusively through the

testimony of [USF] employees and former employees, who could be considered hostile

---

[9] For example, USF challenged Plaintiffs as to what representations USF made to Plaintiffs; whether Plaintiffs relied on any representations by USF; whether customers were aware of USF's pricing practices; whether USF's pricing practices were consistent with industry standards; whether USF's contracts allowed it to receive rebates from the VASPs; whether USF offered the best prices for its products; whether USF was permitted to set its own prices on private-label products; whether the VASPs were "vendors" under USF's contracts; and whether USF took steps to conceal the VASP scheme.  *See* [Dkt. No. 293, USF's Mot. To Compel (Mar. 1, 2013)]; *In re U.S. Foodservice Pricing Litig.*, No. 12-cv-1311, Dkt. No. 4 (2d Cir. June 29, 2012); *U.S. Foods, Inc. v. Catholic Heathcare West et al.*, No. 13-873 (U.S. Jan. 21, 2014).

[10] For example, USF raised questions as to whether RICO requires individual proof of plaintiffs' due diligence; whether expert testimony may be considered at class certification without first conducting a *Daubert* inquiry; and the above-mentioned alleged issues of first impression.  *Id.*

[11] For example, the parties disputed whether USF's representations, customers' reliance, proximate causation, damages, customer compliance with contractual prerequisites, and the commencement of the limitations period were individualized issues; whether extrinsic evidence concerning thousands of customers would be necessary; and the existence of several material variations in applicable state law.  *Id.*

witnesses." *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007).  Consequently, Plaintiffs might have had difficulty finding witnesses with information about the events, and getting those that they can find to testify in a helpful way.  In addition, much of the documentary evidence that Plaintiffs have located would need to be authenticated by USF employees, former employees, agents, or former agents.  For example, Plaintiffs have gained knowledge of the VASP scheme in part from reports and internal memos prepared by USF accountants, consultants, and investigators.  While those documents paint a clear picture of USF's probable liability to Plaintiffs and Class Counsel, admitting them or the facts they contain into evidence during trial could prove challenging.  Thus, Plaintiffs faced a risk that they may be unable to fully establish the alleged illegality of the VASP scheme.

Third, due in part to the time that has transpired since the VASPs' operation, in part to changes to USF's operating and computer systems during and since the VASPs' operation, and in part to USF's overwriting of sales data purportedly in the ordinary course of its business, USF's data necessary to empirically calculate damages on a class-wide basis for the entirety of the class period is incomplete.  For years, Plaintiffs have worked to re-assemble this data, working with a team of highly experienced experts to reverse-engineer USF's data systems and to extrapolate damages estimates for missing time periods. *See* Joint Decl. ¶¶ 62-66.  Through these efforts, Plaintiffs and Class Counsel have produced a viable method of tracing Plaintiffs' damages in USF's data.  Nevertheless, there is no question that USF would do everything in its power to poke holes in Plaintiffs' gap-filling methodologies. Adding additional risk to Plaintiffs' ability to establish class-wide damages is the uncertain and ever evolving jurisprudence on proof of damages in the class-action context.  There have been significant developments in this area in the last few years, and it is difficult to predict whether the Supreme Court will continue to alter

18

the parameters and how the lower courts will interpret its decisions.  *See, e.g.*, *Comcast v. Behrend,* 133 S.Ct. 1426, 1437 (2013) (affirming that "individual damages calculations do not preclude class certification under Rule 23(b)(3)," but reversing certification of class because its proposed damages model was inadequate to show damages on a class-wide basis).

USF is a formidable defendant, represented by some of the most able and well-resourced law firms in the world; it would doubtless continue to vigorously defend itself in this case were it to continue.  Plaintiffs face a serious risk that the ultimate trier-of-fact might be persuaded by USF's defenses, and therefore, this factor supports approval of the Settlements.

### e)        Risks of Maintaining the Class Action Through Trial

The next *Grinnell* factor requires the Court to consider the risks that Plaintiffs would not be able to maintain class action status through trial.  The parties litigated class certification for five years until the Supreme Court denied certiorari on April 28, 2014.  Even though this Court's certification decision was ultimately left intact, USF tried mightily to have it overturned, and, throughout the interlocutory appeal, USF maintained that if it failed to have certification reversed, it would file for decertification prior to summary judgment.  In *Charron*, 731 F.3d at 249, the Second Circuit found that:

> Given defendants' repeated statements that they will immediately move for decertification if the settlement is rejected, the large size of the class, the complicated and diverse claims asserted by plaintiffs, and the heightened legal uncertainty necessarily injected by significant recent Supreme Court authority relevant to the propriety of class certification, however, we cannot find that the district court abused its discretion in finding that the class faced significant risks of decertification, that decertification would drastically reduce the chances of any member of the class achieving meaningful relief, and that the litigation risks attendant to these possibilities weighed heavily in favor of the fairness of a settlement under which plaintiffs achieved substantial benefits that (as in any settlement) fell short of what they might have hoped to achieve.

Here, as in *Charron*, the class risks decertification from an additional motion by USF, changes in class action jurisprudence by the Supreme Court, its large size, and the complex nature of its RICO claims and damages proof.

Although Class Counsel view as minimal the risk that USF would ever succeed in decertifying the class entirely, there is a chance that USF could use information gained in discovery to argue in a decertification motion that the class should be partially decertified or modified.  The Settlement between the parties ensures that the class as certified by this Court will receive prompt monetary recovery, and eliminates the risk that a later development could cause decertification, even if only partial decertification, with little or no recovery to those portions of the class that are decertified.

**f)      The Stage of the Proceedings and the Amount of Discovery Completed**

Under this *Grinnell* factor, the Court should consider the stage of the proceedings and the amount of discovery completed to determine "whether the parties ha[ve] adequate information about their claims." *See In re Global Crossing*, 225 F.R.D. at 458.  Settlement agreements reached before class certification should receive "additional scrutiny,"  but where, as here, settlements are reached after a class was certified, extra scrutiny is not required. *See D'Amato* 236 F.3d at 85; *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 240 n. 6 (E.D.N.Y. 2010).  This factor does not require "that the parties have engaged in extensive discovery ... Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make an appraisal of the Settlement."  *In re Sturm, Ruger, & Co.*, 2012 WL 3589610, at *5. (citation omitted).

Here, the parties have in fact engaged in extensive and wide ranging discovery since 2007.  At this point, Plaintiffs have issued four rounds of discovery requests, served dozens of

20

third-party subpoenas for documents and depositions, taken dozens of depositions, conducted many informal interviews, collected many informal productions of documents, reviewed millions of pages of electronic and hard-copy documents, analyzed billions of lines of data, hired and consulted with data and accounting experts, and responded to USF's discovery requests to Plaintiffs. [Decl. ¶¶ 30-77.] All parties are more than sufficiently apprised of the facts to evaluate the Settlements' terms, and have presented many of the facts to the Court in numerous filings and motions. *See, e.g.* USF's Motion to Dismiss [Dkt. 53]; Plaintiffs Motion for Class Certification [Dkt. 216]. This factor weighs in favor of approval, as there is no risk that the parties lack the information necessary to evaluate the viability of the claims, estimate potential damages, and assess the quality of the Settlements' terms.

### g)     The Ability of the Defendants to Withstand Greater Judgment

The final *Grinnell* factor the Court must consider asks whether the Defendants could withstand a larger judgment. This factor does not require the defendant "to empty its coffers before a settlement can be found adequate."[12] Instead, it is often used to justify the approval of small settlements where a defendant is bankrupt, or nearly so.[13] In cases where defendants are able to withstand larger judgments, or the parties fail to provide the court with sufficient information to make a determination, the factor has been found not to weigh against approval, but rather is neutral.[14]

---

[12] *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008) (internal quotation marks and citation omitted).

[13] *O'Connor v. AR Res., Inc.*, 2012 WL 12743 (D. Conn. Jan. 4, 2012) (approving small settlement where Defendant had negative net worth); *Hertzberg v. Asia Pulp & Paper Co.*, 197 F. App'x 38, 41 (2d Cir. 2006) (finding that the settlement was reasonable because Defendant was judgment-proof and Plaintiffs would not be able to collect a higher judgment even if won at trial).

[14] *Kiefer v. Moran Foods, LLC*, 2014 WL 3882504 (D. Conn. Aug. 5, 2014); *In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *5.

Here, there is no need to justify any paucity in the USF Settlement.  The $297 million fund established by the USF Settlement is one of the largest RICO settlements ever obtained, and as explained in Section II(A)(1)(b) above, will provide a significant recovery to claimants.

The Redgate Settlement does not provide monetary recovery to the class, but Mr. Redgate's cooperation throughout the litigation provided information and assistance to Plaintiffs in pursuing the claims.  This cooperation, in part, contributed to Plaintiffs ability to negotiate the USF Settlement and the substantial recovery obtained therein.   Mr. Redgate's provision of information was much more valuable than any money he might have paid the class, as he is an individual defendant and would not have been able to come close to providing adequate monetary compensation to Plaintiffs for their losses.

**2.      The Settlement Is Presumptively Fair Because it is the Product of Informed Arm's Length Negotiations**

To evaluate the procedural fairness of a settlement, the Court looks to the negotiations between the parties and can presume "fairness, adequacy, and reasonableness" when a class settlement is reached "in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal–Mart Stores, Inc.,* 396 F.3d at 116.

As outlined in Section III, the parties have been litigating this case since 2006 and have taken extensive discovery.  Plaintiffs and Defendants are represented by "experienced, capable counsel."   Plaintiffs are represented by multiple law firms with experience in class action litigation.  Defendant USF is represented by both White & Case LLP and Quinn Emanuel Urquhart & Sullivan, LLP, two of the largest and most prominent litigation firms in the country. Defendant Gordon Redgate is represented by sophisticated counsel familiar with Mr. Redgate's business and the claims at issue.  The Settlements reached this spring were the result of compromises reached between experienced counsel after many years of contentious litigation.

B.       The Plan of Allocation is Fair, Reasonable, and Adequate

To approve the allocation plan, the court must find it fair, reasonable, and adequate.  *See Maley v. Del Global Techs Corp.,* 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) .  To decide if the plan is fair, "courts look primarily to the opinion of counsel. That is, as a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *Chavarria v. N. Y. Airport Serv., LLC,* 2012 WL 2394797, at *8 (E.D.N.Y. June 25, 2012) (internal quotes and citations omitted). "Courts also consider the reaction of the class to a plan of allocation." *Id.*

The proposed allocation plan anticipates distribution of all of the settlement funds directly to the class members, less expenses, attorney's fees, and incentive payments awarded by the Court. The fund will be divided pro rata to each claimant that files a valid claim.  The pro rata distribution will be calculated by comparing the claimant's purchases of relevant products to the total amount of purchases of relevant products by all claimants submitting valid claims. Thus, each claimant will receive a proportion of the settlement fund equal to its portion of the relevant purchases validly claimed.   Each potential claimant that appeared in USF's data was mailed a post-card with a unique claim ID and PIN.   Upon visiting the class website, www.usfoodservicepricinglitigation.com, claimants can enter the ID and PIN, and a claim amount auto-populates based on calculations from USF's purchase data for the years 2002-2005.  The claim amount shown is calculated by summing all of the claimant's purchases from USF under a cost-plus contract where a VASP invoice was used to calculate the cost to the claimant.  Because USF purchase data is not available for the years 1998-2001, the website asks that the claimant enter the number of months during that period it made purchases from USF. The website then multiplies that number by the claimant's average monthly purchases from USF

that used a VASP transaction to calculate the invoice price under a cost-plus contract where a VASP invoice was used to calculate the cost to the claimant.  The claimant can either accept the calculated amounts or may enter its own amount and provide supporting documentation. Murray Dec. ¶ 12.

Class Counsel has developed an allocation plan that is fair, reasonable, and adequate. First, it anticipates distributing the entire distributable portion of the settlement fund to claimants, rather than having any amount revert to defendants or a *cy pres* fund.   As such, class members receive the maximum possible recovery under the terms of the settlement agreement. Second, the claims process is incredibly "user-friendly" and based on empirical USF sales data. Thus, the purchase amounts claimed are verifiable, and do not require the class members to locate decades-old documentation of their claims.  Third, distribution pro rata ensures that each class member receives a fair proportion of the settlement and allows for the entire distributable portion of the settlement fund to be distributed to the class without a remainder.

### C.    Class Notice Complied with the Preliminary Approval Order and Satisfied Due Process Requirements

Federal Rule 23(c)(2)(B) defines notice requirements and instructs that the Court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; and (vi) the binding effect of a class judgment on members under Rule 23(c)(3).

Again, "the standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *See Soberal–Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983); Fed. R. Civ. P. 23(e). "There are no rigid rules for determining whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and is "adequate if it may be understood by the average class member." *Charron*, 874 F. Supp. 2d at 191 (internal citations omitted).

As set forth herein and in the attached Declaration of Ross Murray, Class Counsel has disseminated class notice in full compliance with the Court's July 14, 2014 Preliminary Approval Orders, due process, and Rule 23(c)(2)(B).

On or before August 11, 2014, Gilardi sent postcards containing a Short-Form Notice via first class U.S. mail, postage prepaid, to 198,804 unique names and billing addresses of potential class members provided by USF. *See* Murray Decl. ¶¶ 3-4; *see also* Fed. R. Civ. P. 23(c)(2)(B) (requiring "individual notice to all members who can be identified through reasonable effort"). The Short-Form Notice is attached as Exhibit A to the Murray Declaration.  The Short-Form Notice complies fully with Rule 23(c)(2)(B), because it expressly sets forth: (i) the nature of the action; (ii) the definition of the class; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).  *See also Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-12 (1985) (due process

mandates that class notice "describe the action and the plaintiffs' rights in it," and afford an absent plaintiff "an opportunity to remove himself from the class").

Also on August 11, 2014, Gilardi launched a class website (www.usfoodservicepricing litigation.com), where visitors can download copies of the proposed class settlement agreements, the short- and long-form class notices, the case docket, and other relevant court documents. *See* Murray Decl. ¶ 5. Visitors can request that additional documents from the docket be posted on the class website, and Gilardi has updated the list of documents when new documents were either requested by potential class members or filed with the Court. *Id.* The class website also contains a description of the case, a "Frequently Asked Questions" page, contact information for Gilardi, and an electronic claims form through which potential class members can file generic claims, or can file personalized claims using the ID and PIN provided on their Short-Form Notice. *Id.*

In addition, on August 11, 2014, Gilardi launched a toll-free telephone support center through which potential class members can ask questions about the class settlement, speak with live customer service representatives, and request hard copies of relevant settlement papers and other court documents. Murray Decl. ¶ 6. The class website and telephone support center have been and will be maintained until final disposition of this matter.

Gilardi published the text of the Short-Form Notice in *The Wall Street Journal* on August 18, 2014, and ran banner advertisements linking to the class website on the following host websites from August 13, 2014, to September 12, 2014: www.foodservicecentral.com, www.nrn.com, and www.hhnmag.com. *See* Murray Decl. ¶¶ 7-8. The tear sheet provided by *The Wall Street Journal*, as well as screen shots of the banner advertisements, are attached as Exhibits B and C, respectively, to the Murray Declaration.

In its July 14, 2014 Orders, the Court preliminarily held that the form of the proposed class notices and the manner in which Plaintiffs planned to disseminate such notices constituted "the best means practicable under the circumstances to provide timely and sufficient notice of the settlement to all persons entitled thereto."  *See* [Dkt. No. 508, at 2; Dkt. No. 509, at 2.]  As set forth herein and in the attached Murray Declaration, Class Counsel and Gilardi have complied precisely with the forms and procedures set forth in the Court's Orders, and in so doing have satisfied due process and the class notice requirements of Rule 23(c)(2)(B).

## IV.    CONCLUSION

After many years of painstaking and hard-fought litigation, all parties have reached an accord that provides ample compensation to the class for its alleged damages.  The class is satisfied with the terms, as demonstrated by the lack of even a single objection to the Settlement from any of the nearly two hundred thousand potential class members, and the *Grinnell* factors weigh in favor of approval.  For these and all of the foregoing reasons, Plaintiffs respectfully request that the Court approve the Settlements.

Dated: October 26, 2014

Respectfully,

By: <u>/s/ Richard L. Wyatt, Jr.</u>

**HUNTON & WILLIAMS LLP**
Richard L. Wyatt, Jr.
Todd M. Stenerson
Torsten M. Kracht
Ryan P. Phair
2200 Pennsylvania Ave. NW
Washington, D.C. 20037
(202) 955-1500

**WHATLEY KALLAS, LLP**
Edith M. Kallas
Joe R. Whatley, Jr.
Ilze C. Thielmann
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
(212) 447-7070


**DRUBNER, HARTLEY & HELLMAN, L.L.C.**
James E. Hartley, Jr.
Federal Bar No. ct 08275
500 Chase Parkway
Waterbury, CT 06708
(203) 753-9291

**AKIN GUMP STRAUSS HAUER & FELD LLP**
R. Laurence Macon
300 Convent Street, Suite 1600
San Antonio, Texas 78205
(210) 281-7000